FILED

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

2009 FEB -3 A 8: 20

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

| | |
|---|---|
| E. I. du Pont de Nemours and Company )<br><br>    Plaintiff, )<br><br>v. )<br><br>Kolon Industries, Inc. )<br>Serve: 10th Fl. Kolon Tower )<br>    1-23 Beyoryang-dong, )<br>    Gwacheon-si )<br>    Gyeonggi-do, KOREA )<br><br>    Defendant, )<br><br>and )<br><br>Kolon USA, Inc. )<br>Serve: 3 Sperry Road )<br>    Fairfield, N.J. 07004 )<br><br>    Defendant. )| Civil Action No. 3:09 cv 58<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

The Plaintiff, E. I. du Pont de Nemours and Company ("DuPont" or "the Company"), for

its Complaint states as follows:

### NATURE OF CLAIM

1.      Kolon Industries, Inc. and Kolon USA, Inc. (collectively "Defendants") have

engaged in concerted and persistent actions to wrongfully obtain DuPont's trade secrets and

confidential information about the Company's KEVLAR® aramid fiber. Despite being fully

aware of the highly confidential and proprietary nature of DuPont's KEVLAR® aramid fiber

manufacturing process, Defendants have attempted to obtain and use DuPont's confidential

information to improve their own products and processes. Defendants have hired and attempted

to hire former DuPont employees for the express purpose of obtaining DuPont's KEVLAR® aramid fiber trade secrets. Defendants have gone so far as to engage in negotiations involving cash payments in exchange for information relating to specific aspects of DuPont's KEVLAR® aramid fiber manufacturing process, and, knowing the wrongful nature of their actions, have emphasized the need to maintain secrecy in these negotiations. Moreover, Defendants have sought and received such highly confidential information through DuPont's former employee, Mr. Michael Mitchell ("Mitchell") and Mitchell's business, Aramid Fiber Systems, LLC ("Aramid Fiber Systems"). Defendants' attempts to bypass legitimate research and development, and to use DuPont's confidential information and trade secrets to improve their own production processes, is wrongful, and DuPont seeks relief from this Court to address Defendants' actions.

## THE PARTIES

2.      DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont has a business office in Richmond, Virginia. Among other things, DuPont designs, manufactures, and sells complex science-based materials for customers worldwide. Among these materials is KEVLAR® para-aramid fiber, an innovative high strength fiber used in ballistics applications and protective apparel by the military and law enforcement and used to strengthen various items such as automotive and industrial products. DuPont protects certain information relating to its KEVLAR® aramid fiber products as trade secrets. Such trade secret information includes, but is not limited to: (i) the chemical compositions of different varieties of the material; (ii) the processes of producing the material; and (iii) confidential sales and marketing information, including pricing information, customer lists and prospective customer contact information, and customer requirement information.

2

3.    DuPont hired Mitchell, a resident of Virginia, in 1982. A chemical engineer by education, Mitchell was, for the first nine years, employed in a technical capacity. He later transitioned out of the technical work and into sales of KEVLAR® aramid fiber product. In February 2006, Mitchell's employment with DuPont terminated. Mitchell is now President of Aramid Fiber Systems, LLC, which is a Virginia limited liability corporation having a principal place of business at 9300 Owl Trace Court, Chesterfield, Virginia.

4.    Defendant Kolon Industries, Inc. ("Kolon Industries" or "Kolon") is a South Korean company which produces and markets a competing aramid fiber product. Kolon transacts business in the United States, including the Commonwealth of Virginia. For over ten years, Kolon unsuccessfully attempted to efficiently and effectively produce market-acceptable aramid fiber. Over the last three years, however, Kolon's product offering has shown marked improvement in tensile properties, a key measure of quality.

5.    Defendant Kolon USA, Inc. ("Kolon USA") is a subsidiary of Kolon Industries, Inc., and has an office located at 3 Sperry Road, Fairfield, New Jersey 07004.

