

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

E.I. DUPONT DE NEMOURS AND CO.,

    Plaintiff,

v.                                           Civil Action No. 3:09cv58

KOLON INDUSTRIES, INC., et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on: (1) Kolon Industries, Inc.'s Motion to Dismiss (Docket No. 9); (2) DuPont's Motion to Dismiss Kolon's Counterclaim (Docket No. 27); and (3) the third-party Defendants' Motion to Dismiss Kolon's Third-Party Complaint (Docket No. 30). For the reasons set forth below, Kolon Industries, Inc.'s Motion to Dismiss will be denied, DuPont's Motion to Dismiss Kolon's Counterclaim will be granted, with Kolon afforded leave to amend the Counterclaim, and the third-party Defendants' Motion to Dismiss will be granted.

### BACKGROUND

E.I. du Pont de Nemours and Co. ("DuPont") designs, manufactures, and sells KEVLAR aramid fiber, which is a high-strength fiber used in ballistics applications and

protective apparel. Compl. at ¶ 2. According to the Complaint, "[m]anufacturing aramid fiber is a highly complex and technical process. As a result, there are very few companies in the world who can manufacture a marketable aramid fiber product with market acceptable properties." Compl. at ¶ 11.

As a result of over 40 years of research and development, DuPont has allegedly developed the technology to produce the "highest quality" aramid fiber "more quickly and efficiently than any other manufacturer." See Compl. at ¶¶ 10-11. For over ten years, Kolon Industries, Inc. ("Kolon") has attempted to produce a market-acceptable aramid fiber, but has met with little commercial success. Within the past three years, however, Kolon's product offering has dramatically improved. Compl. at ¶ 4.

Due to its commercially valuable nature, DuPont "subjects the information [relating to KEVLAR] to . . . formidable physical security at its facilities," and it also implements significant computer network security measures. Compl. at ¶ 21. Moreover, DuPont requires all of its employees who have access to this information to sign confidentiality agreements upon their arrival at DuPont. These confidentiality agreements require employees to pledge that they will not "disclose or use at any time

2

either during or subsequent to said employment, any secret or confidential information of Employer of which Employee becomes informed during said employment." Compl. at ¶ 13. Additionally, upon the termination of an employee's tenure at DuPont, DuPont requires all employees to sign an Employee Termination Statement, wherein they agree "not to use or divulge at any time any secret or confidential information of said Company, without Company's consent." Compl. at ¶ 18.

On February 3, 2009, after allegedly discovering that the Defendants had wrongfully obtained DuPont's trade secrets and confidential information, DuPont filed the pending action against Kolon and Kolon USA, Inc.[1] Specifically, DuPont has alleged that Kolon attempted to bypass the difficult research and development phase of designing and learning how to manufacture aramid fiber by enticing certain DuPont employees and consultants to divulge trade secret and confidential information about DuPont's manufacturing process and corporate strategy with respect to KEVLAR aramid fiber. Compl. at ¶¶ 46-50.

---

[1] Kolon USA, Inc. was originally named as a defendant in this action. Pursuant to Fed. R. Civ. P. 41(a)(1)(A), however, DuPont filed a Notice of Voluntary Dismissal Without Prejudice (Docket No. 19), thereby dismissing Kolon USA, Inc. as a party to the action.

In support of this contention, DuPont has alleged that Kolon actively sought the assistance of a former DuPont employee, Michael Mitchell ("Mitchell"), to help with the product development and marketing of aramid fiber.  Compl. at ¶ 27.  While employed by DuPont, "Mitchell had access to confidential and trade secret information regarding the manufacture, marketing, and sale of KEVLAR aramid fiber, from its component parts and properties to the machinery settings used to meet the needs of individual customers." Compl. at ¶ 24.  On February 6, 2006, Mitchell's employment with DuPont ended.

Within a matter of weeks, Mitchell was invited to meet with the President of Kolon USA, Inc. in New York to discuss the possibility of assisting Kolon with the development of Kolon's aramid-fiber product.  Compl. at ¶ 25.  Two weeks after this meeting, Mitchell was contacted by another high-level technical manager with Kolon, and Mitchell was then asked a number of technical questions concerning his knowledge of DuPont's aramid-fiber manufacturing process.  See Compl. at ¶ 26.  After these conversations Mitchell was dispatched to Korea where he met with a number of Kolon officials.  While in Korea, Mitchell was again asked "many specific questions about DuPont's technology, and specifically about DuPont's method of

4

operation in certain areas of the aramid-fiber process."
Compl. at ¶ 29.

After Mitchell returned from Korea, Kolon engaged him
to sell and market its aramid-fiber product in the United
States.   To perform these services, Mitchell formed Aramid
Fiber Systems, LLC, which contracted directly with Kolon to
market aramid fiber in the United States.   Once employed by
Kolon, Mitchell was allegedly pressured by various Kolon
executives to disclose specific details about DuPont's
aramid-fiber technology.   See Compl. ¶¶ 29, 31-34.   This
pressure was successful, and Kolon was able to extract
confidential information and trade secrets from Mitchell
concerning the technical specifications of KEVLAR aramid
fiber.   Compl. at ¶ 34.   This disclosure allegedly occurred
in violation of the confidentiality agreement and the
Employee Termination Statement, both of which were signed
by Mitchell while at DuPont.   See Compl. at ¶¶ 13, 18.

In addition, DuPont alleges that Kolon made a
"concerted effort to recruit other current and former
DuPont employees who possess information about its aramid-
fiber manufacturing process."   Compl. at ¶ 43.   And, Kolon
further instructed Mitchell to recruit a technical
consultant to assist Kolon in solving its manufacturing
issues.   See Compl. at ¶ 46.

Kolon also solicited DuPont's long-standing customers and made certain representations to those customers indicating that Kolon could imitate DuPont's high-quality product. Compl. at ¶ 37. Specifically, Kolon notified these customers that former DuPont employees had assisted Kolon in making dramatic improvements to its technology. Compl. at ¶ 39. Moreover, Kolon advised potential customers that it could undercut DuPont's pricing because of its knowledge of DuPont's rebate practices. Compl. at ¶ 37.

Succinctly stated, DuPont alleges that Kolon "used DuPont's confidential information and trade secrets to compete with DuPont . . . [and] to improve its process for producing aramid fiber, with a resulting increase in range of products, production, and quality." Compl. at ¶¶ 35, 36. Accordingly, DuPont filed the pending Complaint, which asserts six counts against Kolon: (1) a violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-341; (2) Conspiracy to Injure Another in Trade, Business or Reputation, Va. Code § 18.2-499 et seq. ("Statutory Conspiracy"); (3) Tortious Interference With a Contract;

(4) Tortious Interference With a Business Expectancy; (5) Conversion; and (6) Civil Conspiracy.[2]

On April 20, 2009, Kolon filed a Counterclaim against DuPont pursuant to the Sherman Act Section 2 and Clayton Act Section 16 for monopolization and attempted monopolization of the para-aramid fiber market.  See Defs' Answer at 35.  Kolon also filed a Third-Party Complaint against Mitchell and Aramid Fiber Systems, LLC asserting two counts: (1) Breach of Contract; and (2) Contribution.

