

FILED

DEC 18 2009

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

E.I. DU PONT DE NEMOURS
AND COMPLANY,

     Plaintiff,

v.                        Civil Action No. 3:09cv58

KOLON INDUSTRIES, INC.,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff and Counter-Defendant DuPont's Motion to Dismiss Defendant and Counterclaimant Kolon's Second Amended Counterclaim (Docket No. 63). For the reasons discussed below, the motion will be granted, with leave to amend.

## BACKGROUND

This action arises out of a trade dispute between E.I. du Pont de Nemours and Co. ("DuPont") and Kolon Industries, Inc. ("Kolon"), over a product known generally as "para-aramid" fibers, which includes DuPont's commercially successful KEVLAR para-aramid product. The background facts of this dispute, which will not be repeated here, are fully described in this court's recent memorandum opinion, <u>E.I. Dupont De Nemours & Co. v. Kolon Industries</u>, 2009 U.S.

Dist. LEXIS 76795 (E.D. Va. Aug. 27, 2009). In that opinion, the Court assessed and denied Kolon's motion to dismiss DuPont's complaint, which alleged misappropriation of trade secrets and various other business torts. The opinion also assessed DuPont's motion to dismiss Kolon's Counterclaim, under Section 2 of the Sherman Act and Section 16 of the Clayton Act, "for monopolization and attempted monopolization of the para-aramid fiber market." Id. at *7-8. DuPont's motion was granted because of the inadequacy of Kolon's proffered geographic market, but allowed Kolon leave to amend the counterclaim to correct that pleading deficiency.

Kolon has attempted to make that correction in its Second Amended Counterclaim. The fatal flaw[1] in Kolon's initial Counterclaim was its allegation that "[t]he relevant geographic market for para-aramid fibers is the United States," Counterclaim ¶ 24. Because the Counterclaim, read in its entirety, made clear that foreign

---

[1]    This flaw is fatal because without a relevant market, Kolon's allegations lack "a 'necessary predicate' to finding anticompetitive effects." United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1110 (N.D. Cal. 2004) (quoting U.S. v. E.I. Du Pont de Nemours & Co., 353 U.S. 586, 593 (1957)). In the Fourth Circuit, failure to define the relevant market necessitates "dismissal of [the] entire claim." M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 1991 U.S. App. LEXIS 24904, at *5 (4th Cir. Oct. 22, 1991) (citing Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 495-96 (4th Cir. 1986)).

producers competed in the United States, the geographic market that Kolon alleged was "both conclusory and self-defeating," DuPont v. Kolon, 2009 U.S. Dist. LEXIS 76795, at *33.

Kolon's most recent attempt at defining the geographic market states, in full:

> The relevant geographic market is worldwide supply of para-aramid fiber to commercial purchasers in the United States. The geographic market includes foreign supply practicably available to U.S. commercial purchasers, but the extent and nature of that supply is not known and will have to be determined on a factual record. Competition for U.S. commercial para-aramid buyers occurs in the United States where the buyers are located. Many U.S. buyers require particular qualification analysis and tests for their specific commercial uses. And prices in the United States are distinct from other nations. There are only five global producers of para-aramid fiber. DuPont is the only domestic producer. Teijin is the only other supplier to U.S. commercial customers, but the amount of its supply and shipments to the United States for commercial use are not known. Its capacity to divert production for supply to United States commercial customers also is not known. Accordingly, the extent of its production that should be included in market definition and market share calculations must be left for factual determination. Kolon is the only other manufacturer that supplies commercial customers in the United States, and its sales to date are de minimis. Kamenskvolokno and Yenta Spandex do not supply commercial customers or otherwise ship para-aramid fiber into the United States.

The adequacy of this geographic market definition is the threshold issue for Kolon's Counterclaim. The

3

definition offered in the amendment is clearly less conclusory than Kolon's initial one.   The Court still must assess, however, whether the new definition remains internally inconsistent with the remainder of Kolon's Amended Counterclaim, thus defeating it.   Even if the definition does not render the Amended Counterclaim internally inconsistent, the Court must decide whether it adequately states a geographic market.

Also at issue is whether Kolon, in its Second Amended Counterclaim, has pled, in its allegations of exclusive dealing arrangements, anticompetitive conduct sufficient to support its claims of monopolization and attempted monopolization.   Its original Counterclaim, as the Court recognized in the recent memorandum opinion (DuPont v. Kolon, 2009 U.S. Dist. LEXIS 76795, at *39-40), was adequately pled, based upon the information available to DuPont at the time.   In developing its Second Amended Counterclaim, however, Kolon had access to all of DuPont's relevant supply agreements during the time period in question.   Kolon has incorporated the information from those agreements into its amended pleading, and DuPont now asserts that Kolon's amended allegations of anticompetitive conduct are legally insufficient.   Thus, it is necessary to reassess whether the anticompetitive conduct that Kolon

4

alleges is enough to state a claim upon which relief may be granted.

DISCUSSION

## A.    The Applicable Legal Standard

A motion to dismiss under Rule 12(b)(6) seeks to test the legal sufficiency of the factual allegations made in the Complaint.  Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Id.  As the Supreme Court held in Bell Atlantic v. Twombly, 550 U.S. 544 (2007), the pleading standard that Rule 8(a) announces does not require "detailed factual allegations," but it demands more than an unadorned accusation.  Id. at 555.  A pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Id.  Nor does a complaint suffice if it tenders only "naked assertion[s]" devoid of "further factual enhancement."  Id. at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Id. at 570.  A claim has facial "plausibility" when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." Id. at 557.

Although "all civil actions and proceedings in the United States district courts" are now governed by the pleading standard set forth in Twombly (Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009)), the standard's genesis in an antitrust case is significant here. Twombly, 550 U.S. at 558, noted that "antitrust discovery can be expensive." As part of a lengthy citation of the decisional law and academic literature regarding the expense of antitrust discovery, Twombly quoted Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984), to underscore that "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." Twombly at 558. Thus, Twombly admonishes district courts to make

6

every effort to ensure that every element of a claim is plausibly pled in every relevant respect, particularly for cases such as the broad scope antitrust case here at issue.

This case raises a fundamental problem confronting district courts in the post-Twombly era. On one hand, DuPont's pleadings rely in large part upon cases decided at summary judgment or at trial. On the other hand, Kolon does not give Twombly its due. See Kolon Oppo. Memo. at 18-19 (failing to recognize Twombly's warning that a claim is subject to 12(b)(6) dismissal if it only alleges conduct equally consistent with both legitimate and anticompetitive conduct). DuPont argues that a claim which is "merely consistent with" anticompetitive behavior may not rise to the level of plausibility required by Twombly, 550 U.S. at 557. Neither party acknowledges, however, the difficulties in assessing, without the benefit of full discovery, what exactly it takes to make a claim "plausible" as opposed to "merely consistent with" an antitrust violation.

It is also worth noting that, while this action shares an antitrust origin with Twombly, and the alleged anticompetitive actor also has a plausible alternative explanation for its conduct and the results,[2] the context of

---

[2]    Supply agreements are usually legitimate business arrangements. See United States v. Microsoft Corp., 253

the two actions is meaningfully different. Twombly rejected unadorned accusations of collusion amongst disparate actors. In this action, Kolon focuses its inquiry on unilateral practices by the unquestioned industry leader. Whereas the court in Twombly was asked to infer the very existence of an agreement among industry actors based on their independent conduct, there is no question here that DuPont executed the challenged supply agreements. The only question raised then is whether these agreements are sufficient, given the other alleged facts, to present a plausible case that the impact is a violation of the antitrust laws. Although this different context does not excuse Kolon from the need plausibly to allege each element of its claims, it does render the inquiry inherently less speculative than in Twombly.

