

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

E.I. DUPONT DE NEMOURS
AND COMPANY,

    Plaintiff,

v.                     Civil Action No. 3:09cv58

KOLON INDUSTRIES, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the PLAINTIFF E.I. du PONT de NEMOURS AND COMPANY'S MOTION TO COMPEL DEPOSITIONS OF MANAGING AGENTS OF DEFENDANT KOLON INDUSTRIES, INC. (Docket No. 186). For the foregoing reasons, the motion will be denied in part and granted in part.

## BACKGROUND

On February 3, 2009, E.I. du Pont de Nemours and Co. ("DuPont") filed a Complaint against Kolon Industries, Inc. ("Kolon"), alleging trade secret misappropriation, conspiracy, and other business torts. To synopsize, DuPont alleges that Kolon stole its secret processes and technologies for manufacturing Kevlar, and that Kolon has improved its product line based on this trade secret theft.

During discovery, in September 2009, Kolon's document productions and interrogatory responses identified five Kolon employees in Korea who were in a position to have knowledge of information Kolon had obtained about DuPont.[1] DuPont asserts that, shortly after identifying these employees, it asked whether Kolon would accept service on behalf of these employees to appear at depositions, but Kolon refused, indicating that many of these employees had separate counsel. When DuPont learned that many of these employees had separate counsel in the United States, DuPont asked the separate counsel whether they would accept service on behalf of their clients to appear at depositions, either in the United States or in Korea. These requests were uniformly rejected, after which DuPont initiated service under the Hague Convention.

After several conferences in December 2009 and January 2010, during which the parties discussed whether Kolon had to produce these employees as "managing agents" under Fed. R. Civ. P. 30 and decisional law construing it, Kolon appeared to relent. In a letter to the Court on January 20, 2010, Kolon represented that, while it would not technically concede that these employees are managing agents, it would treat them as such:

---

[1] The record does not reveal at what point the remaining three employees were identified as persons potentially having knowledge of issues pertinent to the litigation.

Rather than dispute whether any of these witnesses are properly Fed. R. Civ. P. 30(b)(1) witnesses or argue the legal requirements of these definitions and whether they are to be applied at the time subpoenas are served rather than at the time of the conduct relevant to the dispute, Kolon has agreed to instruct, and has instructed, all individuals who are currently employed by Kolon to appear for a deposition on or about the dates noticed by DuPont, which are in March 2010. However, all of these witnesses, to our knowledge, will be represented by separate counsel who likely will provide advice to their clients based on the constitutional rights afforded to them.

Kolon confirmed that representation during a conference call on February 2, 2010. See Transcript at 5:12-18 (indicating that Kolon has "said . . . we're instructing you as the company and as your employer, at least to those that are still employed, that they ought to appear for their deposition. And we have done that with everybody that we've been able to contact."). Although Kolon identified, at the time, one former employee whose whereabouts were unknown, its affirmation that it would instruct its employees to appear for deposition indicated that, as to all current employees of Kolon, the issue was resolved because there was no reason to doubt Kolon's ability to produce its own employees for deposition. And, the statements by Kolon reflected Kolon's belief that it could enforce the attendance of the employees at depositions.

However, when DuPont sent letters to the employees' separate counsel, again requesting that the American lawyers accept service on behalf of their Korean clients, these requests

3

were refused. When this matter was again raised with the Court on March 26, 2010 in DuPont's Opposition (Docket No. 154) to Kolon's Motion to Compel, Kolon replied that "the parties and the Court have already addressed this issue," in that the persons would be served pursuant to the Hague Convention. After discussion during a hearing on April 1, 2010 about if and how these witnesses may be deposed, DuPont filed this motion to compel the depositions of Kolon's employees as managing agents.

Kolon contends that, because none of these employees are presently managing agents, none of them may be deposed. Kolon further contends that many of these persons never were managing agents. Finally, Kolon contends that, if any depositions are ordered, they should be held in Korea.

The matter has been fully briefed, and the issues are ripe for resolution. The parties have agreed that the motion is to be decided without oral argument.