6.    Kolon Industries and Kolon USA communicated with Mitchell and others regarding Kolon's existing knowledge of DuPont's trade secrets, and its ongoing efforts to obtain additional DuPont trade secret information.

**JURISDICTION AND VENUE**

7.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 because DuPont is a citizen of Delaware, and Kolon USA and Kolon Industries are citizens of foreign states. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Kolon Industries and Kolon USA because they transact business in the Commonwealth of Virginia, contract to supply services or things in the Commonwealth of Virginia, caused tortious injury by an act or omission in the Commonwealth of Virginia, and pursuant to Va. Code § 8.01-328.1, the exercise of personal jurisdiction over Kolon is consistent with due process.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events in this matter occurred in this district.

## FACTS

### DuPont's Business and Its Confidential Information

10.     DuPont, through its location in Richmond, Virginia, manufactures, markets, and sells KEVLAR® aramid products. KEVLAR® is a DuPont registered trademark for its brand of para-aramid fiber, which uniquely combines high strength with light weight, and comfort with protection. KEVLAR® is five times stronger than steel on an equal weight basis, and is used in such products as bullet-resistant vests, helmets, automotive hoses and gaskets, and tires. After more than 40 years of research and refinement and at significant expense, DuPont has developed the technology, machinery, and processes whereby it can produce the highest quality of aramid fiber more quickly and efficiently than any other manufacturer. This information derives independent economic value and gives DuPont a competitive advantage because it is not generally known in the industry.

11.     Manufacturing aramid fiber products is a highly complex and technical process. As a result, there are very few companies in the world who can manufacture a marketable aramid fiber product with market-acceptable properties (such as tensile strength), while maintaining

4

sufficient production speeds and efficiency. The knowledge DuPont has developed for its

product is highly technical and specialized, and is the result of extensive research, development,

trial and error over more than forty (40) years. Such information includes exact combinations of

processes needed to produce KEVLAR® aramid products, the specific configuration and design

of the machinery, the method in which KEVLAR® aramid fiber is woven, and proprietary uses

and applications for the fiber. Furthermore, DuPont is able to adapt and modify its processes to

specifically address the needs of its individual customers. The Company's information about

KEVLAR® aramid products is confidential, proprietary and constitutes trade secrets within the

meaning of Virginia's Uniform Trade Secrets Act. Certain aspects of the KEVLAR® process

and technology are so confidential and sensitive that they are subject to United States export

control restrictions. Moreover, by virtue of the complexity of the process, and DuPont's rigorous

protection of its proprietary information, the confidential nature of such information is well-

known in the industry.

13.     DuPont takes reasonable measures to protect its trade secrets and confidential

information. Among other things, DuPont requires certain employees to sign a confidentiality

agreement, an example of which ("the Agreement") is attached as Exhibit 1. The Agreement

defines the Company's confidential information as "commercially valuable technical and non-

technical information."

13.     By signing the Agreement, employees promise that they will not:

> ...disclose or use at any time either during or subsequent to said employment, any
> secret or confidential information of Employer of which Employee becomes
> informed during said employment, whether or not developed by Employee, except
> as required in Employee's duties to Employer.

Id.

14. By signing the Agreement, employees further promise that, upon termination of employment, they will:

> ...deliver to Employer all drawings, blueprints, manuals, letters, notes, notebooks, reports, and all other materials of a secret or confidential nature relating to Employer's business and which are in the possession or under the control of Employee.

Id.

15. On June 28, 1982, Mitchell signed the Agreement. That Agreement is a valid, enforceable, and binding contract.

16. In order to reinforce the requirement to maintain the confidentiality of certain information, DuPont also periodically trains its employees regarding proper procedures and limitations on distribution.

17. Upon termination of employment, DuPont also asks appropriate employees to execute an Employment Termination Statement ("the Statement"), a copy of which is attached as Exhibit 2. By signing this Statement, employees explicitly acknowledge and promise the following:

> I have returned to E. I. DuPont de Nemours and Company all drawings, blueprints, samples, manuals, letters, notes, textbooks, reports and all other materials which either belong to DuPont or are of a secret or confidential nature relating to said Company's business which were in my possession or under my control.