Kolon has now filed a Motion to Dismiss Counts Two through Six of DuPont's Complaint, contending that these claims are preempted by the Virginia Uniform Trade Secrets Act.  DuPont filed a Motion to Dismiss Kolon's Counterclaim, and Mitchell and Aramid Fiber Systems, LLC filed a Motion to Dismiss Kolon's Third-Party Complaint, seeking to dismiss the claims against them, or, in the alternative, to stay or sever the Third-Party Complaint. These motions have been fully briefed and are now ripe for decision.

---

[2] Through a typographical error, the Complaint erroneously labeled Count Six as Count Ten.  In the following analysis, this count will be referred to as Count Six.

## DISCUSSION

### I.   The Applicable Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) seeks to test the legal sufficiency of the factual allegations made in the Complaint.   Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   Id.   As the Supreme Court held in Bell Atlantic v. Twombly, 550 U.S. 544 (2007), the pleading standard that Rule 8(a) announces does not require "detailed factual allegations," but it demands more than an unadorned accusation.   Id. at 555.   A pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."   Id.   Nor does a complaint suffice if it tenders only "naked assertion[s]" devoid of "further factual enhancement."   Id. at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted by the court as true, to "state a claim to relief that is plausible on its face."   Id. at 570.   A claim has facial "plausibility" when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.   Id. at 556.   The

plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.   Id.   Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." Id. at 557.   Nevertheless, in Twombly, the Supreme Court repeatedly emphasized that alleging plausible grounds for a claim "simply calls for enough facts to raise a reasonable expectation that *discovery* will reveal evidence" to prove the alleged claim.   Id. at 556 (emphasis added).   This pleading standard governs "all civil actions and proceedings in the United States district courts." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009).

### II.   DuPont's Claims Under The Virginia Uniform Trade Secrets Act

In Count One of its Complaint, DuPont has alleged misappropriation of trade secrets, in violation of the Virginia Uniform Trade Secrets Act ("VUTSA").   Under the VUTSA, misappropriation is defined as:

> 1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> 2. Disclosure or use of a trade secret of another without express or implied consent by a person who:

a. Used improper means to acquire knowledge of the trade secret; or

b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
(1) Derived from or through a person who had utilized improper means to acquire it;

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(4) Acquired by accident or mistake.

Va. Code Ann. § 59.1-336. Trade secrets, in turn, are defined as: "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process," that:

1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2. *Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*

Id. (emphasis added).

Notably, the VUTSA also contains a "preemption provision," which provides:

A. Except as provided in subsection B of this section, this *chapter displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret.*

B. This chapter does not affect:

    1. Contractual remedies whether or not based upon misappropriation of a trade secret; or

    2. Other civil remedies that are not based upon misappropriation of a trade secret, or

    3. Criminal remedies, whether or not based upon misappropriation of a trade secret.

Va. Code § 59.1-341 (emphasis added). Hence, the VUTSA preempts "*all* claims for relief, including both common law *and* statutory causes of action, if they provide a civil remedy for misappropriation of trade secrets *unless* they are contractual or criminal in nature." MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1363 (Fed. Cir. 2005) (emphases added). Accordingly, Kolon has argued that, "[a]s a matter of law, the preemption provision of the VUTSA bars DuPont from pursuing Counts II, III, IV, V, and [VI] [sic] of the Complaint because those counts are based entirely on a theory of misappropriation of trade secrets." Defs' Mot. at 2.

### A. The Dispute Over The Alleged "Trade Secrets" At Issue

Notwithstanding this statutory mandate, "where courts have found preemption [under the VUTSA] on a motion to dismiss, they repeatedly establish that the information in issue – as alleged – constitutes trade secrets before reaching the preemption question." Stone Castle Fin., Inc.

v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 657-59 (E.D. Va. 2002). In Stone Castle, for instance, the defendants filed a motion to dismiss, but they disputed in their answer that the information at issue constituted trade secrets. Id. at 665. The court held that "unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA." Id. at 659; accord Combined Ins. Co. v. Wiest, 578 F. Supp. 2d 822, 834 (W.D. Va. 2008) (declining to dismiss conversion claim because defendant specifically disputed whether information at issue was proprietary); H.E.R.C. Products, Inc. v. Turlington, 62 Va. Cir. 489, 494 (City of Norfolk 2003) ("[T]he parties are not in agreement about whether the information in question constitutes trade secrets, and the court is not willing to rule at this time that the alleged material does constitute a trade secret, thereby allowing H.E.R.C.'s VUTSA claim to preempt its common law claims.").

Like the defendants in Stone Castle, Kolon disputes whether the information at issue constitutes trade secrets under VUTSA. See Ans. at ¶¶ 54-55. In its Answer Kolon does not admit that the information in question comprises trade secrets as defined by VUTSA. Instead, in its

12

Affirmative Defenses, Kolon asserts that "DuPont failed to insure that the information claimed to be a trade secret was subject of efforts that were reasonable to maintain its secrecy." Aff. Def. at ¶ 5. This averment explicitly denotes that Kolon intends to challenge the trade secret status of the relevant information. Va. Code Ann. § 59.1-336. Moreover, at oral argument, Kolon confirmed that it disputed that any information at issue constitutes a "trade secret." Therefore, so long as Kolon contends that the information in question falls short of the statutory definition of "trade secrets," the preemptive effect of the VUTSA cannot be determined on the pleadings alone and dismissal on the ground of preemption will be denied for that reason alone.

### B. A Substantive Analysis of the Asserted Preemption of DuPont's Claims

Taking the offensive, DuPont further contends that, "[e]ven if the Court found, on the pleadings alone, that DuPont's information is in fact a trade secret, dismissal of the other tort claims still would be improper, because DuPont has alleged facts other than misappropriation of trade secrets to support its tort claims." Pltf's Opp. at 7. Hence, assuming *arguendo* that the information in question constitutes trade secrets, it is appropriate to

13

analyze the substantive validity of the claims asserted against Kolon in Counts Two through Six against the preemption contention.

"[T]he plain language of the preemption provision indicates that the [VUTSA] was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret." Smithfield Ham and Prods. Co., Inc. v. Portion Pac, Inc., 905 F. Supp. 346, 348 (E.D. Va. 1995); accord Stone Castle, 191 F. Supp. 2d at 664-65; see also S&S Computers and Design, Inc. v. Paycom Billing Servs., Inc., 2001 WL 515260, at *3 (W.D. Va. Apr. 5, 2001). Nevertheless, "the preemption provision is intended to preclude only those common law claims . . . premised *entirely* on a claim for misappropriation of a trade secret." Smithfield, 905 F. Supp. at 348 (emphasis in original) (citing Coulter Corp. v. Leinert, 869 F. Supp. 732, 734 (E.D. Mo. 1994)).