**B.   The Adequacy of Kolon's Alleged Geographic Market**

As recently noted, "[a] relevant market has two dimensions:    (1) the relevant product market, which identifies the products or services that compete with each other; and (2) the relevant geographic market, which identifies the geographic area within which competition

---

F.3d 34, 69 (D.C. Cir. 2001) ("Permitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions.").

takes place." DuPont v. Kolon, 2009 U.S. Dist. LEXIS 76795, at *29 (citations omitted). Neither party disputes that the product market consists of para-aramid fibers. The parties do, however, dispute the adequacy of Kolon's alleged geographic market for that product.

"A product's 'geographic market' is referred to as the 'area of effective competition,' that is, 'the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product.'" Id. at *30 (quoting Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).

District courts historically are reluctant to dismiss an antitrust claim for deficiency of market allegations at the 12(b)(6) stage before the plaintiffs have had a chance to conduct discovery. Nonetheless,

> [I]n some circumstances, [market adequacy] may be determined as a matter of law. Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.

Apani Southwest, Inc. v. Coca-Cola Enterprises, 300 F.3d 620, 628 (5th Cir. 2002). And, both before and after Twombly, courts have dismissed numerous claims for faulty market definitions. See, e.g., Michigan Division, Monument

9

Builders of North America v. Michigan Cemetery Association, 524 F.3d 726, 734 (6th Cir. 2008) (rejecting the plaintiffs' claim that "the relevant geographic market is each individual cemetery in the State of Michigan"); Apani at 633 (rejecting a proposed market when the plaintiff tried to "artificially narrow a broader economic market, the City of Lubbock, to specific venues"); Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554 (8th Cir. 1998) (rejecting a market defined as "unloading services at [a single warehouse] in Urbandale, Iowa"); Queen City Pizza v. Domino's Pizza, 124 F.3d 430, 438 (2d. Cir. 1997) (rejecting a market consisting of all Domino's Pizza franchises) (citations omitted).

The primary fault with most inadequate geographic market definitions is that they have been artificially narrowed by a party seeking to portray a competitor's market power as more dominant than it actually is. As explained in Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 495 (4th Cir. 1986):

> The geographic demarcation should not be too tightly drawn, unless clear evidence exists that potential competitors outside the region are hindered from entering. A market drawn too tightly . . . in geographic terms that exclude potential suppliers . . . creates the illusion of market power where none may exist. Such a misleading start in antitrust analysis, always a difficult area for judicial resolution, makes

accurate determination of the ultimate question
-- whether the antitrust laws have been violated
-- impossible.

In considering geographic market adequacy, it is necessary to keep in mind the Supreme Court's admonition in Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993), "that the antitrust laws were passed for the protection of *competition*, not *competitors*." Market definitions that focus solely on the claimant's own sales, while failing to show damage to competition generally, are facially defective such that dismissal pursuant to a Rule 12(b)(6) motion is proper. See, e.g., Double D, 136 F.3d at 561 ("[P]laintiff's complaint does no more than state plaintiff's commercial disappointment at losing the unloading business at [one] warehouse."); Apani, 300 F.3d at 628 (noting, in rejecting the plaintiff's proposed market that was limited to facilities "owned and operated by the city," that the plaintiff had done business with other establishments in the city).

However, the narrowness or breadth of a geographic market is not dispositive of whether the market is a legally viable one. As noted in Glaberson v. Comcast Corp., 2006 U.S. Dist. LEXIS 62672 at *43, (E.D. Pa. Aug. 31, 2006) (citing Brown Shoe, 370 U.S. at 337), "[t]he relevant geographic market may be local, regional,

national, or international in origin." See also Brown
Shoe, 370 U.S. at 336 ("[A]lthough the geographic market in
some instances may encompass the entire Nation, under other
circumstances it may be as small as a single metropolitan
area."). The key question is whether the geographic
market, as defined in the complaint, "corresponds to
commercial realities." DuPont v. Kolon, 2009 U.S. Dist.
LEXIS 76795 at *30 (quoting Brown Shoe Co. v. United
States, 370 U.S. 294, 336-37 (1962)). As explained in
Apani, 300 F.3d at 626,

> When determining whether a geographic market
> corresponds to commercial realities, courts have
> taken into account practical considerations such
> as the size, cumbersomeness, and other
> characteristics of the relevant product. In
> addition, determinants that affect the behavior
> of market participants may also be considered
> such as regulatory constraints impeding the free
> flow of competing goods into the area,
> perishability of products, and transportation
> barriers.

Thus, when framing a geographic market definition in a
manner that narrows the market from its broadest possible
scope, a claimant must tether this narrowing to specific,
realistic attributes of the market.

When framing the geographic market, the examination
does not look merely at a snapshot in time of the present
market. Rather, it is necessary to undertake the difficult
task of assessing potential changes in market dynamics that

would occur if the alleged monopolist were to raise its prices to anticompetitive levels. See Little Rock Cardiology Clinic, P.A. v. Baptist Health, 573 F. Supp. 2d 1125, 1148 (E.D. Ark. 2008) ("A geographic market is determined not by where consumers actually go for a particular product or service, but rather by where they could go should the defendants' prices become anticompetitive.") (quoting Ferguson Med. Group v. Missouri Delta Med. Center, 2006 U.S. Dist. LEXIS 53493 at *6 (E.D. Mo. Aug. 2, 2006)). Of course, it also is essential to consider the possibility that the alleged monopolists' prices are *already* anticompetitive. See United States v. Eastman Kodak, 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (discussing the so-called "Cellophane fallacy" and academic critique thereof); accord United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) ("[T]he existence of substitution in the event of further price increases or even at the current price does not tell us whether the defendant already exercises significant market power.") (quoting Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 471 (1992)).[3]

---

[3]   The "Cellophane fallacy," a theory criticizing the Supreme Court's decision in United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377 (1956) for a logical error in product substitution, has more to do with product market

One influential theory suggests an expansive definition when assessing potential changes in market dynamics.   As articulated by leading scholars Landes and Posner,

> if a distant seller has some sales in a local market, *all* its sales, wherever made, should be considered a part of that local market for purposes of computing the market share of a local seller.   This is because the distant seller has proved its ability to sell in the market and could increase its sales there, should the local price rise, simply by diverting sales from other markets.

Eastman Kodak, 853 F. Supp. at 1468 (quoting William A. Landes & Richard A. Posner, Market Power in Antitrust Cases, 94 Harv. L. Rev. 937, 963 (1981)).   In assessing the market share of the five major photographic suppliers, Eastman Kodak noted that one-third of the relevant product purchased in America came from foreign manufacturers.   Id. Thus, the court concluded, "foreign manufacturers could quickly increase the supply of film for U.S. consumption if Kodak attempted to restrict output and raise prices."   Id. The ability of foreign manufacturers to rapidly meet American demand showed that American customers could practically turn to these foreign products as substitutes

---

definition than geographic market definition.   Still, on its face it exposes the unspoken starting point for cases such as Little Rock Cardiology, that prices are competitive already, when current prices may not in fact be competitive.

for Kodak products.  Id. at 1471.  The court noted that "Kodak's market share would . . . be exaggerated if the relevant market was defined as solely a United States market."  Id.  Thus, Eastman Kodak held the relevant market to be worldwide.  Id.

In United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1164 (N.D. Cal. 2004), the court also found a worldwide market.  Using such tests as the "hypothetical monopolist" test,[4] the "Elzinga-Hogarty test,"[5] and evidence that "prices in Europe constrain prices in the United States," the court concluded that the defendant had proven that the relevant geographic market could not be limited to the United States, because the "area of effective competition" for the products the court considered was significantly broader.  Id. at 1163-64.