**WHETHER THE PROPOSED DEPONENTS QUALIFY AS MANAGING AGENTS**

**A. Applicable Law**

The phrase "managing agent" appears in several places in the Federal Rules of Civil Procedure pertaining to discovery.[2]

---

[2] See, e.g., Rule 30(b)(6) (allowing an organization to designate a "managing agent" to be deposed in response to an examining party's request to depose the organization on specified matters); Rule 32 (allowing an adverse party to use deposition testimony of a "managing agent" for any purpose at a hearing or trial); Rule 37(b)(2)(A) (providing for sanctions against an organization if its managing agent disobeys a discovery order).

4

However, the framework for determining whether a particular person qualifies as a managing agent is primarily a construction of decisional law concerned with ensuring that an organization is deposed through its proper representatives concerning the matters at issue in the litigation. The examining party may request that the organization select and produce a representative deponent who is an officer, a director, or a managing agent of the entity; alternatively, the examining party may select a particular officer, director, or managing agent for deposition and order the organization to produce the person. In re Honda Am. Motor Co., 168 F.R.D. 535, 540 (D. Md. 1996). In the latter scenario, the organization, upon notice of the deposition, must produce the specified individual. Id. If the specified person, however, is not an officer, director, or managing agent, then the examining party "must resort to Fed. R. Civ. P. 45 for subpoenas on non-party witnesses." Id.

As both parties recognize, "[t]he law concerning who may properly be designated as a managing agent is sketchy." Id. (quoting Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1452 (D.C. Cir. 1986)). "Largely because of the vast variety of factual circumstances to which the concept must be applied, the standard . . . remains a functional one to be determined largely on a case-by-case basis." Webster, 802 F.2d at 1452; accord Honda, at 540.

5

Honda, decided by another district court within the Fourth Circuit, effectively synthesized the several factors that generally are considered in making a case-specific determination of a person's managing agent status: (1) the discretionary authority vested in the person by the corporation; (2) the employee's dependability in following the employer's directions; (3) whether the individual is more likely to identify with the corporation or the adverse party in the litigation; and (4) the degree of supervisory authority in areas pertinent to the litigation.[3] Id. at 540-41. Of these factors, the third -- the employee's identity of interests with his employer as opposed to the opposing party -- is "paramount." Id. at 541. The analytical framework used in Honda incorporates the factors used by other courts and is a sound approach to resolving the issue on a case-by-case basis.

When a person's managing agency status is debatable, "courts in pretrial proceedings have resolved doubts under the standard in favor of the examining party." Webster, 802 F.2d at

---

[3] Honda also notes "the general responsibilities of the individual regarding the matters at issue in the litigation" as a factor to be considered. Care must be taken not to confuse the analysis by suggesting that parties who are intimately involved in matters concerning the litigation, but do not manage, have attributes of managing agents. Of course, the fact that the proposed deponent was deeply involved in the subject matter of the litigation can provide evidence respecting the nature of his or her level of responsibility.

1452 n.4. The inquiry into whether a person is a managing agent for purposes of compelling attendance at a deposition is not dispositive of the issue whether statements made during that deposition bind the corporation by virtue of the deponent's managing agency. However, the latter, more meaningful inquiry cannot occur, at least in this case, unless the deposition occurs. To err on the side of the examining party is to err on the side of caution, because the examined party can present for later decision whether the statement binds the corporation. Thus, when managing agency status is a "close question," doubts should be resolved in favor of the examining party. Sugarhill Records, Ltd. v. Motown Record Corp., 105 F.R.D. 166, 171 (S.D.N.Y. 1985).

Ordinarily, managing agent status is determined as of the time of the deposition, not as of the time when the activities disputed in the litigation occurred. Honda, 168 F.R.D. at 540. Thus, "[t]he general rule is that former employees cannot be managing agents of a corporation." Id. at 541. However, like most rules, this one has exceptions. When a managing agent is fired "to avoid disclosure in pending or potential litigation," or when "the managing agent has been or might be reappointed to another position in the corporation," managing agent status that exists at the time of the events at issue does not magically disappear with the person's termination or reassignment. Id.