18. By signing the Statement, employees further agree "not to use or divulge at any time any secret or confidential information of said Company, without Company's consent." Id.

19. On February 6, 2006, Mitchell signed his Employment Termination Statement. The Employment Termination Statement is a valid, enforceable, and binding contract.

6

20.     DuPont has also implemented policies requiring certain documents and other materials to be designated as confidential or proprietary, or otherwise identified with varying degrees of control, to reflect that they contain information which should not be disclosed to individuals without a need to have access to such information.

21.     To further maintain the confidentiality of its information about KEVLAR® aramid fiber products, DuPont subjects the information to other reasonable protective measures, including formidable physical security at its facilities.  For example, all employees are required to obtain, maintain, and display access badges to enter all areas of the site.  Furthermore, all visitors are screened at a central reception area and must provide photo identification before being escorted into the facility.  DuPont also maintains security cameras and internal controls requiring supervisory approval for the removal of physical property from the site.  These physical measures, to name a few, are in place to protect the Company's investment in its confidential and trade secrets information.

22.     In addition to these physical security measures, DuPont also implements significant computer network security.  DuPont allows only authorized persons to have access to confidential information stored on computers, and therefore provides its employees with secure passwords and digital "e-passes."  DuPont provided Mitchell with such secure passwords and a digital "e-pass."

### Mitchell's Employment with DuPont

23.     Through the course of his lengthy employment with DuPont, Mitchell developed an in-depth knowledge of the Company's KEVLAR® products.  Mitchell had access to and used

7

much of the Company's most sensitive confidential and trade secret information about KEVLAR® aramid products.

24.    In fact, in his several positions at DuPont working with KEVLAR® aramid products, Mitchell had access to confidential and trade secret information regarding the manufacture, marketing, and sale of KEVLAR® aramid fiber, from its component parts and properties, to the machinery settings used to meet the needs of individual customers. This information included both technical information about KEVLAR® aramid fiber, such as the specific process by which it is manufactured and its chemical properties, including the chemical composition of polymerization mixtures, spinning dopes, coagulation baths and surface treating agents, and information about the Company's pricing, applications, marketing strategies, and profit margins for KEVLAR® aramid products, and about customer needs and applications for the products.

25.    Effective February 6, 2006, Mitchell's employment with DuPont ended. Within a few weeks of his separation from DuPont, Mitchell was invited to meet with the President of Kolon USA in New York, to discuss the possibility of his assisting Kolon with the development and sales of Kolon Industries' aramid fiber product, which competes with DuPont's products. Mitchell did in fact meet with Kolon USA's President for approximately half a day in New York.

26.    Approximately two weeks after this meeting, Mitchell was contacted by telephone by Mr. Insik Han, who, upon information and belief, was a high level technical manager with Kolon Industries in Korea. During this call, Mr. Han asked about Mitchell's background and positions held at DuPont. He also asked a number of highly technical questions about Mitchell's knowledge of DuPont's aramid fiber manufacturing process.

8

27.     In the Spring of 2007, Kolon again contacted Mitchell, and indicated that Kolon wanted to penetrate the U.S. aramid fiber market.  Kolon asked Mitchell if he was available to consult with Kolon and assist them with their product development and marketing.  Kolon, through two of its managers, Mr. Park and Mr. Seo, subsequently engaged in several telephone conversations with Mitchell, in which they continued to discuss Mitchell's knowledge of DuPont's aramid fiber manufacturing process.

28.     Mr. Park invited Mitchell to visit Korea to continue their discussions in person. In anticipation of this trip, Mitchell assembled a presentation about the U.S. aramid fiber marketplace, including a description of customers, applications, estimates of volume used in each of the industries, and pricing.  Upon information and belief, the presentation was not technical in nature, but instead focused on sales and marketing issues.