In Smithfield, 905 F. Supp. at 350, for instance, the plaintiff alleged the misappropriation of its secret recipe for barbecue sauce. In addition to pleading a violation of the VUTSA, the plaintiff contended that the defendant had tortiously interfered with its contract expectancy and

business relations because the defendant had exploited knowledge about Smithfield's business to steal Smithfield's customers. Id. On a motion for summary judgment, the court found that the tortious interference claims survived because, even if the defendant was successful in showing that it had independently developed the recipe and therefore had not misappropriated Smithfield's trade secrets, the plaintiff nevertheless had "present[ed] a compelling argument that [the defendant's] misuse of inside information related to pricing, ingredients, and volume of business constituted tortious interference with their long-term contractual relationship and anticipated renewals." Id.

Other courts in this circuit also have found a lack of preemption when certain substantive counts were alleged alongside a claim under the VUTSA. See Combined Ins. Co. of Am. v. Wiest, 578 F. Supp. 2d 822, 834 (W.D. Va. 2008) ("Although Combined cites the defendant's misappropriation of trade secrets in support of its claims for tortious interference and breach of fiduciary duties, neither these claims, nor the corresponding damages, arise solely from the defendant's alleged misuse of such documents. Accordingly, . . . the court concludes that these claims, as pled, are not preempted by the [VUTSA]."); accord Stone

Castle Fin., Inc., 191 F. Supp. 2d at 660 ("the Court will not find the [common-law] claims preempted by the VUTSA").

Hence, the prevailing (and most persuasive) interpretation of the VUTSA in the Eastern District of Virginia rejects the reading of the statute proposed by Kolon, where all claims arising "from the same nucleus of fact as [the] misappropriation cause of action" are preempted by the VUTSA. Convolve, Inc. v. Compaq Computer Corp., 2006 U.S. Dist. LEXIS 13848, at *27 (S.D.N.Y. Mar. 29, 2006); see generally Stone Castle Fin., Inc., 191 F. Supp. 2d at 660 ("Indeed, we do not agree that the [Uniform Trade Secrets Act] provides a blanket preemption to all claims that arise from a factual circumstance possibly involving a trade secret.") (citation omitted).

Therefore, in order for the VUTSA to preempt the claims asserted by DuPont in Counts Two through Six of the Complaint, those claims must be predicated "entirely" upon Kolon's alleged misappropriation of trade secrets. See, e.g., Wiest, 578 F. Supp. 2d at 834. With this analytical framework in mind, DuPont's claims withstand Kolon's preemption assertions.

## A. Counts Three And Four — Tortious Interference

DuPont has asserted claims for Tortious Interference with a Contractual Relationship (Count Three) and Tortious Interference With a Business Expectancy (Count Four). To establish a claim for tortious interference with a contract, DuPont must allege:

> (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued the relationship or realized the expectancy; and (4) damage to plaintiff.

Smithfield Ham, 905 F. Supp. at 349; accord Rappahannock Pistol & Rifle Club, Inc. v. Bennett, 262 Va. 5, 12 (2001) (citing Chaves v. Johnson, 230 Va. 112, 120 (1985)). And, in cases involving a "business expectancy," a plaintiff must also demonstrate that the defendant employed "improper methods" in causing the alleged interference. Duggin v. Adams, 234 Va. 221, 226-27 (1987).

It is well-established that "misappropriation of trade secrets" constitutes an improper method for interference with a contract or expectancy, but it is not the only one. Other improper methods of interference include misuse of inside or confidential information, breach of fiduciary relationships, and certain types of solicitation of

17

employees.  *Id.* at 227; *see also Wiest*, 578 F. Supp. 2d at 834.   DuPont has alleged that "Kolon has used DuPont's *confidential information and trade secrets* to improve its process for producing aramid fiber."   Compl. at ¶ 36 (emphasis added).   Hence, although DuPont's Complaint places its primary emphasis on Kolon's misappropriation of trade secrets, this conjunctive language, which is used throughout the Complaint, reveals that DuPont's claims are not *solely predicated* on the misappropriation of trade secrets.  *Cf. id.* at 834.

Furthermore, DuPont has alleged that, "Kolon sent representatives to the United States for a secret meeting with one current DuPont employee that Kolon, through Mitchell, was attempting to recruit.   Upon information and belief, the purpose of the meeting was to evaluate the level of technical DuPont knowledge possessed by this DuPont employee."  Compl. at ¶ 48.  Such behavior, if true, could also constitute an "improper method" under Virginia law.  *Buffalo Wings Factory, Inc. v. Mohd*, 2007 U.S. Dist. LEXIS 91324, at *27-28 (E.D. Va. Dec. 12, 2007) ("At the very least, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their employer's trade secrets or enticing away his

customers, the injured employer is entitled to protection.").

Those factual averments were incorporated by reference into Counts Three and Four of the Complaint. See Compl. at ¶¶ 62, 67. Therefore, wholly apart from the issue of whether the information in question constitutes trade secrets, it is apparent that DuPont's claims for tortious interference survive the Motion to Dismiss on preemption grounds.

### B.   Counts Two And Six - Conspiracy

In different iterations, Counts Two and Six assert claims for "conspiracy." Count Two states a claim for statutory conspiracy under Va. Code Ann. § 18.2-499, and Count Six states a claim for "civil conspiracy." Under Virginia law, statutory conspiracy requires a showing that two or more people "combined, associated, agreed, or acted in concert together for the purpose of willfully and maliciously" injuring the plaintiff in its business "by any means whatsoever." Advanced Marine Enterprises, Inc. v. PRC, Inc., 256 Va. 106, 124 (1998) (quoting Va. Code § 18.2-499). Similarly, "[a] civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or

unlawful, by criminal or unlawful means." <u>Hechler</u> <u>Chevrolet v. General Motors Corp.</u>, 230 Va. 396, 402 (1985).

Count Two of the Complaint, labeled "Conspiracy to Injure Another in Trade, Business, Reputation," alleges that the "Defendants have combined and conspired with each other, and attempted to procure the participation, cooperation, agreement or other assistance of one or more persons, for the purpose of willfully and maliciously injuring DuPont's business in violation of Va. Code Ann. § 18.2-499, <u>et seq.</u>" Compl. at ¶ 60.

Count Six of the Complaint, labeled "Civil Conspiracy," alleges that the "Defendants, as well as other known and unknown individuals or entities, have acted in concert, agreed, associated, mutually undertaken and combined together to accomplish unlawful concerted actions with the purpose of injuring DuPont." Compl. at ¶ 76. In further support of Count Six, DuPont alleges that the Defendants "used improper and unlawful means, including but not limited to acting in tortuous [sic] interference of contract and business expectancy, and in violation of the Virginia Uniform Trade Secrets Act." <u>Id.</u> at § 77.

Kolon argues that DuPont's conspiracy claims are preempted by the VUTSA because they are "predicated solely

on the alleged misappropriation of DuPont's trade secrets."
See Defs' Mot. at 7.