While Eastman Kodak and Oracle recognized that a foreign supplier's performance outside the United States is relevant to market definition, all of the cases discussed

---

[4]  This test is taken from the Department of Justice Horizontal Merger Guidelines, which are discussed in detail below.

[5]  This test focuses on imports and exports among neighboring countries; it has been frequently criticized, although it was adopted in the Oracle Case, and used against Professor Elzinga, who testified on the Government's behalf that it should not apply under the facts of Oracle.

above have focused primarily on the second element of Tampa Electric, "where consumers can turn, as a practical matter, for supply of the relevant product."[6] DuPont's argument also places significant emphasis on the first Tampa Electric element, "the areas in which the seller operates." See Def. Memo. at 6 (criticizing Kolon's proposed market for not including "the foreign areas from which [para-aramid] supply is obtained in its market definition, focusing instead only on where the customers obtaining the supply are located"); id. at 7 (framing the crux of Eastman Kodak as "[w]hat mattered was not where the purchasers obtaining the supply were located but where the suppliers themselves were located").

Most decisions, however, tend to discuss this supplier-focused aspect of Tampa Electric relatively rarely. Indeed, two cases that Kolon cites are openly dismissive of the first element. See Glaberson, 2006 WL 2559479, at *12 ("[T]he geographic market is not comprised of the region in which the seller attempts to sell its

---

[6] This includes both Eastman Kodak and Oracle, both of which found that customers in the United States had the practical ability to turn to competitors should the alleged anticompetitive actor increase prices. Eastman Kodak at 1471; Oracle at 1163 (finding that a major competing product that is sold only in Europe "would do just fine in the United States," and thus inferring that it was a product to which United States customers could reasonably turn).

product, but rather is comprised of the area where his customers would look to buy such a product.") (quoting Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991); Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir. 1991) ("[A] company may compete in many markets or in only part of a market.  Where it competes does not define the market."). And as Kolon notes, most of the cases that DuPont cites in its argument have also focused primarily on the second element of Tampa Electric.  However, Tampa Electric, 365 U.S. at 327, makes clear that the geographic market analysis includes the "areas in which the seller operates." And, of course, Tampa Electric, not Glaberson or the other cases cited by Kolon, is the controlling authority.

The Department of Justice Horizontal Merger Guidelines § 1.2, 57 Fed. Reg. 41552 (Sept. 10, 1992), which both parties cite,[7] also speak to the issue of geographic market definition.[8]  The Guidelines focus on the ability of "a

---

[7]    Kolon Oppo. Memo. at 6; DuPont Reply Memo. at 4.

[8]    Kolon notes "that the market definition tests used for merger analysis are not completely apposite to market definition for monopoly cases."  Kolon Oppo. Memo. at 8. However, Kolon gives the court no guidance as to whether the Guidelines' force is any less persuasive in the monopolization context, nor whether any theoretical adjustments are required in applying them to the different context.

17

hypothetical monopolist" to raise prices when defining a market. Id. § 1.21. Basically, if a hypothetical monopolist could impose a "small but significant and nontransitory" (e.g., 5%) price increase within an area and not lose significant business, then the Government will designate that area as the geographic market. Id. If, however, the hypothetical monopolist would lose significant business from such a price increase, because customers would turn to outside suppliers at the higher price, then the geographic market would be too narrowly defined. Id. In such a scenario, the Government would "add the location from which production is the next-best substitute" to its geographic market. Id. The Government adopts the "smallest market" principle, meaning that the smallest market in which prices may be raised with relative impunity is considered to be the relevant geographic market. Id. (cross-referencing id. § 1.0, which states that "[a] relevant market is a group of products and a geographic area that is no bigger than necessary to satisfy [the hypothetical monopolist] test").

According to Kolon, "the bottom line collective point of all the geographic market definition tests, theory and authority is to identify and include in the relevant geographic market *only the alternative supply practically*

*available to constrain the alleged monopolist's practice.*" Kolon Oppo. Memo. at 8 (emphasis added). Although Kolon notes a commonality among courts and theorists who have considered market geography, the true bottom line lies deeper, beneath Kolon's self-serving focus on supply. "The penultimate question, towards which this preliminary inquiry into market definition is directed, is whether the defendant has market power: the ability to raise prices above levels that would exist in a perfectly competitive market." Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 495 (4th Cir. 1986).

In sum, to define the geographic market within which to assess market power, the law recognizes a range of possible market types, focusing on the supply to which consumers can practically turn in purchasing a particular product type, while recognizing from whence that supply comes. In defining practicability, the law looks at whether consumers can or could switch between competing products in response to price increases by the alleged anticompetitive actor. Beyond these broad principles, geographic market definition is a fact-intensive, case-specific inquiry.

19

C.   **Kolon's  Proposed  Hybrid  Market  of  Practically
     Available Global Supply and United States Demand**

It  is  clear  from  the  entirety  of  Kolon's  Second
Amended Counterclaim that para-aramid fibers are bought and
sold all over the world.  And, looking to the first element
of  what  constitutes  a  properly  defined  geographic  market
(Tampa  Electric,  365  U.S.  at  327),  the  areas  in  which
DuPont and Kolon operate (2d Am. Counterclaim ¶¶ 1-2) are
worldwide.   Thus,  one  might  expect  "the  world"  to  be  the
relevant geographic market.

However,  focusing  on  the  second  Tampa  Electric
element, "where consumers can turn, as a practical matter,
for supply of the relevant product," id., Kolon attempts to
construct  a  hybrid  world/U.S.  market  definition,  covering
global  supply  that  is  practically  available  to  meet
American  demand.   Such  a  construction  gives  Kolon  the
ability to colorably claim a geographic market that is both
viable  and  internally  consistent,  whereas  an  alternative
allegation  of  "the  United  States"  or  "the  world"  would
plead Kolon out of court.  If Kolon alleged that the market
consisted  of  only  the  United  States,  this  would  belie  the
worldwide  nature  of  both  its  business  and  DuPont's
business, rendering Kolon's claims internally inconsistent.
If  the  market  were  expanded  to  include  the  entire  world,

Kolon could not viably plead monopolization because its Second Amended Counterclaim does not allege that DuPont presently has any sort of world para-aramid monopoly power.[9]

DuPont, citing, Eastman Kodak and Oracle, contends that the relevant geographic market should be "the world". But, in those cases, the acceptability of this market definition was not passed upon until *after* evidence had been presented. In Eastman Kodak, "[i]t was Kodak's burden to prove that the relevant geographic market is world-wide." Id. at 1470. Kodak met that burden by demonstrating "that the area of effective competition . . . is the entire world, and purchasers of film can 'practically turn' to Kodak products produced in the United States, or to the products of foreign manufacturers." Id. at 1470-71. In Oracle, acceptance of the defendant's proposed world-wide market definition occurred only after a lengthy trial, id. at 1101, which included substantial presentation of expert testimony relating to the appropriate geographic market. Hence, Eastman Kodak and

---

[9]    Kolon alleges that, before 2001, "for nearly three decades . . . DuPont's Kevlar with [another firm's para-aramid product] held a global duopoly," and that "DuPont's market share remains greater than 70% of all sales by purchase volume of para-aramid fiber in the United States." 2d Am. Compl. ¶¶ 15, 17.    But Kolon does not allege a present global monopoly or duopoly.

<u>Oracle</u> are of limited utility in assessing the viability of
a complaint under Rule 12(b)(6).