7

The reason for these exceptions is obvious: without them, an organization could manipulate discovery and frustrate the purpose of the rule simply by moving its managers around whenever it wished to prevent them from being deposed.

## B.    Kolon's General Objections

DuPont posits that there are eight people who may be deposed as managing agents based on discovery provided to date. It, of course, is necessary to consider the circumstances relating to each proposed witness individually to decide the motion to compel depositions. However, there are two points which Kolon raises in opposition to the motion that can be considered generally: (1) the effect of the proposed witnesses' resistance to the directive given by Kolon that they appear for deposition under Rule 30(b)(6); and (2) the consequence of the termination or reassignment of the witnesses whose depositions DuPont seeks to compel. Those issues will be addressed before assessing the circumstances relating to each putative managing agent witness.

### 1.    The Resistance Offered to Deposition by the Putative Managing Agent Deponents

It is true, as Kolon observes, that a person's refusal to appear for a deposition, "even at the expense of sanctions for the entity defendants," may indicate that the person does not share an identity of interest with the corporation that employs

him. JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., 220 F.R.D. 235 (S.D.N.Y. 2004). However, that precept does not help Kolon in this case for several reasons.

First, the facts indicate a substantial similarity of interest between Kolon and the persons in question. Kolon still employs most of them and pays their salaries. Kolon also pays for all but two of them to be represented by independent counsel, and, of those two, one of them has not been located. Although the fact of independent representation demonstrates that Kolon and the individuals do not have perfectly identical interests, Kolon is nonetheless spending money to keep these persons on the payroll, and to pay the fees of the top flight lawyers whom Kolon has retained to represent them. It is highly improbable that Kolon is spending such sums out of disinterested generosity, or altruism. It is much more likely that this expense is being incurred to help these employees who, after all, were acting in Kolon's behalf, and apparently at its direction, when they took the actions about which they are to be deposed. These circumstances point to a similarity of interest, not to a conflict.

Second, contrary to Kolon's view, the question of identity of interest is not merely one of how strongly these employees identify with Kolon. This facet of the test focuses on the extent to which they identify with Kolon *as opposed to DuPont*.

9

When one compares the record respecting the nexus between these employees and Kolon, the company that employs them and that provides money and services to them, with the relationship the employees have to DuPont, the company that accuses them of conniving to steal its trade secrets, it is rather clear that their interests identify closely with Kolon and not at all with DuPont. That the employees might claim a privilege in response to a particular question is of only marginal relevance in the identity of interest analysis.[4]

Third, Kolon indicates that the reluctance to date of the deponents to testify is not due to adversity of interest between the persons and Kolon, but because of their fear that evidence will be used to incriminate them. See Kolon Oppo. at 2 ("[T]hese individuals . . . are unwilling to put themselves at risk by testifying under the current circumstances created by DuPont.").

Whatever else this argument may bespeak, it rather clearly discloses an identity of interest between Kolon and the putative deponents: neither the proposed deponent-employees nor Kolon have any interest in being held accountable for misappropriation of DuPont's trade secrets and confidential information. Of course, the interest of DuPont is to hold Kolon accountable.

_____

[4]     Of course, the privilege must be asserted in a question by question basis. Thus, the potential for a privilege assertion presents no bar to the taking of a deposition.

Thus, the aspect of the identity of interest analysis that counts whether the deponent-employees are aligned with Kolon, rather than DuPont, is satisfied and augers in favor a finding that employees are managing agents.

Kolon's real objection is that the deponents may claim the Fifth Amendment privilege and that DuPont later will attempt to use the assertion to Kolon's disadvantage. That concern is no ground for denying DuPont's motion.

To begin, it is unknown now the extent to which, if any, a deponent will assert the privilege to a particular question. Certainly, there are many questions to which no legitimate claim of privilege will lie. In fact, if, as Kolon has indicated in a recent filing, the United States Attorney is talking with the employees' counsel, it may be that a grant of immunity would foreclose any claim of privilege. And, if there is a claim of privilege asserted, Kolon later will be able to present its arguments why that fact should not be used against the corporation at trial.

For the foregoing reasons, the present apparent resistance of the deponents provides no basis for concluding that, at least at this stage, there is not a sufficient record to support a finding that the employees are not amenable to deposition as managing agents.