29.     Within a few weeks, Mitchell traveled to Korea to meet with Kolon.  The meeting spanned two days.  Although the first day of the meeting did address some sales and marketing topics, the second day was spent entirely on technical issues.  Mr. Han participated in this meeting, as did other aramid fiber engineers at Kolon.  The engineers indicated that, although Kolon had an aramid fiber manufacturing facility, it was encountering quality and other problems with its manufacturing process, and the engineers were unsure of how to solve these problems.  Although the engineers knew or should have known that information about DuPont's aramid fiber manufacturing process was extremely confidential and proprietary, they nevertheless asked Mitchell many specific questions about DuPont's technology, and specifically about DuPont's method of operation in certain aspects of the aramid fiber process.

30.     After Mitchell returned from Korea, Kolon negotiated with him over several weeks, and ultimately engaged him to sell and market its aramid fiber product in the United States. To perform these services, Mitchell formed Aramid Fiber Systems, LLC, a Virginia corporation, which contracted directly with Kolon. In so engaging Mitchell and his company, Kolon contracted to have him perform services that were nearly identical to those services performed by Mitchell when he worked for DuPont, but which were in direct competition with DuPont. At all relevant times, Mitchell and Aramid Fiber Systems acted as agents of Kolon, and had both actual and apparent authority to engage in the activities described herein on behalf of Kolon.

### Kolon's Actual and Threatened Misappropriation of DuPont's Trade Secrets

31.     After entering into a contractual relationship with him, Kolon continued to press Mitchell for technical information regarding DuPont's aramid fiber manufacturing process.

32.     In August 2007, Kolon called Mitchell to Korea a second time. This time the meeting occurred at Kolon's aramid fiber plant, and again involved another meeting with Kolon's technical engineers. Again, Kolon's engineers asked Mitchell very detailed questions about DuPont's manufacturing technology and process. Upon information and belief, the inquiries regarding DuPont's process related directly to Kolon's need to improve its own process and to address the quality and other problems they were experiencing. During the meeting, for example, one engineer drew a schematic on a board indicating that it reflected Kolon's process; the engineer then asked, "How can we do it better? How does DuPont do it?" or words to that effect. These Kolon employees knew or should have known that their questions would elicit information that consisted of highly protected and confidential DuPont trade secrets, and that such information could only be obtained through improper means. Upon information and belief,

Mitchell's responses to Kolon's questions did in fact include information which constituted DuPont confidential, proprietary and trade secret information.

33.     After the meeting in the summer of 2007, Kolon continued their efforts to obtain confidential DuPont technical and manufacturing information from Mitchell. Through September of 2007, Mr. Park was Mitchell's primary contact, and was the primary source of the questions from Kolon. After September, Mr. Ju Wan Kim became Mitchell's primary contact, and continued to ask Mitchell similar questions about DuPont's confidential processes. The questions were both verbal and via electronic mail. For example, Mr. Kim asked Mitchell in one document to identify DuPont's "key properties of polymers *in specific numbers*" (emphasis added) and to explain "How polymer, spinneret spec[ifications] and Q-Jet condition[s] are changed to produce high tenacity filament?" Further, Mr. Kim asked Mitchell for information "about R&D *in detail*." (Emphasis added). Such questions go to the heart of DuPont's aramid fiber manufacturing process, and Mr. Kim knew or should have known that the answers to such questions would require the disclosure of DuPont trade secrets. Nevertheless, Kolon continued to ask these questions at least as often as every three to four weeks, during regular weekly conference calls with Mitchell, and through electronic mail.

34.     Kolon was in fact successful in extracting DuPont trade secrets from Mitchell. Contrary to his assurances to DuPont in the Employment Termination Statement, Mitchell had retained certain highly confidential information on his home computer after his separation from DuPont, including, but not limited to, information about the Company's production of aramid fiber products, including details regarding production speeds, machine spinning speeds and parameters, chemical ingredient costs and DuPont's overall aramid fiber production capacity. Kolon obtained electronic copies of this data, through Mitchell, as a direct result of the

11

continuing and persistent inquiries described above. Upon information and belief, Mitchell transmitted this information to Mr. Kim and/or others at Kolon, so that Kolon could use it to improve its own aramid fiber production process. Kolon knew or should have known that this information constituted DuPont trade secrets.