Even if Kolon were to concede that the information at
issue constitutes trade secrets,[3] it is apparent that DuPont
has articulated claims of conspiracy which are independent
of its claim of misappropriation. In Count Two, DuPont has
alleged a violation of Va. Code Ann. § 18.2-499, which
addresses "combinations to injure others in their
reputation, trade, business or profession." Id. Nowhere
is this claim tied to the misappropriation of trade
secrets. See id. Also, in Count Six, DuPont alleges that
the extensive and concerted actions of Kolon's executives
included, "but were not limited to, *acting in tortuous
[sic] interference of contract and business expectancy*, and
in violation of the Virginia Uniform Trade Secrets Act."
Id. at § 77 (emphasis added). Thus, DuPont has plainly
articulated claims for conspiracy which are independent of
the claim for misappropriation of trade secrets, and
Kolon's Motion to Dismiss this count will be denied.[4]

---

[3] As noted above, however, this contention of preemption is
premature because Kolon has argued that the information at
issue does not constitute trade secrets. See Wiest, 578 F.
Supp. 2d at 834.

[4] In its Reply, Kolon argues that, "in addition to being
preempted, DuPont's claim for statutory conspiracy fails to
state a claim because Kolon is incapable of conspiring with

###### C.    Count Five - Conversion

In  Count  Five,  DuPont  has  stated  a  claim  for "Conversion" by averring that "[t]he confidential and trade secret  information  [that]  Kolon,  through  Mitchell's actions,  removed  from  DuPont's  offices  and  computer networks,  belongs  to  DuPont  and  DuPont  is  entitled  to immediate possession of such information."  Compl. at ¶ 73. This  information  includes  "several  electronic  files containing  highly  confidential  information."   See  Pltf's Opp. at 8, 15; see also Compl. at ¶ 73 ("Kolon obtained electronic copies of this data, through Mitchell . . . .").

Under  Virginia  law,  "[a]  person  is  liable  for conversion  for  the  wrongful  exercise  or  assumption  of authority  over  another's  goods,  depriving  the  owner  of their  possession,  or  any  act  of  dominion  wrongfully  exerted over  property  in  denial  of,  or  inconsistent  with,  the owner's  rights."   Simmons  v.  Miller,  261  Va.  561,  582 (2001).   While  a  claim  for  conversion  traditionally  has been  a  means  to  recoup  tangible  property,  "courts  have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document."

---

itself  or  its  agent."   Defs'  Reply  at  10.   At  oral argument,  however,  Kolon  conceded  that  the  Complaint  states a  claim  sufficient  to  avoid  the  strictures  of  the  intra-corporate  immunity  doctrine.   Therefore,  this  claim  will not be considered by the Court at this time.

Wiest, 578 F. Supp. 2d at 835 (citing United Leasing Corp.
v. Thrift Ins. Corp., 247 Va. 299, 304 (1994)).
Consequently, under Virginia law, a conversion claim does
not fail merely because the property at issue is "an
electronic version of [the] list rather than a hard copy."
Wiest, 578 F. Supp. 2d at 835.

Kolon has argued that DuPont's claim for conversion
fails because Mitchell only disseminated electronic
"copies" of the documents alleged to be the objects of the
conversion claim, as opposed to the original documents
themselves. See Defs' Reply at 13. Specifically, Kolon
points to a Seventh Circuit opinion which held:

> [T]he possession of copies of documents -- as
> opposed to the documents themselves -- does not
> amount to an interference with the owner's
> property sufficient to constitute conversion. In
> cases where the alleged converter has only a copy
> of the owner's property and the owner still
> possesses the property itself, the owner is in no
> way being deprived of the use of his property.
> The only rub is that someone else is using it as
> well.

FMC Corp. v. Capital Cities/ABC, Inc., 915 F.2d 300, 303
(7th Cir. 1990).

The courts in Virginia have not yet addressed the
issue of whether the possession of "copies" of documents
can constitute conversion. Virginia courts have, however,
demonstrated a distinct willingness to expand the scope of

the doctrine of conversion in light of advancing technology. See United Leasing Corp., 247 Va. at 304. And, given the expansive definition of conversion employed in Virginia, *i.e.*, "*any act of dominion* wrongfully exerted over property in denial of, or inconsistent with, the owner's rights," Simmons, 261 Va. at 582 (emphasis added), it appears that the purloining of copies of documents would constitute conversion because such action is an act of "dominion" inconsistent with the true owner's property rights.

Moreover, the rationale of FMC Corp., though fascile, completely ignores the fact that use of a purloined copy by a commercial competitor to court the owner's customer actually deprives the owner of ability to use the original with that customer, especially if the customer is persuaded to do business with the competitor. Further, it is undeniably true that theft of a copy is the same as taking the content of the original and that the copy belongs to the owner. The reasoning of FMC Corp. would deprive the owner of the stolen copy of a time-tested means of redressing the injury sustained when property is stolen which, of course, is the traditional office of a conversion claim.

For the foregoing reasons, DuPont's claim for conversion, even if based exclusively on the transfer of copies of electronic information, survives Kolon's Motion to Dismiss.

### III. Kolon's Counterclaim Of Monopolization

Kolon has asserted a Counterclaim against DuPont for monopolization and attempted monopolization under the "Sherman Act Section 2 and Clayton Act Section 16 for monopolization of the para-aramid fiber market." Counterclaim at ¶ 1. Kolon alleges that DuPont's anti-competitive conduct has led to DuPont's monopolization of the aramid fiber market. Specifically, Kolon alleges that this exclusionary conduct has taken the form of DuPont's: (1) execution of various "long-term supply agreements" with customers; (2) disparagement of Kolon's para-aramid fibers; and (3) joint ventures with rivals. Counterclaim at ¶ 28. In response, DuPont has moved to dismiss Kolon's allegations of monopolization, which assertedly "fall short of adequately pleading actionable monopolistic conduct, both because they fail Twombly's requirements for allegations of a plausible violation, and because they do not amount to the type of activity that rises to the level of an antitrust offense." Pltf's Mot. at 3.

25

### A.   Claims Of Monopolization/ Attempted Monopolization

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade" is guilty of an offense and is subject to penalties.   Id.   Monopoly power is defined as "the power to control prices or exclude competition."   United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).   A company that can exert market power to set prices or exclude competition, without regard to outside market forces, has monopoly power.   In re Payment Card Interchange Fee and Merchant Antitrust Discount Antitrust Litigation, 562 F. Supp.2d 392, 399 (E.D.N.Y. 2008).

Two elements comprise the offense of monopolization under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic acumen."   Berlyn Inc. v. Gazette Newspapers, Inc., 73 Fed. Appx. 576, 581 (4th Cir. 2003).   Attempted monopolization further requires: "(1) a specific intent to monopolize the relevant market;

(2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 166 (4th Cir. 1992).

To prevail on either such claim, a plaintiff "must present evidence of conduct on [a] defendant's part that is unreasonably exclusionary or predatory." Imaging Ctr., Inc. v. W. Md. Health Sys., 2004 U.S. Dist. LEXIS 16138, at *21-22 (D. Md. Aug. 10, 2004). This, in turn, involves showing the lack of a legitimate business justification for the challenged action(s). Id. DuPont has moved to dismiss Kolon's Counterclaim for the following three reasons.