However, it is true that the market need not consist
of the entire world simply because competing products of
comparable quality are bought and sold globally.  Case law
and the Horizontal Merger Guidelines make it abundantly
clear that the relevant geographic market is not defined
according to the broadest scope in which the product is
traded.   See <u>Apani</u>, 300 F.3d at 629 (noting that the city
of Lubbock might constitute an appropriate market); <u>United
States v. Philadelphia National Bank</u>, 374 U.S. 321, 359
(1963) (finding a "four-county area" sufficient when the
majority of the seller's business was done there); <u>see also</u>
Horizontal Merger Guidelines §§ 1.11, 1.21 (employing a
"smallest market" principle in constructing both the
product market and the geographic market).  What matters is
that the market definition reflects commercial realities --
specifically, consumers' ability to practically purchase
competing products.

In this action, Kolon alleges that United States
customers have considerable difficulty in turning to the
products of foreign manufacturers.   See 2d Am. Counterclaim
¶ 24 (identifying that U.S. buyers often "require
particular qualification analysis and tests" that have

22

stunted competition in the United States, as evidenced by the fact that "prices in the United States are distinct from other nations"). Furthermore, in identifying Kamenskvolonko and Yantai Spandex as para-aramid producers "who do not supply commercial customers or otherwise ship para-aramid fibers into the United States," 2d Am. Counterclaim ¶ 24, Kolon plausibly alleges that supply from these companies is unavailable, practically speaking, to American para-aramid purchasers.

Furthermore, Kolon gives specific reasons explaining why certain segments of the worldwide para-aramid market are practically unavailable to American purchasers. In so doing, Kolon endeavors to tether its alleged relevant geographic market to the commercial realities of the para-aramid fiber business. For example, the sale of para-aramid fibers requires that these fibers be integrated into the design of a second product (such as a tire or a protective vest) that is then sold to end users. 2d Am. Counterclaim ¶ 22. See also DuPont Mot. Exh. 1, at 3 ("[T]he qualification time often required by customers for evaluating and qualifying new materials can be anywhere from months to two years."). Thus, both Kolon and DuPont seem to agree that, for this highly specialized, for-integration-only product, one cannot expect customers to

23

switch seamlessly among suppliers all over the world in response to a hypothetical monopolist's price increase. This mitigates toward the plausibility of Kolon's proposed market definition.

So do other "commercial realities" of the para-aramid market. First, and most importantly, Kolon alleges that pricing in the United States is higher than other markets while U.S. supply remains low (2d Am. Counterclaim ¶¶ 17, 24) despite the existence of two foreign suppliers that are actively competing for American customers. A plausible inference from this allegation is that the pricing discrepancy demonstrates DuPont's ability to raise the prices it charges to American customers without losing substantial business.[10]  Cf. Horizontal Merger Guidelines § 1.21.  However, Kolon also alleges a reason why prices are higher in the United States by pleading that many buyers impose high standards for product performance and strict product specifications which, of course, logically explains the higher prices.

---

[10]    Another plausible inference is that DuPont has already raised its prices with impunity.  Yet another plausible inference is that pricing is higher in the United States because of the "qualification analysis and tests" that Kolon alleges American customers require, as opposed to DuPont's anticompetitive conduct.  But, for the purposes of a Rule 12(b)(6) motion, the claimant meets its burden by setting forth one plausible inference among several.

As a second market reality, Kolon alleges that "sophisticated technology and a very large investment in capital" are required to compete in the para-aramid market. 2d. Am. Counterclaim ¶ 26. The fact that there are only five producers worldwide, three of whom (Kolon, Kamenskvolokno, and Yantai Spandex) appear to have emerged relatively recently, 2d Am. Compl. ¶ 8(c)-(e), despite high prices and low demand, supports this allegation.

As a third consideration, it is asserted that travel barriers may preclude all foreign supply from being practically available to American purchasers. Cf. United States v. General Dynamics Corp., 415 U.S. 486, 491 (1974) (finding, in assessing the relevant geographic market for coal production, that "a realistic geographic market should be defined in terms of transportation arteries and freight charges that determine[] the cost of" the delivered product). The importance of travel barriers is said to be magnified in this case, given that para-aramid yarn must be integrated into other products, delaying the ability of customers to switch rapidly between suppliers. Additionally, because all of DuPont's competitors are located overseas, shipping and marketing costs may be higher for such suppliers. Although Kolon is not entitled to special protection from shipping costs as a foreign

manufacturer, the faraway locations of competing producers may bear upon the feasibility of the United States as a separate market.

Fourth, Kolon also pleads that DuPont recognizes the North American market as distinct. Kolon Oppo. Memo. at 3. Industry recognition of a market may carry some weight in defining the geographic market. See FTC v. Freeman Hospital, 69 F.3d 260, 270 (8th Cir. 1995) (noting "that testimony of market participants is relevant to a determination of a proper geographic market"). However, "the views of market participants are not always sufficient to establish a relevant market, especially when their testimony fails to specifically address the practicable choices available to consumers." Id. Thus, DuPont's view of what constitutes a separate market carries no weight unless it reflects market realities. Moreover, for purposes of this motion, it is important to note yet another instance of dissonance between Kolon's geographic market allegation and the rest of its pleadings because the allegation is that DuPont views North America, not simply the United States, as a distinct market.

Finally, and most importantly, Kolon notes a "unique legislative barrier to market entry" in the United States: the requirement that the Department of Defense purchase

products made in America, commonly referred to as "the Berry Amendment." 2d Am. Counterclaim ¶ 26. See also id. ¶ 27 (noting that the only way around the Berry Amendment prohibition of foreign sales to Department of Defense purchasers is by congressional action, and observing that Teijin obtained such a waiver in 2001); 10 U.S.C. § 2533a ("[Absent a few exceptions], funds appropriated or otherwise available to the Department of Defense may not be used for the procurement of [items] not grown, reprocessed, reused, or produced in the United States.").

This legislative barrier to market entry is another factor in assessing the viability of Kolon's alleged geographic market. The documents that DuPont has provided in preliminary discovery indicate that five of its top ten customers cannot, by virtue of the Berry Amendment, purchase Kolon's products. DuPont Mot. Exh. 1, at 3. Thus, these customers should not be considered as part of the relevant market. Cf. Ideal Dairy Farms v. John Labatt, Ltd., 90 F.3d 737, 749 (3d Cir. 1996) (identifying regulatory barriers that had formerly existed, prohibiting sales of New York milk in New Jersey markets, but "no longer limited [the] potential market"). Also worth noting is that DuPont's top ten customers, in aggregate, represent approximately 85% of DuPont's overall sales volume, id.

Exh. 1, at 2-3, indicating that roughly 40-45% of DuPont's customers would not have the option of buying from Kolon.

DuPont views the effect of the Berry Amendment somewhat differently. DuPont characterizes Kolon's inability to compete for these customers as resulting from "Kolon's failure to obtain a waiver." DuPont Mot. Exh. 1, at 3. Perhaps this is true. Kolon does not allege that it has even tried to obtain a waiver; it only notes that obtaining a waiver "involves a lengthy process of petitioning members of Congress." 2d Am. Counterclaim ¶ 27.

The parties have not discussed the Berry Amendment in the pleadings, other than in passing reference. The Third Circuit, however, addressed a similar regulatory barrier to market entry in Barr Laboratories, 978 F.2d 98, 113 (3d Cir. 1992). Barr Laboratories compared the regulatory barriers that the Supreme Court discussed in United States v. Marine Bancorporation, Inc., 418 U.S. 602, 629-30 (1974) (finding that commercial banking regulations posed a significant barrier to market entry) and United States v. Falstaff Brewing Corp., 410 U.S. 526 (1973) (finding that regulation of the beer industry did not pose a significant barrier to market entry). Considering the FDA approval process, Barr Laboratories found it dissimilar to

28

commercial banking regulations, which render 'the entry of new competitors into the . . . field 'wholly a matter of governmental grace . . .' and 'far from easy,'" id. at 113 (quoting Marine Bancorporation, 418 U.S. at 628-29).