2. **The Record Warrants an Exception to the General Rule that Managing Agency is Determined as of the Time of the Deposition**

The Court rejects Kolon's contention that its removal of these persons from positions of managing agency necessarily negates their managing agent status as a matter of law. Mindful of the general rule that former employees are not managing agents, the Court finds ample evidence to demonstrate that an exception is warranted in this case, at least for the limited purpose of requiring them to appear at depositions. The timing and circumstances of Kolon's reassignment or termination of its employees render the true status of the proposed deponents highly suspect, and allow for a strong inference that Kolon is moving its employees around like chessmen, conveniently shielding them from DuPont's access. That is reinforced by Kolon's vacillation on the issue in this litigation.

Of course, deposition testimony could reveal that the putative deponent-employees are not managing agents. However, on this record, DuPont has demonstrated that the termination and reassignments of the proposed deponents are sufficiently suspect to warrant a deviation from the general rule that the deponent should be a managing agent at the time of the deposition. The circumstances surrounding the termination and reassignments will be explored at deposition, but, as the record now stands, it

warrants a finding that the personnel actions appear to be contrivances to avoid the general rule.

## C. Findings as to Each Defendant

The foregoing general findings apply as a backdrop to the next task: assessing the status of each proposed deponent according to the factors set forth in Honda, 168 F.R.D. at 540-41, which, as explained above, is the most analytically sound framework for the task. That analysis, and a finding for each defendant, follows.[5]

### 1. In Sik Han

In Sik Han ("Han"), a twenty-five year employee at Kolon, currently serves as a Deputy Vice-President in Kolon's Heracron Research Institute. Heracron is Kolon's trade name for its Kevlar-like para-aramid fiber product. Han was responsible for directing Kolon's research efforts as they related to improving its Heracron product. He also had considerable involvement in Kolon's dealings with Mitchell during the period during which DuPont alleges that Kolon stole its trade secrets.

Kolon concedes that Han is vested with discretionary authority. His long history of service and his attainment of a high position within the business unit are indicia of his

---

[5]    In light of the preceding general findings, it is clear that the first three persons listed -- In Sik Han, Jong Hyun Choi, and Kyeon Hwan Rho -- are managing agents. However, as to the other five persons listed, there is some room for dispute.

13

dependability to act in accord with Kolon's interests. His identity of interest with Kolon vis-à-vis DuPont appears strong. As Research Manager, his supervisory authority covered at least seven to ten employees and their work is developing the product, the making of which is alleged to be with the aid of the stolen information.

Thus, all of the Honda factors indicate that Han, at least for purposes of compelling his deposition testimony, must be classified as a managing agent.

**2. Jong Hyun Choi**

Jong Hyun Choi ("Choi"), as a Vice President in the Industrial Materials and Tire Cord Divisions, was one level above Han in the Kolon hierarchy. He was the signatory for Kolon on its agreement with Mitchell. He worked with Mitchell during the time period at issue in the litigation and had responsibility in securing information from Mitchell. At some point after DuPont filed this action, Kolon placed Choi on administrative leave.

Kolon concedes that Choi is vested with discretionary authority. His attainment of a high position within the business unit indicates that he dependably follows his employer's instructions. His identity of interest with Kolon vis-à-vis DuPont appears strong. His supervisory authority, although nowhere expressed in the record in terms of numbers of

subordinates, included running Kolon's industry intelligence-gathering efforts, the activity that lies at the core of DuPont's allegations, and he appears to have had supervisory authority over other employees engaged in Heracron product development and manufacturing.

Thus, all of the Honda factors indicate that Choi, at least for purposes of compelling his deposition testimony, must be classified as a managing agent.

## 3. Kyeong Hwan Rho

Kyeong Hwan Rho ("Rho") has worked twenty-three years for Kolon as a manager with Kolon's Heracron Technology Team. He was actively involved in the acquisition of information about DuPont that is at issue in the litigation. He attended at least fifteen meetings from May 2006 to August 2008 that involved DuPont's Kevlar product or production processes, and was involved in recruiting at least one current and one former DuPont employee to "consult" about DuPont's products and production. At some point after DuPont filed this action, Kolon placed Choi on administrative leave.