35.     Kolon, through Mitchell, also used DuPont's confidential information and trade secrets to compete with DuPont.

36.     Upon information and belief, Kolon has used DuPont's confidential information and trade secrets to improve its process for producing aramid fiber, with a resulting increase in range of products, production and quality. Upon further information and belief, Kolon has benefited from the sale of its products, which are derived from DuPont's trade secrets and confidential information.

37.     On behalf of Kolon, Mitchell has also made representations to DuPont customers referring to his knowledge and use of DuPont's trade secrets. For example, in making presentations to customers regarding the properties of Kolon's products, Mitchell stated that the charts he was using during the presentation were "the same as my old ones but with the names changed," or words to that effect. Finally, with regard to DuPont's pricing of its products, and in an attempt to compete with those products, Mitchell has stated to DuPont customers that he "knows what the [DuPont] rebates are because I offered them," or words to that effect. DuPont learned of Kolon's relationship with Mitchell, and its misappropriation of DuPont information, only after Mitchell began calling on DuPont customers and making such statements.

38.     Kolon has thus attempted to obtain and has obtained DuPont's trade secrets related to KEVLAR® aramid fiber through the actions of its employees and through its agent,

12

Mitchell. For example, upon information and belief, Kolon directed Mitchell to misappropriate and transmit to Kolon DuPont's confidential and proprietary process technology relating to the production, processing, manufacturing costs, and denier aspects of DuPont's KEVLAR® aramid fiber. Additionally, upon information and belief, Kolon has also misappropriated confidential and proprietary DuPont process technology relating to the specifications involving impurities which influence the molecular weight of the KEVLAR® polymer.

39.     Upon further information and belief, the Purchasing Manager at one of DuPont's customers visited a Kolon facility in Korea in or around June or July of 2008 and met with Kolon's management. These Kolon managers told DuPont's customer that Kolon had recently made dramatic improvements in their technology through the help of a former DuPont employee, and that based on that information, Kolon expected to more than triple its production capacity by the end of 2010.

40.     Upon information and belief, Kolon has misappropriated DuPont's proprietary information and trade secrets, and has used such information to improve its own aramid fiber production process. These wrongful actions have enabled Kolon to increase the range, production rate, and quality of its products in a timeframe that would not have been achievable without the use of DuPont's confidential information. With DuPont's confidential information, Kolon has been and will continue to be able to avoid the significant research and development efforts to develop its KEVLAR® aramid fiber products in which DuPont has engaged over the last 40 years.

41.     Kolon's actions were willful, malicious and intended to injure DuPont and its business.

42.    DuPont will suffer irreparable harm as a result of Kolon's unlawful conduct and disclosure, misappropriation and continued threatened misappropriation of the Company's confidential information and trade secrets. Kolon's activities will result in a substantial loss of business for DuPont, now and over a period of time.

### Kolon's Attempts to Recruit Other DuPont Employees

43.    While seeking and obtaining DuPont's trade secrets as described above, Kolon has also made a concerted effort to recruit other current and former DuPont employees who possess information about its aramid fiber manufacturing process.

44.    For example, upon information and belief, Kolon engaged a recruiter to seek out current and former DuPont employees with knowledge of, and experience with, the Company's confidential and trade secrets information related to KEVLAR® aramid fiber.

45.    One such recruiting effort conducted, upon information and belief, on Kolon's behalf, even specifically identifies DuPont experience as highly desirable:

> The Client wishes to recruit key talents (who have rich and solid proven track records of success in engineering, R&D and even hopefully coupled with hands-on commercial and marketing experience) **from globally renowned leading companies such as DuPont**, Teijin and so forth.

(Emphasis added).