### i. The Sufficiency Of Kolon's Asserted "Relevant Geographic Market"

DuPont argues that Kolon's asserted "geographic market" is legally inadequate. See Pltf's Mot. at 10. "A relevant market has two dimensions: (1) the relevant product market, which identifies the products or services that compete with each other; and (2) the relevant geographic market, which identifies the geographic area within which competition takes place." America Online, Inc. v. GreatDeals.Net, 49 F. Supp. 2d 851, 857 (E.D. Va. 1999) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962)). The outer boundaries of a "relevant

market" are determined by "reasonable interchangeability of use," see, e.g., GreatDeals.Net, 49 F. Supp. 2d at 858, which refers to consumers' "practicable ability to switch from one product or service to another." Id.

A product's "geographic market" is referred to as the "area of effective competition," that is, "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961). The selected geographic market must "both correspond to the commercial realities of the industry and be economically significant." Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962). Hence, "[w]hat this usually boils down to in practice is the area of actual or potential competition between the parties involved in the case." Mich. Div. Monument Builders of N. Am. v. Mich. Cemetery Ass'n, 524 F.3d 726, 733 (6th Cir. 2008).

It is well-settled that "[t]he fact-specific nature of the relevant market inquiry makes courts reluctant to dismiss Section 2 claims for failure to properly plead a relevant market." Thus, a complaint survives a Rule 12(b)(6) motion "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." Newcal Industries, Inc. v. Ikon Office Solution,

513 F.3d 1038, 1045 (9th Cir. 2008). Nevertheless, "[w]hile proper market definition is often determined after a factual inquiry into the commercial realities faced by consumers, an antitrust plaintiff must still allege a legally sufficient relevant market" to survive a motion to dismiss. GreatDeals.Net, 49 F. Supp. 2d at 859; see also Lee v. Life Ins. Co., 23 F.3d 14, 19 (1st Cir. 1994) (holding that inadequate allegations regarding scope of relevant market are proper grounds for Rule 12(b)(6) dismissal).

Kolon has plead that "[t]he relevant geographic market for para-aramid fibers is the United States. Customers who require para-aramid fibers are located throughout the United States." Counterclaim at ¶ 24. With this in mind, DuPont argues:

> While Kolon asserts that the relevant geographic market for para-aramid fibers is limited to the United States, it fails to provide any factually plausible support for this legal conclusion. *Kolon makes no attempt to demonstrate that the United States market encompasses all of the competitive alternatives to which consumers reasonably can turn, or that it represents the extent of the geographic area in which DuPont faces competition.* For this reason alone, Kolon's monopolization claims should be dismissed.

Id. (emphasis added). Moreover, DuPont contends that "Kolon's general allegations about a U.S. market are

contradicted by its other, more specific allegations, which speak of the para-aramid market as 'worldwide,' 'global,' and 'international.'" Id. at 11 (citing Counterclaim at ¶¶ 1, 14, 28). Thus, says DuPont, Kolon's allegations of the relevant geographic market are both "conclusory and internally inconsistent." Pltf's Mot. at 12.

As currently plead, Kolon's asserted relevant geographic market is undeniably lacking in detail. Moreover, despite Kolon's argument to the contrary, it appears that a Sherman-Act plaintiff's asserted "geographic market" can be "global" in scope, even if such a global market would extend to localities which are beyond the reach of the Sherman Act. See, e.g., United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1164 (N.D. Cal. 2004) ("The court finds that the relevant geographic market ('the area of effective competition') in this case is a worldwide market."); Corey Airport Servs. v. City of Atlanta, 2008 U.S. Dist. LEXIS 75508, at *131 (N.D. Ga. Sept. 30, 2008); Rockbit Industries U.S.A., Inc. v. Baker Hughes, Inc., 802 F. Supp. 1544, 1551 (S.D. Tex. 1991).

Because Kolon's allegation of the relevant market is both conclusory and self-defeating, Dupont's Motion to Dismiss is well-taken. However, the Court will grant Kolon leave to amend the Counterclaim so as to both plead the

Counterclaim with greater specificity and to do so in a
manner which is internally consistent with its other
averments.

### ii. Kolon's Allegations Of Anti-Competitive Conduct

In the Counterclaim, Kolon alleges that DuPont has
engaged in three discrete types of anti-competitive
conduct.  This conduct includes DuPont's: (1) execution of
long-term supply agreements with customers; (2)
disparagement of Kolon's para-aramid fibers; and (3) joint
ventures with rivals.  Counterclaim at ¶ 28.

At oral argument, however, Kolon admitted that it
intended to assert only the "long-term supply agreements"
as the predicate of DuPont's anti-competitive conduct, and
that the other two types of anti-competitive conduct were
asserted merely to provide context to its monopolization
claim.  Hence, insofar as Kolon's allegations of product
disparagement and joint ventures are asserted as predicate
for DuPont's alleged anti-competitive conduct, the Motion
to Dismiss will be granted with prejudice.

Fundamentally, therefore, what is left is Kolon's
allegation that DuPont has procured a number of long-term
supply agreements in order to hinder Kolon's ability to

effectively compete in the aramid-fiber market.   In support

of this contention, Kolon has averred the following:

> As Kolon prepared to enter the U.S. market,
> DuPont aggressively entered into long-term supply
> contracts with top U.S. purchasers for the sale
> and distribution of para-aramid fiber products.
> As a result, DuPont locked customers into
> purchasing para-aramids from DuPont for periods
> in excess of one year. For example, upon
> information and belief, DuPont has long-term
> supply arrangements with significant numbers of
> the highest volume U.S. para-aramid customers.
> Upon information and belief, these contracts
> range in length from two to seven years. And
> potential customers indicate that they cannot
> place orders from Kolon due to their agreements
> with DuPont. *Through its long-term para-aramid
> supply contracts, DuPont has eliminated access to
> U.S. customers, erecting unnatural, additional
> barriers to entry that have unnecessarily
> excluded Kolon from competition, strengthening
> and prolonging DuPont's monopoly power in the
> United States.*

Counterclaim at ¶ 24 (emphasis added).

Although not illegal in and of themselves, "exclusive

dealing arrangements" can constitute an improper means of

maintaining a monopoly.   See, e.g., United States v.

Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. Del. 2005)

(citing United States v. Grinnell Corp., 384 U.S. 563

(1966)); ACT, Inc. v. Sylvan Learning Sys., Inc., 104 F.

Supp. 2d 1096, 1111 (N.D. Iowa 1999) ("Sylvan's market

share, coupled with its use of long-term or exclusive

contracts . . . demonstrate that there exists a question of

fact whether Sylvan had the power to control prices or

exclude competition and willfully acquired or maintained that power"); Ultronics, Inc., v. Cox Cable of San Diego, Inc., 1991 WL 1302931, at *5 (S.D. Cal. 1991) ("[L]ong term contracts have been found to be 'unnatural barriers' to competition that 'unnecessarily exclude actual and potential competition' and could thus establish the willfulness element of the second prong [of a monopolization claim] under certain circumstances."); Twin City Sportservice, Inc. v. Finley & Co., 676 F.2d 1291, 1309 (9th Cir. 1982) ("cash-for-long-term-commitment deals" deals were sufficient "to provide proof of all three elements of a [S]ection 2 attempted monopoly violation").