In this case, Kolon has alleged that obtaining a Berry Amendment waiver is "far from easy." Id. Thus, for purposes of a motion under Rule 12(b)(6), the Court views Kolon's inability to compete for customers limited by the Berry Amendment as one that narrows the applicable market to those customers not affected by the Berry Amendment.

Narrowing the market to account for the impact of the Berry Amendment, however, creates a pleading problem for Kolon. The pleadings provide only vague clues as to DuPont's share of this market. In its pleadings, Kolon alleges that the separate market for customers restricted by the Berry Amendment is split between DuPont and Teijin. But, Kolon makes no allegations respecting what percentage of the Berry-limited market DuPont controls, nor what percentage of DuPont's overall sales are attributable to the restricted vis-à-vis the unrestricted segments of the market. Kolon, while acknowledging the Berry Amendment as

a constraint, does not plead that the relevant market is limited to customers not subject to the Berry Amendment.[11]

In addition to the Berry Amendment barrier and the other market realities discussed above, Kolon's "de minimis" share of the United States market (2d Am. Compl. ¶ 28), while not raised as an element of geographic market definition, could demonstrate that American purchasers may have practical difficulty even when turning to foreign suppliers that do attempt to compete in the United States. Alternatively, Kolon's low sales volume may indicate that Kolon has simply not figured out how to compete in the American market, or that it has not yet competed in the

---

[11]     The information required to plausibly allege monopoly power in such a restricted market, as opposed to an unrestricted market, may be very difficult to discover, but it is necessary for Kolon to have a viable claim.  It is necessary because, as explained infra, Kolon is unable to allege an adequate degree of market foreclosure, as required to show anticompetitive effects from DuPont's supply agreements, if the market is expanded to include customers restricted by the Berry Amendment.  To summarize that explanation here, DuPont has executed supply agreements, covering various periods from 2006 through the end of 2010, with four of its top twelve customers.  Given all the surrounding circumstances, this percentage does not allow for a plausible claim of substantial foreclosure. However, if the customers restricted by the Berry Amendment are excluded, then DuPont has executed supply agreements with four of its top seven customers -- a majority, and a number plausibly allowing for an adequate degree of foreclosure.

American market for long enough to have gained much traction. However, at this stage of the case, if Kolon is competing, it is plausible to infer that, if it has been hindered from entering the market (Consul, 805 F.2d at 495), the full extent of Kolon's global supply is not practically available to American customers.

Even if there is considerable evidence that much of Kolon's supply is not practically available to consumers in the United States, the wisdom of Landes & Posner (as applied in Eastman Kodak, 853 F. Supp. at 1468) counsels the Court to include *all* of Kolon's sales to all markets within the relevant geographic market for this case. Kolon does not allege that all of its global sales should be included in the relevant market.

But the economic model proposed by Landes and Posner is less persuasive when exclusive dealing arrangements are alleged. When a "distant seller" (id.) is prevented from effectively competing in the American market by anticompetitive conduct, the anticompetitive actor's exclusive deals prevent the distant seller from injecting a rapid influx of competing product in response to a price increase. And, when such alternative supply is not "practically available," the Landes and Posner model should

not dictate that such supply be included in the relevant geographic market.

Based on the market realities described above, Kolon may plausibly assert that the relevant geographic market is not global. However, that does not mean that Kolon's proposed hybrid world/U.S. geographic market is valid. The Court is aware of no cases that have specifically adopted a market drawn to include world supply available to meet American demand. The market, per Tampa Electric, 365 U.S. at 327, must be expanded to include the areas where the sellers operate.

In this case, a plausible market may be smaller than the world, but it must be larger than the United States. Specifically, Kolon plausibly alleges that China and Russia should not be counted, because, as Kolon pleads (2d Am. Counterclaim ¶ 24), supply from these countries is not practically available to American consumers because the companies based there (Yantai Spandex and Kamenskvolokno) do not compete in the United States. But, Kolon cannot acknowledge, on one hand, that Teijin and Kolon sell to American customers while, on the other hand, excluding those countries from the geographic market. Thus, the minimum plausible geographic market for Kolon's allegations must include the Netherlands, where Teijin is

headquartered, and Korea, where Kolon is headquartered. Although Kolon may plausibly allege that an American aramid purchaser could not practically turn to Russia for supply, because Russia has no manufacturer that would be equipped to handle the needs of the American consumer, Kolon could not plausibly say the same of Korea or the Netherlands.

Although markets consisting of the United States plus other parts of the world, but not including the entire world, are uncommon, they are not unprecedented. See Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F. Supp. 462, 471 (E.D. Pa. 1972) ("The relevant geographic markets are the United States and Canada and the metropolitan areas in which the NHL teams are located."). In this case, such a market is needed to reflect the commercial realities of the para-aramid industry, in which the pertinent loci of production are (at minimum) the United States, the Netherlands, and Korea.

As DuPont notes, "at the pleading stage, the Court need not determine what the relevant geographic market actually is . . . . [r]ather, it must determine whether Kolon's allegations are sufficient." DuPont's Reply Memo. at 4. Even if discovery were to reveal "clear evidence . . . that potential competitors outside the [United States] are hindered from entering," Consul, 805 F.2d at 495, such

evidence would not remedy the implausibility of Kolon's alleged geographic market, one that fails to include the areas where the pertinent sellers operate, and where American customers have in fact turned to purchase para-aramid fibers.

It is not clear whether Kolon plausibly could allege that DuPont has monopoly power in a market that would meet the legal requirements for a relevant geographic market. Thus, Kolon should be afforded the opportunity to amend its complaint if, within the confines of Fed. R. Civ. P. 11, it can allege monopoly power in a market including, at minimum, the United States, the Netherlands, and Korea, and a market that excludes those customers with whom Kolon cannot do business by reason of the Berry Amendment.

## D. The Adequacy of Kolon's Alleged Anticompetitive Conduct

Kolon alleges two varieties of antitrust claims: actual monopolization and attempted monopolization. First, Kolon alleges actual monopolization, the two elements of which are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Oksanen v. Page

34

Memorial Hospital, 945 F.2d 696, 710 (4th Cir. 1991)
(quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
472 U.S. 585, 596 n. 19 (1985)). Second, Kolon alleges
attempted monopolization, the three elements of which are
"(1) a specific intent to monopolize the relevant market;
(2) predatory or anticompetitive acts in furtherance of the
intent; and (3) a dangerous probability of success." M & M
Medical Supplies & Services, Inc. v. Pleasant Valley
Hospital, Inc., 981 F.2d 160, 166 (4th Cir. 1992).

Although slightly different analyses underlie the
actual monopolization and attempted monopolization claims,
each of them must, as their foundation, include some type
of conduct that threatens the competitive balance in the
relevant market, or has prevented competitors from emerging
at all. Kolon's Second Amended Counterclaim alleges but
one type of anticompetitive conduct: "multi-year supply
agreements that required the customer to purchase from 80%
to 100% of the customer's requirements from DuPont." 2d
Am. Counterclaim ¶ 29.