Kolon concedes that Rho is vested with discretionary authority. His long tenure with Kolon evidences a track record of dependably following corporate orders. His identity of interest with Kolon vis-à-vis DuPont appears strong. He had

supervisory authority over approximately 30 people in the area of Heracron production, an area central to the litigation.

Thus, all of the Honda factors indicate that Rho, at least for purposes of compelling his deposition testimony, must be classified as a managing agent.

### 4. Youn Soo Seo

Youn Soo Seo ("Seo"), a twenty-two year employee at Kolon, served as a manager in Kolon's Heracron Business Division. The record already shows that he had sustained involvement in Kolon's dealings with Mitchell during the period in which DuPont alleges that Kolon stole its trade secrets, including being in charge of the project to retain Mitchell and negotiating Mitchell's contract.

Kolon asserts that Seo has no authority to approve technology, bind Kolon in contract, hire or fire staff, or approve travel to the United States, whereas DuPont has shown that Seo arranged meetings and negotiated contracts which points to the existence of discretionary authority. His long history of service shows him to be a person that Kolon could depend upon to act in the company's interest. His identity of interest with Kolon vis-à-vis DuPont appears strong. He supervised at least seven employees, including several who were involved in the events disputed in this litigation, and he was in charge of retaining and using Mitchell.

Thus, the Honda factors indicate, on balance, that Seo is a managing agent, though the question is slightly closer than for Han, Choi, or Rho. The mere closeness of the question indicates that Seo should be classified as a managing agent, at least for purposes of compelling his deposition testimony. Webster, 802 F.2d at 1452 n.4; Sugarhill, 105 F.R.D. at 171. And, considering the nature of Seo's responsibility, Seo, at least at this stage, must be considered a managing agent.

## 5. Oh Hwan Kim

Oh Hwan Kim ("O.H. Kim") serves as a manager within Kolon's Heracron Technology Team, in the Quality Assurance unit. His position made him responsible for ensuring that Kolon's Heracron product met a high standard of quality. He had some involvement in Kolon's dealings with Mitchell during the period in which DuPont alleges that Kolon stole its trade secrets, including soliciting meeting topics, attending meetings, and corresponding with Mitchell.[6]

Kolon asserts that O.H. Kim, like Seo, has no authority to approve technology, hire or fire staff, or approve travel to the United States, whereas DuPont contends that Kim's arrangement of meetings and correspondence with Mitchell shows discretionary

---

[6]     Unlike most of the other individuals whom DuPont seeks to depose, O.H. Kim does not appear to have separate counsel. DuPont Memo. at 19.

17

authority. That requires further exploration. O.H. Kim's current employment with Kolon, and his promotion within the past few months, indicate that Kolon has depended on him, and continues to depend on him, to act on the company's behalf. His identity of interest with Kolon vis-à-vis DuPont appears stronger than the other persons who are represented by independent counsel. He supervised twenty-five employees, though it is not clear whether these employees were involved in the issues disputed in this litigation.

Thus, the Honda factors indicate, on balance, that O.H. Kim must be classified as a managing agent, at least for purposes of compelling his deposition testimony.

## 6. Dae Sik Kang

Dae Sik Kang ("Kang") served as either a "section manager" (according to DuPont) or an "assistant manager" (according to Kolon). He has worked for Kolon since January 2001, and has been promoted several times during his tenure, including a significant promotion in April 2009. He corresponded frequently with Mitchell during the period in which DuPont alleges that Kolon stole its trade secrets. In June 2009, Kang was "transferred out of the Heracron Business Center and no longer works in the aramid business."

Kolon asserts that Kang, like Seo and O.H. Kim, has no authority to approve technology, hire or fire staff, or approve

travel to the United States, whereas DuPont contends that Kim's correspondence with Mitchell shows discretionary authority. He occupied positions of responsibility and trust thereby indicating Kolon regarded him as dependable. His identity of interest with Kolon vis-à-vis DuPont appears beyond dispute. However, he does not appear to have had any supervisory authority.