46.    Furthermore, in late 2007, Kolon instructed Mitchell to locate a technical consultant who could further assist Kolon in solving its manufacturing problems. Mitchell thereafter began contacting current and former DuPont employees and consultants for this role. At least one of the individuals Mitchell contacted indicated that he could not perform such a consulting role for Kolon without divulging confidential DuPont information. Nevertheless,

14

Kolon, through Mitchell's efforts, continued to seek a DuPont employee or consultant to assist Kolon.

47.     Through Mitchell, Kolon engaged in negotiations with one former high level technical DuPont employee, even to the point of discussing specific prices for certain categories of highly proprietary information relating to DuPont's process. Specifically, through a series of electronic mail messages and telephone calls, Kolon and Mitchell outlined the entire aramid fiber manufacturing process, and then discussed specific dollar values for each part of that process. Kolon indicated to Mitchell that it was willing to pay for the first segment of information about the process, and would then evaluate that information and decide how much to pay for the other segments. Kolon knew or should have known that such information was highly confidential and proprietary, and that it could not be obtained through any legitimate means.

48.     In addition, Kolon sent representatives to the United States for a secret meeting with one current DuPont employee that Kolon, through Mitchell, was attempting to recruit. On August 6, 2008, three representatives from Kolon, Mr. Seo, Mr. Kim, and Mr. Rho, travelled to Richmond, Virginia to meet with Mitchell and the DuPont employee. Upon information and belief, the purpose of the meeting was to evaluate the level of technical DuPont knowledge possessed by this DuPont employee.

49.     During the meeting, the DuPont employee raised the issue of whether the questions being asked by the Kolon executives required disclosure of DuPont's trade secrets. In response, Mr. Seo acknowledged that this was a potential issue, and stated that any meetings between the DuPont employee and Kolon would need to be *kept secret* (emphasis added). Mr. Seo further stated that he did not want anything in writing, but instead wanted all future

communication to be verbal. If anything did need to be in writing, Mr. Seo stated that it should be passed to Mitchell, who would, in turn, relay it to and from Kolon's engineers.

50.     Also during this meeting, the Kolon representatives showed the DuPont employee a drawing of certain aspects of the Kolon manufacturing facility, and stated that it "should be familiar to him." Upon information and belief, the Kolon representatives then asked the DuPont employee about the kinds of information he might be able to provide regarding DuPont's aramid fiber manufacturing process.

51.     Kolon's agents knew that the information they sought was proprietary and confidential, and that their efforts to obtain such information were improper. For this very reason, and to conceal their efforts from DuPont and others, the Kolon agents stated that their activities should be kept secret.

52.     DuPont does not have an adequate remedy at law to address Defendants' flagrant actual and threatened misappropriation of its trade secrets.

## COUNT ONE

### MISAPPROPRIATION OF TRADE SECRETS (against all Defendants)

53.     DuPont hereby incorporates by reference the allegations contained in paragraphs 1 through 52 of the Complaint as if fully set forth herein.

54.     Defendants sought and misappropriated the Company's confidential and proprietary information, including detailed information as to how KEVLAR® aramid fiber product is manufactured, marketed, and sold. This information is protectible as a trade secret, in that DuPont derives independent economic value from the information not being generally

16

known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from the information's disclosure or use. Furthermore, the information is protectible as a trade secret in that DuPont made efforts to protect the information that are reasonable under the circumstances.

55.     Defendants misappropriated DuPont's trade secret information by entering into an agreement with Mitchell which called for him to obtain the information, and by using the information misappropriated from DuPont, through Mitchell, to manufacture and market Kolon's improperly derived product. Defendants' improper use of the trade secrets constitutes misappropriation in that at the time of disclosure or use, Kolon and Kolon USA knew or had reason to know that the trade secret information was acquired under circumstances giving rise to a duty to maintain its secrecy and in disregard for Mitchell's duty to DuPont to maintain the secrecy of the information. Specifically, Kolon has obtained from Mitchell specific information about the costs, manufacturing data, processes and production capabilities of DuPont's KEVLAR® aramid fiber business. This information possesses independent economic value from not being generally known in the industry, and is subject to reasonable efforts to maintain its confidentiality.