Accordingly, the dispute between the parties on this issue centers not on whether such agreements can run afoul of the Sherman Act, but on whether Kolon's Counterclaim respecting the long-term contracts "asserts the predicate facts necessary to establish the requisite foreclosure and adverse impact on competition." Pltf's Mot. at 13.

Specifically, DuPont argues that the allegations respecting its long-term agreements have left a number of essential questions unaddressed. Id. These "unaddressed questions" include: (1) what market segments the identified contracts relate to; (2) the exact length of the "long-term" supply contracts; (3) whether the contracts are

actually exclusive; (4) what percentage of the market was actually foreclosed by the contracts; (5) whether Kolon has any alternate routes to the market; (6) whether Kolon has competed for the contracts as they expire; and (7) whether the customers, and not DuPont, requested the contracts at issue. See id. at 13-15. In response, Kolon states that "[n]othing in Twombly or Rule 8 requires Kolon to present this evidence at pleading; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Defs' Opp. at 9 (citing Twombly, 550 U.S. 556).

It is undoubtedly true that Bell Atlantic v. Twombly altered the pleading standard to survive a motion to dismiss. However, the Court in Twombly did not elevate the pleading standard applicable to a motion to dismiss to something akin to the standard which applies at the summary judgment stage. Nevertheless, DuPont's argument on this issue conflates these two standards. This is evident from the fact that the vast majority of cases cited by DuPont specifically address the validity of long-term agreements on a motion for *summary judgment*, after the factual record had been fully developed. See, e.g., Indeck Energy Servs., Inc. v. Consumers Energy Co., 250 F.3d 972 (6th Cir. 2000) (appeal of district court's grant of summary judgment); W.

Parcel Express v. UPS of Am., 190 F.3d 974 (9th Cir. 1999) (appeal of district court's grant of summary judgment); Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215 (8th Cir. 1987) (appeal of district court's denial of directed verdict); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362 (M.D.N.C. 2002) (summary judgment), aff'd, 67 Fed. Appx. 810 (4th Cir. 2003); Bepco, Inc. v. Allied-Signal, Inc., 106 F. Supp. 2d 814 (M.D.N.C. 2000) (summary judgment); Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 850 F. Supp. 470 (E.D. Va. 1994) (summary judgment), aff'd, 57 F.3d 1317 (4th Cir. 1995).

Additionally, it is important to note that, even after Twombly, "no legal authority [indicates] that [] particularized allegations are a pleading requirement. To the contrary, the Supreme Court has reiterated that Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" In re Hypodermic Products Antitrust Litigation, 2007 WL 1959225, at *11 (D.N.J. June 29, 2007) (emphasis added) (quoting Twombly, 550 U.S. at 555).

Furthermore, by focusing only on the factual omissions from Kolon's Counterclaim, DuPont has failed to address the

substance of Kolon's claim. Indeed, Kolon's assertion of anti-competitive, long-term supply agreements goes beyond the type of "naked" assertions deemed insufficient in Twombly. In its Counterclaim, Kolon has averred the existence of: (1) a large number of long-term supply agreements; (2) the approximate length of these long-term agreements ("in excess of one year" and often "two to seven years"); (3) the customers with whom DuPont executed these agreements ("the highest volume U.S. para-aramid fibers"); DuPont's evident market dominance (70%); and (5) the apparent "exclusivity" of the agreements ("potential customers have indicated that they cannot place orders from Kolon due to their agreements with DuPont"). See Counterclaim at ¶¶ 24, 29.

Notwithstanding the foregoing, however, at oral argument, Kolon indicated that, subsequent to the filing of its opposition brief, but before the argument before the Court, DuPont had provided it with certain details concerning DuPont's supply agreements with its top consumers of aramid fiber. This subsequent production undercuts Kolon's otherwise-persuasive contention that it is unable to plead the details of the long-term supply agreements at issue because these agreements "are in the hands of DuPont and para-aramid customers who likely cannot

afford to risk their relationship with DuPont by disclosing the terms." Defs' Opp. at 11. Therefore, although the Court will deny DuPont's Motion to Dismiss for failure to specify the nature and effect of its long-term agreements, it will grant Kolon leave to amend its Counterclaim to include this pertinent information, and the Court encourages Kolon to make such amendment.

### iii. Kolon's Allegation Of "Antitrust Injury"

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 311 (4th Cir. 2007) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). Courts have made clear that "because the antitrust laws are intended to protect competition, and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim." Thompson Everett, Inc. v. National Cable Adver., 57 F.3d 1317, 1325 (4th Cir. 1995) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)). Consequently, DuPont argues that Kolon has failed to allege the existence of an "antitrust injury" because "Kolon's pleading is devoid of any facts that would show plausible

harm to competition or the competitive process, as opposed to harm to Kolon as an individual competitor." Pltf's Mot. at 21.

Importantly, "the antitrust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market." Gill v. Del. Park, LLC, 294 F. Supp. 2d 638, 644 (D. Del. 2003). Beyond that, "an analysis of antitrust injury . . . [is] more properly conducted after discovery." Continental Airlines, Inc. v. United Air Lines, Inc., 120 F. Supp. 2d 556, 569 n.25 (E.D. Va. 2000) (citations omitted).

In this case, Kolon has alleged the following effects from DuPont's alleged monopolization of the aramid-fiber market:

- "The aramid-fiber industry is a highly concentrated market, dominated by DuPont and Teijin, with only a few alternative suppliers such as Kolon. The main reasons for the lack of competition in this market are the large barriers to entry that exist in the aramid-fiber industry, and the entry deterrence practiced by DuPont." Counterclaim at ¶ 25;

- "Kolon's para-aramid fiber had similar if not superior tensile strength and quality compared to DuPont's Kevlar. In addition, Kolon's para-aramid product was more reasonably priced than DuPont's Kevlar. Despite its high quality and low price, Kolon has garnered a mere .87% of the U.S. para-aramid market to date. The reason: DuPont locked Kolon out through long-term supply agreements with U.S. purchasers." Counterclaim at ¶ 28;

- "DuPont's anticompetitive conduct has reduced output and increased prices for para-aramid fiber in the United States. Its long-term supply contracts eliminate access to customers and preclude effective competition." Counterclaim at ¶ 30;

- "The damages suffered by Kolon cumulate and increase with each passing day that DuPont's anticompetitive practices are allowed to continue. These damages will continue to increase during the pendency of the suit until halted by a Court Order, or by abandonment of the long-term supply arrangements and disparagement campaign, or both." Counterclaim at ¶ 31;

- "DuPont's anticompetitive and malicious conduct has caused substantial harm and damage to Kolon. Kolon has been severely damaged through, *inter alia*, lost sales and profits, higher costs and loss of good will." Counterclaim at ¶ 32; and

- "Absent long-term supply arrangements and disparaging conduct, the U.S. trade would have purchased Kolon's para-aramid fiber. If Kolon had been permitted to compete for suppliers in the United States, Kolon would have achieved a scale permitting it to be a much more effective competitor to DuPont. By precluding Kolon from entering into such supply arrangements when demand for para-aramid fibers has significantly increased and supply is low, DuPont's conduct has excluded one of the few para-aramid competitors from effectively entering the U.S. market, reducing if not practically eliminating additional competition, as well as preserving and growing DuPont's monopoly position. Today in the United States the price of para-aramid fiber remains high, demand is high and supply is low, all to the benefit of DuPont's margin and market share." Counterclaim at ¶ 33.