The Court's recent memorandum opinion in this
litigation found that Kolon had adequately pled allegations
of anticompetitive conduct respecting DuPont's supply

agreements.[12]  DuPont v. Kolon, 2009 U.S. Dist. LEXIS 76795,

at *39-40.  However, the Court also encouraged Kolon, when

amending its counterclaim, to consider the information that

DuPont had recently disclosed about its supply agreements

with its largest customers.  Kolon has incorporated some of

the information provided, and DuPont has attacked the

sufficiency of Kolon's allegations once again, alleging

that Kolon has retrenched from its prior position based on

the information DuPont has provided.  See DuPont Memo. at

16-18 (identifying four instances where Kolon, in response

to the recently disclosed information, has altered its

allegations in the second amended counterclaim).

     Ordinarily, courts considering a motion under Rule

12(b)(6) need consider only the pleadings themselves,

without evaluating extrinsic evidence.   However, when a

plaintiff relies on an item outside the pleadings to

substantiate its claim, the Court may consider it.

American Chiropractic v. Trigon Healthcare, 367 F.3d 212,

234 (4th Cir. 2004); see also Philips v. Pitt County

Memorial Hospital, 572 F.3d 176, 180 ("We may also consider

documents attached to the complaint, see Fed. R. Civ. P.

---

[12]   The Court also dismissed, with prejudice, Kolon's
other allegations of anticompetitive conduct, namely those
rooted in DuPont's disparagement of Kolon's product and
DuPont's joint ventures with rivals.  DuPont v. Kolon, 2009
U.S. Dist. LEXIS 76795, at *33.

10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic."). Both parties reference the supply agreements extensively, though with considerable discretion, because the agreements, filed under seal, are confidential.

Consideration of the supply agreements, which have been incorporated into the pleadings as exhibits, does not convert the motion to dismiss into a summary judgment motion. See, e.g., Walker v. S.W.I.F.T. SCRL, 517 F. Supp. 2d 801, 806 (E.D. Va. 1997) (citing Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431) (noting that the rule allowing incorporation of an extrinsic document into a motion to dismiss "requires that the referenced document be central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted"). The Court will not view these supply agreements as it would view the entirety of both parties' evidence at summary judgment. But, DuPont has affirmed, at oral argument in open court, that it has disclosed all supply agreements pertinent to Kolon's claims. Thus, the legal sufficiency of Kolon's allegations depends upon whether its claims of market exclusion are plausible given the substance of the supply agreements.

Because the supply agreements are pertinent to both the monopolization and the attempted monopolization claims, the facts of the agreements are discussed first, and the legal implications for each of Kolon's antitrust theories are discussed second.

1.    The Documents in Question

DuPont has revealed supply agreements with four of its twelve largest customers at various times since 2006.  As above, DuPont asserts that these are the only supply agreements relevant to Kolon's claims.   And, Kolon makes reference to these agreements in its amended pleadings.

Three of the agreements are similar enough to be considered together.   These three agreements all contain a "meet-or-release" clause, providing that if the customer gets an offer from a competing supplier that is 2% below DuPont's price, and DuPont declines to "meet" this offer, the customer is "released" from the supply agreement.   Each of these three agreements required the customer to purchase 80% or 85% of its para-aramid fiber yarn from DuPont.   Two of the agreements are currently in effect through the end of 2010; one has expired, but was in effect at various points between the beginning of 2006 and the present.   One of the agreements currently in effect has a provision allowing termination, without cause, upon 180 days notice.

38

The fourth agreement, which is no longer in effect, was with DuPont's second highest volume customer. It differed from the other three agreements in several respects. First, it did not contain a "meet-or-release" clause. Second, it mandated that the customer purchase 100% of its para-aramid fibers from DuPont for existing applications. Third, although it did not specifically state that DuPont provided discounts to the customer, the agreement lists "the prices offered by Seller set forth below" as "consideration" for the agreement. Fourth, the agreement provided for substantial rebates when certain product types were bought through certain distributors. This two-year agreement expired in February 2009. DuPont Mot. Exh. 2.

These documents, in essence, are Kolon's case for anticompetitive conduct. Other than an allegation, 2d Am. Counterclaim ¶ 30, that "various key customers refuse even to deal with Kolon while under supply agreement with DuPont," which is not substantiated by any information indicating which customers, or how many, refuse to deal with Kolon, the supply agreements constitute the entirety of the anticompetitive conduct alleged. It is necessary now to discuss whether these supply agreements can carry the substantial weight that Kolon has placed upon them.

## 2.   Kolon's Antitrust Theories

As noted above, the legal analysis differs slightly for claims of actual monopolization and claims of attempted monopolization.   See Barr Labs, 978 F.2d 98, 110-12 (analyzing the impact of exclusive dealings separately for each claim type).   Thus, the legal implications of DuPont's supply agreements are discussed for actual monopolization and attempted monopolization in turn.

### a. Actual Monopolization

As noted above, a monopolization claim requires both the possession of monopoly power, and the acquisition or maintenance of that power through improper means.   In this instance, the Court will presume, *arguendo*, that DuPont possesses monopoly power and thus meets the first element. Kolon alleges that DuPont has a market share of at least 70% in the United States.   DuPont, while disputing the plausibility of United States purchasers as a separate market, does not dispute Kolon's allegation of its market share.   Whether Kolon is able to plausibly allege market power in a viable geographic market will be assessed on the basis of future pleadings, if any are to be filed.

Respecting the second element, maintenance of monopoly power through improper means, the Court recently observed that "[a]lthough not illegal in and of themselves,

40

'exclusive dealing arrangements' can constitute an improper means of maintaining a monopoly." Dupont v. Kolon, 2009 U.S. Dist. LEXIS 76795, at *35. (citations omitted). "The legality of an exclusive dealing arrangement under the Clayton Act depends on whether the competition foreclosed constitutes a substantial share of the market." Barr Laboratories, 978 F.2d at 110. Substantiality of market share is not defined by an arbitrary numerical percentage threshold, but, rather, is "qualitative," "requir[ing] the courts actually to evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." Id. at 111. Such factors may include "the duration of the agreement, the ability of consumers to comparison shop, and their propensity to switch products, the existence of barriers to entry, and the availability of alternative channels of distribution." R.J. Reynolds Tobacco Co. v. Philip Morris, 199 F. Supp. 2d 362, 389 (M.D.N.C. 2002) (citing Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1233-34 (8th Cir. 1987)). And, "[t]he lower the foreclosure percentage, the more salient these factors become in determining whether there has been substantial foreclosure." Id. In the context of these factors, "[c]ourts have condemned provisions involving foreclosure

as low as 24% while provisions involving foreclosure as high as 50% have been upheld." Id. at 388.[13]

As stated in United States v. Dentsply, "economic realities rather than a formalistic approach must govern review of antitrust activity." 399 F.3d 181, 189 (3d Cir. 2005) (citing Eastern Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 466-67 (1992)). "Exclusivity" of supply agreements is thus properly considered as a matter of their substantive effect, not as a simple identification of whether the agreements literally foreclose all possible competition. Courts will take "cognizance of arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors." LePage's, Inc. v. 3M, 324 F.3d 141, 157 (3d Cir. 2003) (citing Tampa Electric, 365 U.S. at 327). The alleged anticompetitive actor need not achieve "total foreclosure" through its supply agreements, but it may violate antitrust law by simply keeping a competitor's market share "below the critical level necessary for any rival to pose a real threat." Id. at 191. Thus, antitrust law does not require that a supply agreement, by its specific terms, limit the

---

[13]    Notably, the case finding 24% to be substantial foreclosure, involved "contracts of greater than ten years' duration." Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1302 (9th Cir. 1982).

purchaser to buying only the seller's product, if the effect of the agreement is to prevent any real threat to the seller's dominance.   However, the use of supply agreements must have anticompetitive effects that exceed the mere winning of business.   The use of supply agreements must damage the competitive balance in the market.   Brooke Group, 509 U.S. at 224.