Unlike the other persons considered thus far, DuPont has not set forth any evidence that Kang was *managing* anything. On the other hand, Kolon, the party with the knowledge, has not set out Kang's job responsibilities. Although Honda identified identity of interest as the "paramount test," the law of managing agency cannot, by its plain language, be said to extend to one who was not a manager in some capacity. Thus, at this point, there is not a sufficient showing to classify Kang as a managing agent. That issue can be fleshed out in further discovery and his status may be revisited later.

## 7. Juwan Kim

Juwan Kim ("J. Kim") served as a "manager" in Kolon's Heracron Business Center. He had close involvement in Kolon's dealings with Mitchell during the period in which DuPont alleges that Kolon stole its trade secrets, corresponding extensively with Mitchell. He does not appear to still be working for or paid by Kolon.

19

Kolon asserts that J. Kim also has no authority to approve technology, hire or fire staff, or approve travel to the United States, whereas DuPont contends that J. Kim's correspondence with Mitchell "necessarily would require him to exercise discretion." There is no record to allow assessment of the dependability factor. Kim's identity of interest with Kolon vis-à-vis DuPont is somewhat unclear. Kim does not appear to have had any supervisory authority. However, Kolon has done little to provide a description of Kim's job responsibilities.

On this record, the Court cannot conclude that it is appropriate to classify Kim as a managing agent. As was the case with Kang, the issue of Kim's status can be explored in other discovery and revisited if appropriate.

**8. Jae Bum Park**

Jae Bum Park ("Park") is in a somewhat different position from the other persons at issue. He served as a "general manager" in Kolon's Heracron Business Center. He had close involvement in Kolon's dealings with Mitchell: he and Seo arranged Mitchell's original visit to Korea, he negotiated Mitchell's contract, and he served for some time as Mitchell's primary contact within Kolon. He left Kolon in March 2009. The circumstances surrounding his departure are unclear, and Kolon asserts that his current whereabouts are unknown; he is rumored to be in Canada.

Kolon asserts that Park had no authority to approve technology, hire or fire staff, or approve travel to the United States, whereas DuPont contends that J. Kim's close relationship with Mitchell required the exercise of discretion. His fifteen years of employment with Kolon indicate some degree of dependability to follow corporate orders. His identity of interest with Kolon vis-à-vis DuPont is not clear. He does not appear to have had any supervisory authority. The circumstances surrounding the termination of Park's employment are not of record and hence are unclear.

Park is perhaps the most difficult person to classify. He had a long history with Kolon, and appears to have had somewhat more discretionary authority than Kang and J. Kim. However, there is no indication that he was really managing anything, and there is no evidence that he had supervisory authority. But, Kolon, the party with knowledge, has not been forthcoming with the information about Park's job responsibilities or the circumstances surrounding his departure. And, that information likely would be helpful in deciding this motion as to Park. Thus, his status too can be explored further in other discovery and revisited if appropriate.

## LOCATION OF DEPOSITIONS

### A.    Applicable Law

The Court quite recently has considered the question of where to depose foreign managing agents.    See In re Outsidewall Tire Litig., No. 1:09cv1217, 2010 U.S. Dist. LEXIS 44019, at *3 (E.D. Va. May 4, 2010), which vacated and remanded a magistrate judge's order that managing agents of foreign corporate defendants were to be deposed in Virginia.    In so doing, Outsidewall relied on the framework set forth in Armsey v. Medshares Mgmt. Servs., Inc., 184 F.R.D. 569, 571 (W.D. Va. 1998).    Armsey recognized the "initial presumption that a defendant should be deposed in the district of his residence or principal place of business."    Id.    However, it also recognized that this presumption may be overcome by an analysis of the following factors:

> (i) location of counsel for the parties in the forum district, (ii) the number of corporate representatives a party is seeking to depose, (iii) the likelihood of significant discovery disputes arising which would necessitate resolution by the forum court, (iv) whether the persons sought to be deposed often engage in travel for business purposes, and (v) the equities with regard to the nature of the claim and the parties' relationship.

Outsidewall, at *9-10 n.4 (citing Armsey, at 571).