56.     DuPont will suffer actual losses as a result of Kolon's misappropriation of trade secrets in that Kolon has offered and is offering an improperly derived competing product, thus causing DuPont to lose sales.

57.     In addition, Kolon has been, and will continue to be, unjustly enriched in that it saved considerable time and expenses in developing its competing product because Kolon improperly used the misappropriated information, and because Kolon has been able to offer a

17

competing product of improved quality earlier than they would have otherwise had Kolon's competing product been developed without improperly acquired information.

58.     Kolon's misappropriation was willful and malicious, thus entitling DuPont to punitive damages pursuant to Va. Code § 59.1-338(B) and attorneys' fees pursuant to Va. Code § 59.1-338.1.

## COUNT TWO

### CONSPIRACY TO INJURE ANOTHER IN TRADE, BUSINESS, REPUTATION (against all Defendants)

59.     DuPont hereby incorporates by reference the allegations contained in Paragraphs 1 through 58 of the Complaint as if fully set forth herein.

60.     By the conduct described herein, Defendants have combined and conspired with each other, and attempted to procure the participation, cooperation, agreement or other assistance of one or more persons, for the purpose of willfully and maliciously injuring DuPont's business in violation of Va. Code Ann. § 18.2-499, *et seq*.

61.     This conduct has caused DuPont to suffer damages, including but not limited to, loss of its trade secrets and confidential information, and lost profits, loss of trade, goodwill, business and reputation in the marketplace. This damage was a reasonably foreseeable consequence of the Defendants' conduct.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH A CONTRACT (against all Defendants)

62.     DuPont incorporates by reference the allegations contained in Paragraphs 1 through 61 of the Complaint as if fully set forth herein.

63.   Mitchell executed a valid Employee Agreement with DuPont on June 28, 1982.

64.   Defendants had, or reasonably should have had, knowledge of this Employee Agreement.

65.   Defendants intentionally interfered with the Employee Agreement by inducing Mitchell to disclose confidential, proprietary trade secrets, including how the KEVLAR® aramid fiber product is manufactured, marketed, and sold, in violation of the Employee Agreement.

66.   DuPont has suffered, and will continue to suffer, harm as a result of Defendants' actions.

## COUNT FOUR

### TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY
### (against all Defendants)

67.   DuPont incorporates by reference the allegations contained in Paragraphs 1 through 66 of the Complaint as if fully set forth herein.

68.   DuPont had a business expectancy with each of its aramid fiber customers and potential customers at the time of Mitchell's termination.

69.   Defendants had, or reasonably should have had, knowledge of this business expectancy.

70.   Defendants intentionally interfered with the business expectancy by inducing Mitchell to use his knowledge of DuPont trade secrets to call on DuPont customers and converters on behalf of Kolon in an effort to compete against DuPont's KEVLAR® product.

71.     DuPont has suffered, and will continue to suffer, harm as a result of Kolon's actions.

## COUNT FIVE

## CONVERSION (against all Defendants)

72.     DuPont hereby incorporates by reference the allegations contained in Paragraphs 1 through 71 of the Complaint as if fully set forth herein.

73.     The confidential and trade secret information Kolon, through Mitchell's actions, removed from DuPont's offices and computer networks, belongs to DuPont and DuPont is entitled to immediate possession of such information.

74.     Defendants wrongfully converted DuPont's confidential and trade secrets information when it retained and used DuPont's confidential information.

## COUNT TEN

## CIVIL CONSPIRACY (against all Defendants)

75.     DuPont incorporates by reference the allegations contained in Paragraphs 1 through 74 of the Complaint as if fully set forth herein.

76.     By the conduct described herein, Defendants, as well as other known and unknown individuals or entities, have acted in concert, agreed, associated, mutually undertaken and combined together to accomplish unlawful concerted actions with the purpose of injuring DuPont.