Through these detailed averments, Kolon has alleged that DuPont has *actively excluded* Kolon from participation in the aramid-fiber market, and that the resulting "damage to

the competitive process" has significantly impacted both Kolon and ordinary consumers. Therefore, Kolon's allegations of harm to the competitive process are sufficient to state a claim for antitrust injury, and DuPont's Motion to Dismiss for failure adequately to allege an anti-trust injury will be denied.

### IV.  Kolon's Third-Party Complaint

On the same day that Kolon filed its Answer and Counterclaim, Kolon filed a two-count third-party Complaint against both Aramid Fiber Systems, LLC ("AFS") and Mitchell (collectively, the "third-party Defendants") for Breach of Contract and Contribution. The third-party Defendants have moved to dismiss both counts of the third-party Complaint. And, if the Court does not dismiss the third-party Complaint in its entirety, AFS and Mitchell have requested that the Court strike the third-party Complaint or, in the alternative, sever the third-party Complaint from the main case and stay any proceedings with respect to the third-party claims until after the resolution of DuPont's action against Kolon. TP Defs' Mot. at 3.

### A.  Breach Of Contract

In Count One of the third-party Complaint, labeled "Breach of Contract," Kolon avers the following:

> An Independent Contractor Agreement between Aramid Fiber Systems and Kolon Industries was entered into April 12, 2007. The Independent Contractor Agreement included a provision whereby the Contractor, Aramid Fiber Systems, represented that it would not utilize any invention, discovery, development, improvement, innovation, or trade secret in which it did not have a proprietary interest. If it is found that Kolon misappropriated DuPont's trade secrets, it will be as a result of Mitchell's and Aramid Fiber Systems' misappropriation and/or utilization of a trade secret in which they do not have a proprietary interest, in breach of the contract between Aramid Fiber Systems and Kolon.

TP Compl. at ¶¶ 16-18. In response, the third-party Defendants contend that Count One should be dismissed because Kolon: "(a) as a matter of law and public policy cannot assert the Independent Contractor Agreement between it and AFS to shield itself from liability for its own intentional conduct; and (b) has not pled facts sufficient to state a claim against either AFS or Mitchell for breach of contract." TP Defs' Mot. at 2,3. The third-party Defendants further argue that Count One should be dismissed as to Mitchell for the reason that "Kolon has failed to state a claim on which Mitchell can be held personally liable for the debts and obligations of AFS." Id. at 3.

In Virginia, "[t]he elements of a breach of contract action are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the

41

plaintiff caused by the breach of obligation." Filak v. George, 267 Va. 612, 619 (2004). In contrast, impleader is controlled by Rule 14(a) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 14(a) states, in relevant part:

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff. A third-party defendant may proceed under this rule against any person not a party to the action who is or may be liable to the third-party defendant for all or part of the claim made in the action against the third-party defendant.

Id. As the language of the Rule makes clear, a third-party claim under Rule 14(a) can be maintained only if the asserted liability is in some way derivative of the main claim. Scott v. PPG Indus., 920 F.2d 927, 938 (4th Cir. 1990); Watergate Landmark Condominium Unit Owners' Assoc. v. Wiss, Janey, Elstner Assoc., Inc., 117 F.R.D. 576, 578 (E.D. Va. 1987).

Hence, "[u]nder Rule 14(a), a third-party defendant may not be impleaded merely because he may be liable to the plaintiff," Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 368 n.3 (1978), and "[i]t is not sufficient that the third-party claim is a related claim." Scott, 920 F.2d at

938 (citations omitted). As the court in <u>Watergate</u> explained:

> [A] third party claim is not appropriate where the defendant and putative third party plaintiff says, in effect, "It was him, not me." Such a claim is viable only where a proposed third party plaintiff says, in effect, "If I am liable to plaintiff, then my liability is only technical or secondary or partial, and the third party defendant is derivatively liable and must reimburse me for all or part . . . of anything I must pay plaintiff.

117 F.R.D. at 578.

Consistent with those precepts, it is well-settled that "[a] breach of contract claim may form the basis for impleader of a third-party defendant, so long as it is sufficiently derivative of or dependent upon the main claim." <u>International Paving Sys. v. Van-Tulco, Inc.</u>, 866 F. Supp. 682, 687 (E.D.N.Y. 1994). In this case, however, "[t]he breach of contract claim asserted by the third-party plaintiffs [] fails to constitute a derivative cause of action because separate and independent contracts serve as the basis for the claims." <u>See Blais Constr. Co. v. Hanover Square Associates-I</u>, 733 F. Supp. 149, 157 (N.D.N.Y 1990).

In the original Complaint, DuPont alleges, <u>inter</u> <u>alia</u>, that its damages flow from Kolon's *willful* misappropriation of its trade secrets and confidential information. <u>See</u>,

e.g., Complaint at ¶ 36 ("Upon information and belief, Kolon has used DuPont's confidential information and trade secrets to improve its process for producing aramid fiber, with a resulting increase on range of products, production and quality."). Further, DuPont alleges that Kolon purposefully, knowingly, and actively encouraged Mitchell to disclose DuPont trade secrets. See id.

In contrast, in the third-party Complaint, Kolon alleges that it was merely an ignorant actor, and that it played an unwitting role in the receipt and utilization of DuPont's trade secrets and confidential information. See TP Complaint at ¶ 14 ("Kolon did not believe that any information Mitchell provided to it were confidential trade secrets, and Mitchell represented orally and in the Independent Contractor Agreement that he would not use or divulge to Kolon any trade secrets."). Hence, in attempting to establish the derivative liability of the third-party Defendants, Kolon has plead an entirely different factual predicate from that which was asserted in the original Complaint. Such factually divergent pleading is inconsistent with the established jurisprudence surrounding third-party practice. See Standard Fire Ins. Co. v. Boyce-Harvey Machinery, Inc., 202 F.2d 871, 872 (5th Cir. 1953) (Rejecting an attempted impleader by noting that

"[w]hether or not appellant is liable on its contract of insurance, and whether or not the shipyard is guilty of negligence, are two entirely different matters, dependent for solution upon different facts and different principles of law, and probably involving a different measure of recovery.    We regard these, not merely as two separate causes of action, but as two independent 'matters.'"); accord Estate of Bayes v. Liberati, 1990 U.S. Dist. LEXIS 7337, at *5 (E.D. Pa. June 15, 1990).