The parties dispute whether the "substantial foreclosure" standard used for § 1 and § 3 claims also applies to § 2 monopolization claims.   Compare Kolon Oppo. Memo. at 15-16 (contending that DuPont applies "the wrong legal standard" because "'Substantial foreclosure' is a Sherman Act Section One and Clayton Act Section Three standard") with DuPont's Reply at 9 n.3 (stating that Kolon is wrong in rejecting the "substantial foreclosure" standard in § 2 cases, and collecting cases that purportedly support the opposite proposition).

A review of the two cases Kolon cites for the proposition that "substantial foreclosure" is "the wrong legal standard" make clear that a degree of foreclosure may be large enough to violate § 2 without being large enough to violate § 1.   United States v. Microsoft Corp, 253 F.3d 34, 70 (D.C. Cir. 2001).   And it is true that some courts have found activity by a monopolist to have a higher

likelihood of substantially foreclosing a relevant market
than would the same conduct by an actor without monopoly
power.   Id.; see also Dentsply, 399 F.3d at 187 ("[A]
monopolist is not free to take certain actions that a
company in a competitive (or even oligopolistic) market may
take, because there is no market constraint on a
monopolist's behavior.");[14] LePage's, Inc., 324 F.3d at 159
(noting that "[t]he Microsoft court treated exclusionary
conduct by a monopolist as more likely to be
anticompetitive than ordinary § 1 exclusionary conduct").

      Still, although Dentsply did not use the phrase
"substantial foreclosure," it might as well have:   "The
test is not total foreclosure, but whether the challenged
practices bar a substantial number of rivals or severely
restrict the market's ambit."   Id. at 191.   And though
Microsoft indicated that § 2 claims might not be held to
the 40% standard for §1, it did not imply that
insubstantial market foreclosure was actionable.   The
plaintiff in Microsoft alleged that the company's

---

[14]      As DuPont does not appear to be a strict monopolist,
because Teijin appears to possess a substantial percentage
of the market share, the extent to which this authority
helps Kolon is not clear.   However, as the Third Circuit
observed in LePage's, Inc., "even the foreclosure of 'one
significant competitor' from the market may lead to higher
prices and reduced output."   324 F.3d at 159 (citations
omitted).

anticompetitive conduct involved "closing to rivals a *substantial percentage* of the available opportunities for browser distribution." 253 F.3d at 70 (emphasis added). Furthermore, the court found that the deals in which Microsoft engaged "clearly have a significant effect in preserving its monopoly." Id. at 71.

Overall Microsoft and Dentsply indicate that, if the facts indicate a significant detriment to competition from a monopolist's exclusive dealing agreements, the court may recognize it and assess the monopolist's behavior accordingly. And it is possible for an exclusive dealing agreement to violate § 2, but not § 1.[15] However, at the very least, the effect of the agreements upon preservation of monopoly power must be significant. Thus, the best possible standard for Kolon in this case could be construed as a "significant effect" standard.

Dentsply provides an example of market foreclosure in the monopolization context. In the specialized market for artificial teeth that Dentsply considered, despite the

---

[15] The cases DuPont lists for its proposition that "substantial foreclosure" applies equally to § 2 cases, DuPont Memo. at 9 fn.3, demonstrate only that it is possible for exclusive dealing agreements to have so little impact that they meet neither the higher § 2 standard nor the lower § 1 standard. None of these cases held that the analysis was identical, nor did they appear to consider (or have reason to consider) the differences pertinent to the present litigation.

existence of some degree of competition in the industry,
"[t]he reality [was] that the firm that tie[d] up the key
dealers rule[d] the market." 399 F.3d at 190. Microsoft
likewise involved a pattern of dealing that "help[ed] keep
usage of [a competing product] below the critical level
necessary for [the competing product] or any other rival to
pose a real threat to Microsoft's monopoly." 253 F.3d at
71.

Kolon argues, along similar lines, that, in the
specialized market for para-aramid fibers, DuPont's supply
agreements have "severely limited Kolon from competition
for the most important customers in categories needed to
gain a foothold for effective competition," in their
"cumulative impact." 2d Am. Counterclaim ¶¶ 32-33.

In response, DuPont raises two arguments. First,
DuPont contends that the supply agreements were not
exclusive. Second, it asserts that the agreements did not
foreclose a substantial share of the market.

Tackling the easier issue first, the agreements,
viewed in the light most favorable to Kolon, are exclusive
in nature. DuPont gives three reasons why this should not
be so: (1) because the agreements only mandated that the
buyer purchase 80-85% of its product from DuPont, Kolon was
free to compete for the remaining 15-20% of the buyers'

business; (2) the "meet or release" clauses in three of the four supply agreements left Kolon free to compete for all of the suppliers' business; and (3) in the agreement that contained no "meet or release" clause obligating the buyer to purchase 100% of its product from DuPont for existing applications, Kolon was still free to compete for new applications that this customer may develop in the future. None of these reasons show the agreements not to have an exclusive effect.

As to DuPont's first proffered reason, the idea that Kolon could compete for 15-20% of a purchaser's business may not be realistic. And changing suppliers, particularly given the timeframes noted above for qualification and testing, may not be practicable. Conceptually, the customer has some freedom to buy Kolon's product. However, the commercial realities of the para-aramid industry, particularly the fact that para-aramid fibers are integrated into the products that para-aramid customers make, render it unlikely that such a customer would use a second supplier for such a small share of that customer's para-aramid needs. To expect one manufacturer to use two different brands of para-aramid fiber in one of its product types would be asking them to risk possible discrepancies within a product line.

Second, the "meet or release" clauses, while they may provide the illusion of unfettered access to potential customers, can be severely restrictive. Kolon notes, 2d Am. Counterclaim ¶ 30, that these provisions give DuPont "an absolute right to preempt new entrants." Furthermore, such a clause "also gives DuPont competitive information and a competitive advantage not available to Kolon." Id. In essence, to win business that DuPont controls by a supply agreement with a "meet or release" clause, Kolon must make a shot-in-the-dark price offer, hope that the offer beats DuPont's price (which it has no way of knowing) by 2% or more, then hope that DuPont decides not to match Kolon's price. Kolon is thus not "free to compete" for this business, as DuPont alleges. Although these clauses may provide some incremental check on DuPont's ability to raise prices to anticompetitive levels, they pose a formidable hurdle to competing for the customers who have agreed to these deals.

Third, the ability to compete for new applications, for a supplier who is committed to using DuPont's product for 100% of its existing applications, appears unrealistic. The only way that any percentage of this customer's business is open to new applications is if it is actually developing new applications. There is no indication that

this customer has any new applications, and thus there is no showing that there is any business of this customer for which Kolon can compete. Thus, the agreement, even more than the others, appears undeniably exclusive.

As to DuPont's claim that these agreements to not foreclose the market to a degree requisite to constitute prohibited conduct by a monopolist, that presents a more challenging issue. Kolon asserts its theory, a la Dentsply and Microsoft, that DuPont's supply agreements have prevented Kolon from having "an opportunity to compete for high volume customers in critical sustainable use categories necessary to gain a threshold level of sales to effectively enter the United States." 2d Am. Counterclaim ¶ 37. Thus, DuPont's actions have allegedly barred "the only potential entrant to the United States in decades from effectively entering the market. . . . DuPont continues to control both price and output." Id.

Turning to the actual share of the market that Kolon has been effectively prevented from entering, the record shows that four of DuPont's top twelve suppliers are or were, at various points in time from 2006 until the end of 2010, constrained from buying a competitors' product. Although the pleadings do not indicate the exact percentage of the market that these agreements foreclose, four of

twelve equates to roughly 33% of DuPont's customers that were foreclosed from competition. Giving Kolon a favorable inference that DuPont controls 75% of the market,[16] if 33% of DuPont's 75% market share is foreclosed, that results in an overall foreclosure percentage of less than 25%.