Applying those factors, Outsidewall found that the Magistrate Judge had improperly relied solely upon (a) the frequency of the deponents' general business travel and (b)

difficulties in managing the depositions due to the time difference between Virginia and Dubai, where the Defendants sought to be deposed. Without opining on the result to be reached, the Court remanded the case for fuller consideration of the <u>Armsey</u> factors. <u>Id.</u> at *20-27.

In construing those factors, <u>Outsidewall</u> provided some guidance as to <u>Armsey</u> factors (iii) and (iv). First, with respect to the prospect of discovery disputes likely to occur during deposition, <u>Outsidewall</u> emphasized that only "disputes *requiring judicial intervention*" weighed on the side of having the deposition within the forum district. <u>Id.</u> at *24. Noting that "it is important to recognize a distinction between a party's good faith assertion of reasonable objections, which is entirely appropriate discovery conduct, and a party's uncooperative or obstructionist discovery behavior and the assertion of meritless or near-frivolous objections," the Court indicated that the central question is "whether defendants' discovery conduct suggests that they or the deponents will be uncooperative or obstructionist if the depositions occur in" their corporate employer's country. <u>Id.</u> at 23-24. Second, with regard to business travel, that inquiry should not focus on whether the deponent is a frequent traveler in general, but instead should focus on that deponent's travel history to the

forum where the adverse party adverse to the deponent seeks to conduct the deposition. Id. at *21-22.

## B. The Depositions Should be Held in the Eastern District of Virginia

Recognizing that the presumptive location in which to depose the employees identified as managing agents would be Korea, and that the Armsey factors must be applied to each managing agent individually, the Court nonetheless finds that, as to all five of the managing agents identified above, Virginia is the proper place in which the depositions should occur in this case. Although some of the Armsey factors do not indicate a preference for conducting the depositions in Virginia, both the highly contested nature of discovery and the equities require that the managing agents be deposed in Virginia.

The first two Armsey factors are fairly straightforward in their application. Kolon and four of the individuals have American counsel -- some in Richmond, some in Washington, D.C., and some in California -- who would be inconvenienced more by travel to Korea than travel to a location in the forum district. And, with respect to the number of corporate representatives (five) that DuPont seeks to depose, that is a considerable number to remove from their principal place of business, although less international travel is required in doing that than would be to fly all of the American lawyers to Korea.

24

Moreover, Kolon represents that it has instructed the employees to be available for deposition and has retained counsel for them in the United States, thereby indicating that Kolon would not consider the absence of the employees from the Korean offices to be prejudicial to its business operations. These two factors, in combination, weigh slightly towards Virginia depositions.

The third Armsey factor provides the most compelling reason to conduct the depositions in Virginia. Discovery disputes have littered the litigation landscape in this case since the beginning,[7] and they show no signs of abating -- if anything, they are worsening. Most recently, during an inspection of Kolon's production facility in Korea, the parties were unable to resolve issues during the inspection such that a second trip is now required to visit Kolon's production facilities. See

---

[7] See MOTION FOR PROTECTIVE ORDER AND TO MODIFY SUBPOENA by Michael D. Mitchell (Docket No. 82, Oct. 29, 2009); Kolon Letter of January 20, 2010; DuPont Letter of January 20, 2010; Kolon's MOTION TO COMPEL (Docket No. 114, Feb. 5, 2010), Supplemental Memorandum in Support of Kolon's Consolidated Motion to Compel (Docket No. 131, Feb. 25, 2010); Kolon's MOTION TO COMPEL, (Docket No. 148, March 24, 2010); and Kolon's MOTION TO COMPEL (Docket No. 209, May 21, 2010). In addition, countless conference call hours and a five-hour hearing on April 1, 2010 have been dedicated to these discovery disputes. Furthermore, a special master has been appointed to assist the parties in resolving the accusation, which both parties level at one another, of overuse of the "Attorney's Eyes Only" designation. And, of course, the motion now before the Court is yet another discovery dispute. Finally, the Court has not even had occasion to consider objections from the independent counsel representing the individual managing agents, which can only complicate resolution of the disputes.