77.     In furtherance of this conspiracy, Defendants, as well as other known and unknown individuals or entities, used improper and unlawful means, including but not limited to

acting in tortious interference of contract and business expectancy, and in violation of the
Virginia Uniform Trade Secrets Act.

78.     Defendants' actions in furtherance of this conspiracy were taken to maliciously
injure DuPont in its trade and profession.

79.     Defendants' actions in furtherance of this conspiracy were taken intentionally,
purposefully and without lawful justification.

80.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff will
suffer irreparable injury, as well as other damages, including lost profits, loss of trade, goodwill,
business and reputation.

81.     In addition, on information and belief, Defendants have unlawfully profited in an
amount to be proven at trial from the unlawful actions described above.

### PRAYER FOR RELIEF

WHEREFORE, DuPont seeks the following relief:

1.      An immediate order preliminarily requiring Kolon and Kolon USA to preserve all
information currently stored on their business computers, including computers employees may
have at their homes, and including any information stored on backup tapes that may relate in any
way to the issues raised in this Complaint;

2.      An immediate order granting DuPont the right to conduct an immediate
inspection of Defendants' business computers (as described above) conducted by reputable
experts in the information technology field. As part of this inspection, DuPont proposes that its
expert be permitted to copy the hard drives of the Defendants' business computers and analyze

21

the hard drives to determine if they presently or ever have contained DuPont trade secrets. As soon as this analysis is complete, counsel for DuPont will promptly report the results of this inspection to the Court. None of the information copied will be used by DuPont, unless permitted by an order of this Court;

      3.    An order preliminarily, then permanently, requiring that Kolon and Kolon USA:

          a.    Return to DuPont all of DuPont's trade secrets and other confidential information including, but not limited to, any information copied from DuPont computers or computer networks and any documents or other DuPont property physically copied or removed from the Company's office by Mitchell or any other former or current DuPont employee;

          b.    Destroy all remaining electronic copies of DuPont's trade secrets and other confidential information (as described above);

          c.    Identify all persons to whom DuPont's trade secrets and other confidential information have been disclosed;

          d.    Refrain from ever using any DuPont trade secrets or confidential information and from ever selling any product based thereon, regardless of whether the trade secret or confidential information is embodied only in a component part of a larger product, or the product is produced through the trade secret or confidential information;

          e.    Destroy any inventory of products embodying or produced by DuPont's trade secret or confidential information;

          f.    Refrain from contacting DuPont's current and former employees; and

g.    Refrain from conducting business with any party who was a DuPont customer or prospective customer before or in February 2006 (the date of Mitchell's termination);

4.    An order requiring Defendants to pay DuPont compensatory damages for the actual losses caused by their misappropriation of DuPont's trade secrets;

5.    An order requiring Defendants to pay to DuPont punitive damages pursuant to Va. Code § 59.1-338(B);

6.    An order requiring Defendants to pay the Company's attorneys' fees pursuant to Va. Code § 59.1-338.1;

7.    An order requiring Defendants to pay to DuPont compensatory, incidental and punitive damages for Kolon's tortious interference with contract;

8.    An order requiring Defendants to pay DuPont compensatory and incidental damages for Defendants' conversion of the Company's property;

9.    An order requiring Defendants to pay to DuPont its damages, including treble damages, and attorneys' fees, pursuant to Va. Code Ann. § 18.2-500;

10.    An order requiring Defendants to pay to DuPont the appropriate pre- and/or post-judgment interest on any award;

11.    An order requiring Defendants to pay to DuPont its costs for bringing this lawsuit; and

12.    Such other and further relief as this Court may consider just and proper.

Plaintiff demands trial by jury.

Dated: February 3, 2009

Respectfully submitted,

*Rodney A. Satterwhite*

Rodney A. Satterwhite (VSB # 32907)
rsatterwhite@mcguirewoods.com
Brian C. Riopelle (VSB # 36454)
briopelle@mcguirewoods.com
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1000
(804) 775-1061 (Fax)

**Counsel for DuPont**