Here, DuPont's detailed allegations respecting Kolon's superseding and willful acts of misappropriation are distinct from the breach of contract claim asserted by Kolon against the third-party Defendants.    Consequently, Kolon's alleged misappropriation presents an *independent claim* that is not appropriately litigated under the procedural vehicle of impleader.    Therefore, the breach of contract claim asserted by Kolon against the third-party Defendants must be dismissed.    See Kohl's Dep't Stores, Inc. v. Target Stores, Inc., 214 F.R.D. 406, 413 (E.D. Va. 2003) (dismissing a third-party claim for "negligence" when the main cause of action related to the defendant's "breach of contract").[5]

---

[5] This conclusion obviates the need to consider the legal questions respecting: (1) the applicability of Korean law

### B. Contribution

In Count Two of the third-party Complaint, labeled "Contribution," Kolon states the following:

> A right to contribution exists because DuPont has a cause of action against Kolon Industries, Inc., Mitchell, and Aramid Fiber Systems for the same indivisible injury. A cause of action lies against Mitchell and Aramid Fiber Systems, from whom contribution is sought, for breach of contract with Kolon. Kolon is therefore entitled to contribution from Mitchell and Aramid Fiber Systems pursuant to Va. Code § 8.01-34.

TP Compl. at ¶¶ 22-24. In response, the third-party Defendants argue that Count Two should be dismissed because "[e]ach of the causes of action DuPont asserts against Kolon is an intentional tort and . . . Virginia substantive law does not recognize a cause of action for contribution with respect to intentional torts." TP Defs' Mot. at 3.

Under Virginia law, contribution is available only where both the party seeking contribution, and the party from whom contribution is sought, are liable to a third party for the same indivisible injury. Kohl's Dep't Stores, Inc., 214 F.R.D. at 413. Moreover, contribution among wrongdoers may only be enforced when "the wrong results *from negligence* and involves no moral turpitude."

---

to the contract between Kolon and the third-party Defendants; (2) the piercing of AFS's corporate veil; and (3) the issues of public policy raised as a defense to the enforcement of the contract at issue.

Va. Code § 8.01-34 (emphasis added); accord Canterbury Assocs. v. Schirmer, 26 Va. Cir. 217, 221 (City of Charlottesville 1992). Consequently, contribution is unavailable if the third-party plaintiff was either "actively negligent" or engaged in intentional conduct. Philip Morris, Inc. v. Emerson, 235 Va. 380, 412 (1988) (addressing a claim for indemnification); see also First Am. Corp. v. Al-Nahyan, 175 F.R.D. 411, 413-14 (D.D.C. 1997) (noting that "active negligence" is "akin to an intentional tort"); VEPCO v. Wilson, 221 Va. 979 (1981) (The principles with respect to contribution are "equally applicable to indemnity," the only distinguishing feature being that "indemnity must necessarily grow out of a contractual relationship.").[6]

As a threshold matter, it is apparent that Kolon's claim for contribution suffers from the same defect under Rule 14(a) identified above in that it is predicated upon the third-party Defendants' breach of contract. As the foregoing analysis establishes, the litigation of this claim in a third-party posture is improper because it is not derivative of the main claim between DuPont and Kolon.

---

[6] The contracts executed between the third-party Defendants and Kolon contained no express promise of indemnification. A claim of contribution, however, requires no such written agreement.

47

See Van-Tulco, Inc., 866 F. Supp. at 687. Therefore, Kolon's claim for contribution will be dismissed.

Furthermore, the third-party Defendants argue that Kolon's claim of contribution must also be dismissed because "[e]ach of the claims asserted [against Kolon] by DuPont is an intentional tort." TP Defs' Mot. at 11. In resisting this argument, Kolon states that the third-party Defendants "prejudge the basis on which any liability might ultimately be assigned at trial." TP Pltf's Opp. at 8. Specifically, Kolon notes that "DuPont has asserted claims under the VUTSA, which provides a basis for liability in the case of both intentional conduct *and* negligence." Id. (emphasis in original). Therefore, Kolon contends that, because it *could* be found liable for its negligent conduct on Count One of the original Complaint, its claim of contribution cannot be dismissed at this time. See id.

Kolon's argument, however, ignores the substance of the allegations contained in the Complaint. Fundamentally, *each* of DuPont's claims against Kolon, including Count One, asserts the existence of an intentional tort. Indeed, from the opening paragraph of the Complaint, DuPont contends that Kolon "*engaged in concerted and persistent actions* to wrongfully obtain DuPont's trade secrets and confidential information about [the] KEVLAR aramid-fiber manufacturing

48

process." Compl. at ¶ 1 (emphasis added). Additionally, each of the six counts asserted against Kolon in the original Complaint allege the existence of intentional misconduct. These counts allege the following:

- In Count One, a claim for misappropriation of trade secrets, DuPont straightforwardly asserts that by actively soliciting trade secrets from Mitchell through furtive meetings and technical questions, "Kolon's misappropriation *was willful and malicious.*" Compl. at ¶ 58 (emphasis added).

- In Count Two, a claim for conspiracy to injure another in trade, business or reputation, DuPont alleges that "Defendants have combined and conspired with each other, and attempted to procure the participation, cooperation, agreement or other assistance of one or more persons, for the purpose of *willfully and maliciously* injuring DuPont's business in violation of Va. Code. Ann. § 18.2-499, et seq." Compl. at ¶ 60 (emphasis added).

- In Count Three, a claim for tortuous interference with a contract, DuPont states that Kolon "*intentionally interfered* with the Employment Agreement [between DuPont and Mitchell] by inducing Mitchell to disclose confidential, proprietary trade secrets . . . ." Compl. at ¶ 65. (emphasis added).

- In Count Four, a claim for tortuous interference with business expectancy, DuPont alleges that Kolon "*intentionally interfered with the business expectancy* by inducing Mitchell to use his knowledge of DuPont trade secrets to call on DuPont customers and converters on behalf of Kolon . . . ." Compl. at ¶ 70 (emphasis added).

- In Count Five, a claim for conversion, DuPont alleges that Kolon "wrongfully converted DuPont's confidential and trade secrets information when

it *retained and used* Dupont's confidential information." Compl. at ¶ 74 (emphasis added).

- In Count Six, a claim for civil conspiracy, DuPont alleges that Kolon "used improper and unlawful means, including but not limited to acting in tortious interference of contract and business expectancy, and in violation of the Virginia Uniform Trade Secrets Act." Compl. at ¶ 77.

Therefore, because each claim against Kolon pleads the existence of an intentional tort, Kolon is not entitled to contribution from the third-party Defendants.   For this additional reason, the third-party Defendants' Motion to Dismiss will be granted.

CONCLUSION

For the foregoing reasons, Kolon's Motion to Dismiss (Docket No. 9) will be denied, DuPont's Motion to Dismiss Kolon's Counterclaim (Docket No. 27) will be granted, with Kolon afforded leave to amend, and the third-party Defendants' Motion to Dismiss (Docket No. 30) will be granted.

It is so ORDERED.

                                    /s/          REP
                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date: August 27, 2009