Under the circumstances of this case, 25% is not enough to have, even using the standard favorable to Kolon articulated in Microsoft, a significant effect on competition that would violate § 2. Although Microsoft and Dentsply provide conceptual support for a § 2 violation when less than 40% of the market has been foreclosed, these two cases are factually distinguishable. In Dentsply, even though the alleged monopolist did not exclude all existing competitors from the market, and had a market share of 75-80% (not that different from what Kolon alleges DuPont's market share to be), its next largest competitors had market shares of 5% and 3%, respectively. 399 F.3d at 193. Furthermore, the exclusive dealing agreements in Dentsply, through the use of "grandfathering" provisions, absolutely prevented the monopolist's distributorships from

---

[16]     Kolon states that "[u]pon information and belief, DuPont's market share remains greater than 70% of all sales by purchase volume of para-aramid fiber in the United States." Of course, if Kolon is to amend its claim, it must allege monopoly power in a viable geographic market, not simply the United States.

distributing *any new* competing products.  Id. at 181.  In
Microsoft, the monopolist had a staggering 95% market
share, 253 F.3d at 51, enough to cast suspicion upon even
the slightest anticompetitive conduct.

In the para-aramid industry, Teijin, DuPont's
competitor, has a market share of almost 30% according to
the pleadings.  Thus, the arrangement appears almost
oligopolistic, with Teijin supplying a serious check on
DuPont's market power.  It does not appear that DuPont has
sufficient market power such that its exclusive deals with
25% of the market can effectively foreclose competition.
At the very least, DuPont appears constrained from
significant nontransitory price increases both by the terms
of its supply agreements and by the existence of Teijin.

The Court also considers other factors, as mentioned
in R.J. Reynolds, 199 F. Supp. 2d at 389, in finding a 25%
foreclosure of the market to be insufficient to allow a
plausible claim of monopolization.  First, the duration of
DuPont's supply agreements, most of which lasted two years,
was relatively short.  Second, it does not appear that
customers have any difficulty in comparison shopping.  It
is true that the market has significant entry barriers, and
that consumers may have a low "propensity to switch
products."  Id.  However, looking at the totality of the

51

circumstances, some of which make DuPont's conduct look less anticompetitive, while others tend toward the opposite result, it does not appear that this is the sort of exceptional case in which a low foreclosure percentage of 25% can support a monopolization claim.

However, the calculus could change significantly if the market is narrowed to those customers that are not prevented from purchasing Kolon's product by the Berry Amendment. Assuming the correctness of DuPont's assertion that five of its top ten customers are constrained by the Berry Amendment, then DuPont has effectively made exclusive dealing arrangements with four of its top seven customers. Assuming, as above, that DuPont controls 75% of the market, then approximately 43% of the market, as narrowed to reflect the commercial reality of the Berry Amendment, is foreclosed from competition through the use of supply agreements. That presents a plausible degree of foreclosure whether under the "substantial foreclosure" standard or under a less stringent "significant effect" standard suggested by Microsoft, 253 F.3d at 71.

Thus, Kolon has demonstrated the existence of a _potentially_ plausible monopolization claim. Its plausibility is only potential because Kolon has failed to allege a geographic market that includes the bases of

operation for Kolon and Teijin. Kolon has also failed, in its pleadings, to account for those customers which, because the Berry Amendment does not apply, can practically buy from Kolon. Because there appears some chance that Kolon could make out a plausible claim on these facts, it should be given a chance to do so in perspective of the relevant geographic market, as explained above.

### b. Attempted Monopolization

As stated above, the elements of an attempted monopolization claim are a specific intent to monopolize, engagement in exclusionary conduct, and a "dangerous probability of success." M & M Medical Supplies, 981 F.2d at 166. "Specific intent may be inferred from . . . anti-competitive practices," id., and is thus not at issue here.[17] DuPont's alleged exclusionary conduct consists solely of the supply agreements discussed above, and their analysis for an attempted monopolization claim does not

---

[17] If it were, it could probably be shown through DuPont's actions in defending its already large share of the market. See, e.g., Aramid Fiber Formed of Poly Para-Phenylene Terephthalamide from the Netherlands, 2001 ITC LEXIS 560, at *37 (Feb. 2001) (heavily redacted decision of the International Trade Commission) (rejecting DuPont's argument that the expansion plans of its primary competitor for American customers, Teijin, would "cause material injury to the domestic industry" unless anti-dumping duties were maintained). It could also be shown by several statements produced in discovery that show an intent to prevent Kolon from competing in the United States.

materially differ. Thus, the only additional factor left to consider here is DuPont's probability of success in achieving a monopoly.

As stated by the Fourth Circuit in <u>M & M Medical Supplies</u>,

> The third element of attempted monopolization, a dangerous probability of success, must be shown to be substantial and real. Market share is relevant, but its relevance is tempered by evidence of the other two elements of the claim. Compelling evidence of an intent to monopolize or of anticompetitive conduct reduces the level of market share that need be shown. Conversely, weak evidence of the other two elements requires a showing of significant market share. . . . Other factors must be considered, such as ease of entry, which heralds slight chance of success, or exclusionary conduct without the justification of efficiency, which enhances the likelihood of success.

981 F.2d at 168. As with a claim of actual monopolization, the inquiry is fact-specific. It is true that, in a prior Fourth Circuit case, "allegation of a dominant market share coupled with exclusionary conduct withstood a motion to dismiss for failure to state a claim." <u>Id.</u> (citing <u>Advanced Health-Care Servs. v. Radford Community Hosp.</u>, 910 F.2d 139, 147-49 (4th Cir. 1990)). However, because of the fact-sensitive nature of the inquiry, the mere existence of a dominant market share and some form of exclusionary conduct may not always be enough to state a plausible claim.

In this case, DuPont's market share is fully discussed in the actual monopolization analysis supra, and appears to be dominant. There are plausible allegations of intent to monopolize, particularly when considering statements produced during discovery from DuPont management, and DuPont's recent resistance to the International Trade Commission's decision to lift anti-dumping duties on DuPont's major competitor for customers in the United States, Teijin (see fn.17, supra). The evidence of anticompetitive conduct, in the form of supply agreements, while plausible, is not exactly "compelling," because it appears equally plausible that DuPont engaged in the supply agreements for legitimate business reasons. Furthermore, it is difficult to show a dangerous probability of gaining monopoly power, which is "the power to control prices or exclude competition," United States v. DuPont, 351 U.S. at 391, when DuPont's competitor, Teijin, appears to control approximately 29% of that market.

Because Kolon's proffered geographic market fails as a matter of law, its attempted monopolization claim must be dismissed. However, because the elements of a monopolization and an attempted monopolization claim "are very similar," Advanced Health-Care, 910 F.2d at 147, if leave to amend is granted respecting actual monopolization,

55

it is proper to grant leave as to the attempted monopolization claim as well. And, as noted above, Kolon may have a plausible § 2 claim, and should be given one more chance to plead it adequately in perspective of the relevant geographic market as outlined above.

## CONCLUSION

For the foregoing reasons, DuPont's Motion to Dismiss Kolon's Second Amended Counterclaim must be granted, but Kolon is granted leave to amend once more, in a manner not inconsistent with this opinion, to allege a relevant geographic market and anticompetitive conduct therein. If Kolon files an amended counterclaim, the proceedings on it will be severed and will be adjudicated separately from the merits of DuPont's claims.

It is so ORDERED.

_____/s/_____ *REP*
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: December 17, 2009

56