Transcript, Conference Call of May 6, 2010, at 55-56. A real risk arises that multiple rounds of depositions may be needed if the Court does not closely monitor the conduct of both parties during the depositions.

Moreover, the record foretells that privilege issues are going to arise during the depositions. It thus is important that the Court be available to resolve disputes to assure that the rights of the parties and the deponents are protected while assuring that legitimately posed questions seeking non-privileged information are answered. To that end, the Court will supervise the depositions and they will be taken in the Court facilities so the parties and deponents will be on neutral ground. By having the depositions in neutral facilities, supervised by a judicial officer, the Court can best assure the just, speedy, and most inexpensive resolution of the deposition and, indeed, of this action.[8]

The fourth Armsey factor, frequency of business travel to Virginia, applies differently to different persons, but generally does not favor Virginia as the deposition situs. While Seo and Rho (along with J. Kim, whom DuPont has not shown to be a managing agent) made one trip to Virginia in August

---

[8] DuPont shall be required, at the outset, to bear the travel and accommodation expense necessarily and reasonably incurred in attending the depositions in Richmond. Whether those expenses are recoverable by DuPont in whole or in part is a matter for another day.

2008, there is no evidence that any of the managing agents travel to Virginia with a frequency that would render their appearance at a deposition in Virginia only a minor inconvenience.

The fifth Armsey factor, a general consideration of the equities, weighs toward holding the depositions in Virginia. As an initial aside, the financial equities are not a consideration. DuPont will bear the initial expense of travel and accommodation subject to later agreement as to allocation or assessment. Moreover, given the parties' litigation strategy thus far, it does not appear that litigation cost is a major motivating factor for either party. The primary equitable consideration is the conduct by Kolon as an entity -- and, from what the Court can glean from a record not fully developed on the issue, of some of the individual deponents[9] -- to needlessly delay the deposition of these persons.

Kolon originally raised objections to taking these depositions under Rule 30(b)(6). Then, Kolon relented, leading

---

[9]   For example, during the hearing of April 1, 2010, DuPont's counsel represented that independent counsel for one or more of the individuals who have been served via the Hague Convention are now claiming, by independent counsel, "that service was ineffective because the subpoenas [are captioned] 'Eastern District of Virginia,'" and that depositions must occur in the place from which the subpoena issues.  See Apr. 1 Transcript at 40:14-21.   Thus, effectively, the person argued that the depositions should occur in Virginia, not Korea, contrary to Kolon's present argument.

DuPont, and the Court, to believe the objections as to the taking of the depositions (but, of course, not to their use, that issue being reserved) had been resolved. Then, Kolon changed positions again to oppose even the taking of the depositions.

Furthermore, Kolon has taken personnel actions (terminations and reassignments) that Kolon then has used as a ground to oppose the taking of the depositions. That conduct weighs against Kolon in the balance of equities.

DuPont has been trying to depose the persons at issue for many months now, and due to fencing of Kolon and the individuals, has not been able to do so. Kolon argues, with some audacity, that DuPont does not actually want to depose these managing agents, but rather prefers to extract adverse inferences from these parties' refusal to appear. The record refutes that contention. Thus, the equities weigh firmly towards requiring the depositions to be held in Virginia.

## CONCLUSION

For the foregoing reasons, PLAINTIFF E.I. du PONT de NEMOURS AND COMPANY'S MOTION TO COMPEL DEPOSITIONS OF MANAGING AGENTS OF DEFENDANT KOLON INDUSTRIES, INC. (Docket No. 186) will be denied, without prejudice to renewal, as to Dae Sik Kang, Juwan Kim, and Jae Bum Park; and granted as to In Sik Han, Jong

Hyun Choi, Kyeong Hwan Rho, Youn Soo Seo, and Oh Hwan Kim. The depositions will be held be held in the Spottswood W. Robinson III and Robert R. Merhige, Jr. Federal Courthouse, at 701 East Broad Street, in Richmond, Virginia.

It is so ORDERED.

_____/s/_____ _R&P_

Robert E. Payne
Senior United States District Court

Richmond, Virginia
Date:   May 25, 2010

29