


**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

E.I. DU PONT DE NEMOURS
AND COMPANY,

     Plaintiff,

v.                    Civil Action No. 3:09cv58

KOLON INDUSTRIES, INC.,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on the Defendant Kolon Industries, Inc.'s ("Kolon") MOTION FOR SANCTIONS (Docket No. 453). Kolon has moved for sanctions against DuPont for DuPont's alleged spoliation of relevant evidence, which has thereby deprived Kolon of information needed to support some of its defenses. Kolon's motion focuses on DuPont's alleged deletion of the email accounts and documents of four former DuPont employees: Otto Fernandez, Tad Lee, Chico Bogaz, and Alan Temple. For the reasons that follow, the motion will be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

**A.   Background of the Litigation**

On February 3, 2009, E.I. du Pont de Nemours and Company ("DuPont") filed a Complaint against Kolon, alleging trade secret misappropriation, theft of confidential business information, conspiracy, and other business torts related to

DuPont's para-aramid fiber Kevlar®. In sum, DuPont alleges that Kolon "used DuPont's confidential information and trade secrets [about DuPont's Kevlar® product] to compete with DuPont . . . [and] to improve its process for producing aramid fiber, with a resulting increase in range of products, production, and quality." The Complaint against Kolon was precipitated largely from the activities of Michael Mitchell ("Mitchell"), a former DuPont employee who admittedly ferried from DuPont to Kolon at Kolon's invitation much information which DuPont alleges to be trade secrets. Mitchell worked for DuPont in various sales and technical capacities from 1982 until DuPont terminated his employment on February 6, 2006. His technical area of specialization related to Nomex®, another DuPont aramid product, but his final position at DuPont involved sales and marketing of Kevlar®.

At the time DuPont terminated Mitchell's employment, it reminded him about the nondisclosure provisions in his employment contract, and consistent with company policy, it demanded that he return any proprietary information in his possession. Pl.'s Mem. in Opp'n, Ex. 4, Mitchell Statement of Facts ¶ 4; Ex. 26, Mitchell Employee Termination Statement.[1]  By

---

[1]  The exhibits of the parties and other documents quoted throughout this opinion have been filed "UNDER SEAL -- SUBJECT TO PROTECTIVE ORDER -- CONTAINS CONFIDENTIAL MATERIALS DESIGNATED CONFIDENTIAL -- ATTORNEYS' EYES ONLY -- TO BE OPENED

2

signing his Employee Termination Statement, Mitchell affirmed that he had returned all documents and promised that he would not use or divulge, at any time, any secret or confidential information that was the property of DuPont. Notwithstanding those affirmations and promises, Mitchell retained DuPont computer files containing secret and confidential information that he previously had in his possession.

For some considerable time before Mitchell left DuPont, Kolon had been searching for individuals who had an understanding of Kevlar®'s technology and marketing. Kolon officials sought out Mitchell after he left DuPont, and over the next year or so, Mitchell was in communication with personnel at Kolon about the prospects of an employment relationship. In March 2007, Mitchell traveled to Korea to confer with Kolon officials about the prospect of a paid consulting arrangement. The next month, Mitchell entered into a formal consulting contract with Kolon to provide assistance relating to the production and marketing of Heracron®, Kolon's para-aramid fiber product that competes with Kevlar® for use in a number of applications.

---

ONLY BY OR AS DIRECTED BY THE COURT". The Court, however, finds no reason to believe that any document it has cited or quoted in this opinion contains trade secrets or highly confidential information such that redaction of information needs to occur.

3

At some point in late April or early May 2007, James Shomper,[2] Corporate Counsel for DuPont in Wilmington, Delaware, became aware that Kolon had contracted with Mitchell. Shomper and Michael Clarke, another Corporate Counsel for DuPont, began an internal review of Mitchell's pre-termination activities at DuPont and thereafter. As the initial investigation progressed, DuPont began to anticipate filing suit against Mitchell for injunctive relief to prevent him from disclosing DuPont's proprietary information to Kolon. In May 2007, DuPont communicated with the Federal Bureau of Investigation ("FBI") and the United States Department of Commerce ("DoC") to inform them of its investigation into Mitchell's activities, specifically its suspicions about the potential theft of trade secrets by Mitchell and possible violation of export control laws.[3] DuPont hired counsel on May 21, 2007 to assist with the investigation and advise on possible litigation options.

---

[2] Since 2006, Shomper has been assigned as counsel to the DuPont Advanced Fiber Systems ("AFS") business unit. At the time of Shomper's Declaration on September 13, 2010, the AFS business unit had been renamed the DuPont Protection Technologies business unit. Shomper Decl. at 1. However, for purposes of this opinion, the Court will refer to the unit as the AFS business unit.

[3] Kevlar® is subject to the export control laws of the United States.

**B.** **DuPont's Three Litigation Hold Orders and Intervening Events**

On June 25, 2007, DuPont issued a Records Hold Order ("First Hold Order"), under the matter name Michael David Mitchell, to eighteen individuals in the Advanced Fiber Systems ("AFS") business unit thought likely to have relevant information in a potential suit against Mitchell and/or Kolon. The Summary of the First Hold Order states:

> DuPont believes Mr. Mitchell provided DuPont trade secrets and confidential information about DuPont™ Kevlar® brand fiber, in direct violation of his confidentiality agreement with DuPont, to his new employer, Kolon Industries, Inc. Kolon is a South Korean company and direct competitor of DuPont.

The documents subject to the hold order included,

> Any and all: employment records or personnel information related to Michael David Mitchell; any and all documents (in hard copy or electronic format) authored by, sent to or reference Michael David Mitchell; and any competitive intelligence related to Kolon Industries, Inc.

When the First Hold Order was issued the federal Government had instructed DuPont to keep the investigation into Mitchell's activities confidential. During the next ten months, DuPont and the Government continued to investigate Mitchell's activities on behalf of Kolon. On March 12, 2008, agents with the FBI and the DoC executed a search warrant on Mitchell's residence, seizing documents and multiple computers. Later forensic analysis of

the computers disclosed that they housed many, many electronic documents containing DuPont proprietary information, including an Excel spreadsheet entitled "Denier Economics."[4] Denier Economics spreadsheets "contain[] highly sensitive information related to DuPont's production capacity for Kevlar® yarn in a variety of denier types." Pl.'s Mem. in Opp'n, Ex. 4, Mitchell Statement of Facts ¶ 7. After the search warrant was executed, Mitchell agreed to cooperate with the Government. Meanwhile, the Government continued its forensic analysis of the seized evidence.

In April 2008, the Government informed DuPont that Mitchell had retained certain DuPont financial records, including a portion of a Denier Economics spreadsheet. Then, in June 2008, the Government informed DuPont that Mitchell had sent portions of the Denier Economics spreadsheets to Kolon, though it did not disclose what specific information had been sent. Only on December 17, 2008 did DuPont receive from the Government actual copies of parts of two Denier Economics spreadsheets that had been found on Mitchell's computer and that had been sent to Kolon. Those spreadsheets were reports from DuPont's Spruance Plant that is located in Virginia.

---

[4]     "DuPont produces Kevlar® in a variety of fiber sizes, known as denier, which is a term used to describe the weight per unit length (linear density) of a continuous filament or yarn." Pl.'s Mem. in Opp'n, Ex. 4, Mitchell Statement of Facts ¶ 2.

On February 3, 2009, DuPont filed this action. The same day, DuPont issued a Revised Hold Order ("Second Hold Order") to all 2,500 employees in the AFS business unit. On April 20, 2009, Kolon filed its Answer to DuPont's Complaint, as well as a Counterclaim alleging violations of Section 2 of the Sherman Act and Section 16 of the Clayton Act for monopolization and attempted monopolization of the para-aramid fiber market in the United States. Four days later, on April 24, 2009, in response to the Counterclaim, DuPont issued a revision to the Second Hold Order ("Third Hold Order").

On August 11, 2009, in response to a DuPont discovery request, Kolon produced 4500 pages of documents that Kolon had obtained from Mitchell. In reviewing those documents, DuPont learned for the first time that Mitchell also had possessed and had sent to Kolon Denier Economics spreadsheets from DuPont's Maydown Londonderry, U.K. ("Maydown") plant. Furthermore, DuPont learned that Kolon had obtained the full Denier Economics spreadsheets as well as documents which disclosed some ways in which DuPont sought to gather competitive intelligence about its competitors. On October 21, 2009, Kolon served its Second Set of Interrogatories on DuPont, requesting that DuPont "[d]escribe any strategies, tactics, measures, or efforts . . . to track, monitor, or otherwise study the expansion of Kolon's Heracron® production capacity, entrance into new geographical markets, new

para-aramid product lines, or new para-aramid applications, or approaches to para-aramid customers with new para-aramid product offerings." Pl.'s Mem. in Opp'n, Ex. 9 at 3. That was when DuPont's competitive intelligence gathering practices were first injected into this litigation.

## C. DuPont's Email Retention Policy

To ensure that inactive accounts are not needlessly occupying space on DuPont's servers, DuPont deletes inactive email accounts from its servers after an employee leaves the company. Pl.'s Mem. in Opp'n, Ex. 13, Connor Decl. ¶ 7. DuPont handles such inactive accounts two different ways. First, if an email account is inactive for 30 days, it "appears on an inactivity report, which is then circulated to Human Resources, Legal, and upper-level management." Pl.'s Mem. in Opp'n, Ex. 14, Letter from R. Gray to S. Flicker (July 2, 2010) at 1. "These individuals then have 30 days to remove the email account from the inactivity report or the account will be deleted." Id. Under this practice, therefore, an inactive email account sits for sixty days before routine deletion from DuPont's servers if it is not subject to a litigation hold or removed from the inactivity report. "Alternatively, during the time in question, a departing employee's immediate manager or the human resources representative may request that the email account be deleted at the time of the employee's departure, or shortly

8

thereafter, provided the email account is not subject to a Legal Hold Order." Id. at 1-2. "Under these circumstances," according to DuPont, "the email account is deleted without being placed on an inactivity report." Id. at 2.

## D. DuPont's Employment of Otto Fernandez, Tad Lee, Chico Bogaz, and Alan Temple and Deletion of Their Email Accounts and Documents

The focus on Kolon's motion is the deletion of emails and some other documents from computers of four DuPont employees after they left, or changed, their employment at DuPont. So, with the foregoing background in mind, the Court will now turn to the circumstances surrounding the departure of the four former DuPont employees and the subsequent deletion of their email accounts and documents from DuPont's servers.

### 1. Otto Fernandez

From August 1, 2004 until October 31, 2006, Otto Fernandez was employed by DuPont as the Global Product Manager -- KEVLAR®, at DuPont's Spruance Plant. At Spruance, his responsibilities included sales in the AFS business unit, which encompassed both Kevlar® and Nomex®, and to a lesser extent, the gathering and analysis of intelligence related to DuPont's competitors in the para-aramid fiber market. Though competitive intelligence was not a full-time role for Otto Fernandez, he was responsible for collecting the competitive intelligence information forwarded to him by AFS employees.

9

Otto Fernandez left Spruance on November 1, 2006 to work for the company's TYVEK® division in Wilmington, Delaware, after which he no longer had any responsibilities related to competitive intelligence. On January 16, 2009, he resigned from DuPont. His email account was deleted on August 4, 2009. DuPont first identified him as a potential custodian of relevant documents when Kolon requested his email account on March 23, 2010. Notwithstanding the deletion of his email account, DuPont searched for and located copies of documents that Otto Fernandez had left with his successor, Pascal Renaud ("Renaud").

At the time Otto Fernandez left Spruance, his competitive intelligence duties were "rolled into a full-time position occupied by" Renaud, titled Global Competitive Intelligence Manager. Pl.'s Mem. in Opp'n, Ex. 13, Connor Decl. ¶ 5. Indeed, Renaud was the only employee at AFS who held a full-time position related to the gathering or analysis of competitive intelligence. He was responsible for gathering and analyzing competitive intelligence about para-aramid producers from a loose-knit, vast network of DuPont AFS employees around the globe. Even when Otto Fernandez still managed para-aramid competitive intelligence gathering, Renaud worked closely with him and other individuals to gather and analyze competitive intelligence. He had been in the fold for quite some time with respect to intelligence about other para-aramid producers.

Upon his departure from Spruance, Otto Fernandez left Renaud two CDs "containing competitive intelligence documents." Id. From these two CDs, DuPont produced sixty-nine responsive documents to Kolon. DuPont produced another 357 responsive documents on which Otto Fernandez was either the author or recipient of the document. On June 28, 2010, Kolon subpoenaed Otto Fernandez. However, due to conflicts with the date proposed by Kolon in the subpoena, Kolon chose not to depose him, notwithstanding that DuPont proposed alternative dates.

2. **Tad Lee**

Tad Lee was Regional Segment Leader for the AFS business unit at DuPont Korea, Inc. ("DKI"). In this role, he was responsible for sales and marketing of the AFS products, including Kevlar®, in Korea. As part of the AFS business unit, he also collected competitive intelligence about DuPont's Korean para-aramid competitors. Within DuPont's 2500-employee AFS business unit, Renaud and his predecessors reached out regularly to sixty to seventy people, generally sales and marketing employees such as Tad Lee, who, in addition to their regular duties at the company, were tasked with gathering information on para-aramid competitors. Renaud was responsible for compiling and analyzing the information that was forwarded to him. At DKI, Tad Lee and several other employees gathered competitive intelligence on DuPont's Korean para-aramid fiber competitors,

including Kolon, Hyosung, and Teijin-Twaron and forwarded that information, first to Otto Fernandez, and then to Renaud. See Pl.'s Mem. in Opp'n, Ex. 20 (providing examples of emails from DKI employees forwarding competitive intelligence to Renaud). Tad Lee collected competitive intelligence related to Heracron® as early as April 2005, when Kolon publicly announced that it was entering the para-aramid fiber market. Before then, DuPont had been gathering competitive intelligence about Kolon, but only with respect to its other products.

Often, Otto Fernandez and Renaud would ask Tad Lee specific questions about Heracron®. For example, he was asked about the type of equipment that Kolon had purchased to manufacture Heracron®, whether samples of the fiber could be obtained, and the layout of Kolon's manufacturing facility. However, DuPont expected all employees, including Tad Lee, to adhere to legal and ethical standards in collecting competitive intelligence.[5]

---

[5] This would include gathering competitive intelligence only from public sources, such as newspapers, magazines, trade journals, trade shows, conferences, Internet searches, government statistics, and customers, Pl.'s Mem. in Opp'n, Ex. 19, Hendren Dep. at 21:15-22:25; Ex. 10, Renaud Dep. at 92:21-93:23, and never accepting proprietary information from a competitor, Ex. 19, Hendren Dep. at 80-81, 82; Ex. 10, Renaud Dep. at 71:4-72:14, 271. In addition, before communicating with a competitor's retired personnel, employees are required to consult with their local legal counsel for assurances that the consultation will not violate DuPont's legal or ethical standards. Ex. 19, Hendren Dep. at 164:15-23. And, with respect to employees' conversations with customers of competitors about the details of the contracts between the

12

In January 2009, it came to Shomper's attention that Tad Lee was resigning from DKI to work for Hyosung, another DuPont competitor in Korea. At some point prior to his departure, Tad Lee permitted Kyoo Woon Lee ("K.W. Lee"), who succeeded Tad Lee in his position as Regional Segment leader for the AFS business unit at DKI, and Jenny H. J. Son, another DKI employee, to download electronic documents from Tad Lee's computer onto K.W. Lee's own hard drive. The downloaded documents were documents K.W. Lee would need in order to succeed Tad Lee as Regional Segment Leader. Tad Lee pointed out to K.W. Lee which folders and files he used in his job and K.W. Lee copied those files. DuPont does not know whether K.W. Lee deleted electronic documents from Tad Lee's hard drive. However, K.W. Lee kept the documents copied from Tad Lee's computer on his hard-drive in a folder named TAD, the size of which is 14,029,361,701 bytes, 18,290 files, and 1,622 sub-folders. From these documents and others, DuPont has produced over 380 documents as to which Tad Lee was identified as either author or recipient.[6]

On January 15, 2009, Tad Lee officially resigned from DKI. On January 20, 2009, K.W. Lee gave a PowerPoint presentation to

customer and competitor, DuPont employees are trained to verify with the customer if the information was being freely given and was not covered by an agreement with the competitor. Id. at 101:18-101:21.

[6] Kolon served a subpoena on Tad Lee in February 2010 for a deposition, but he has resisted Kolon's efforts to depose him.

13

DKI employees regarding guiding principles and document preservation efforts to be used by the DKI employees when the suit against Kolon was to be filed. Those "guiding principles," included instructions to DKI employees, for example, to "compete for business ethically, fairly and lawfully," not to "disparage Kolon or its product Heracron®," and to "promote Kevlar® with prospective customers based on the merits and attributes of Kevlar® and based on what DuPont can offer the customer." Under the heading, "Further Guidance," K.W. Lee instructed DKI employees to "Read Legal Records Hold Order and comply with document retention," and "Preserve previously created e-mails and documents."

DuPont's witness pursuant to Rule 30(b)(6), Walter Connor, explained, that the employees at DKI were a "non-U.S. business unit . . . now subjected to US litigation and it needed to be made clear to them what needed to be preserved as a result of that situation. That is not a situation that they are ultimately or intimately familiar with and, therefore, the communication needed to go out to them as to what they needed to do outside the normal preservation of records under the record retention guidelines." Connor Dep. at 96:2-11.

On January 27, 2009, seven days after the PowerPoint presentation and twelve days after his departure from the

company, Tad Lee's email account was deleted from DuPont's servers. It was never placed on an inactivity report.

### 3. Chico Bogaz

Chico Bogaz held the title, Financial Cost Analyst, at DuPont's Spruance Plant. His responsibilities included creating, maintaining, distributing, and securing the Denier Economics information for the Spruance Plant. On April 30, 2007, he retired from DuPont, though from June 14, 2007 until April 23, 2008, he worked for the company as a limited service employee on a project related to DuPont's order tracking software system. On November 15, 2008, Bogaz's email account was deleted. DuPont produced 126 documents as to which Bogaz was identified as either author or recipient.

### 4. Alan Temple

Alan Temple held the title of Specialist -- Finance Business at DuPont's Maydown facility. Part of his responsibilities included creating, maintaining, distributing, and securing the Maydown Denier Economics information. On December 22, 2007, Temple retired from DuPont, but beforehand, he gave his successor, Cristina Fernandez, a CD with his archived email account. Temple's email account subsequently was deleted from DuPont's server on February 19, 2008. After reviewing the CD given to Cristina Fernandez and other

documents, DuPont produced 180 documents as to which Temple was identified as either the author or recipient.

**E. Kolon's Claims in Support of Motion for Sanctions**

Kolon has moved for sanctions for DuPont's alleged spoliation of the email accounts and documents of Otto Fernandez, Tad Lee, Bogaz, and Temple. Specifically, Kolon claims that the spoliation resulted from three improper decisions made by counsel for DuPont, Clarke and Shomper. First, Kolon argues that DuPont failed to issue a litigation hold for over thirteen months after DuPont reasonably anticipated litigation in May 2006. Compounding this failure, says Kolon, was DuPont's second decision to distribute the First Hold Order to only eighteen individuals, notwithstanding DuPont's alleged knowledge that many more employees were likely to have relevant information. Missing from the list of employees who received the First Hold Order were Otto Fernandez, Tad Lee, Bogaz, and Temple, and, as a result, their email accounts and electronic documents were deleted from their computers after they each left the company. Furthermore, the deletion of Tad Lee's electronic documents and email account occurred under rather suspicious circumstances, according to Kolon.

Because of this spoliation, Kolon says that it has suffered substantial prejudice. According to Kolon, Tad Lee and Otto

Fernandez were "primarily responsible" for DuPont's collection of competitive intelligence on Kolon, and, in fact, the two were "instructed to collect the very same type of information on Kolon that DuPont alleges to be trade secrets in this case." Def.'s Mem. in Supp. at 2. Furthermore, Kolon asserts that Tad Lee solicited sensitive proprietary information, of the same type that DuPont alleged to be trade secrets in this case, from retired Kolon employees. Thus, according to Kolon, the electronic documents in the computers of Otto Fernandez and Tad Lee "provide[d] the best evidence of what methods of competitive intelligence-gathering are standard in the industry, and what types of information are publicly available," id., and as such, are "highly probative" of Kolon's defenses, which include that the alleged trade secrets are public, that they lack value, and that Kolon did not utilize "improper means" or have the requisite level of intent to have committed the torts of which it is accused.

According to Kolon, the missing electronic documents were likely the only evidence explaining how Tad Lee and Otto Fernandez went about collecting information on Kolon; whom Tad Lee contacted for information; and what documents and raw data he collected. Moreover, says Kolon, Otto Fernandez's email account and documents would have provided "crucial evidence" demonstrating the type of information considered to be a trade

17

secret in the industry and the methods employed by DuPont to gather competitive intelligence. Id. at 17. Finally, Kolon claims that Tad Lee passed alleged trade secret information to both competitors and interested third parties, generally customers of DKI. From this Kolon posits that "it is only reasonable to assume that [Tad] Lee's emails and documents contained a good deal more information about what trade secrets he revealed and to whom." Id. at 16-17.

As to the failure to issue the First Hold Order to Bogaz and Temple, Kolon asserts that as the two persons primarily responsible for creating, maintaining, protecting, and distributing the Denier Economics spreadsheets for Spruance and Maydown, respectively, their documents would contain "unique evidence of how these documents were created, to whom they were distributed and why, and what security measures were applied." Id. at 3. These documents, therefore, are said to be "highly probative" of Kolon's defenses, including that the alleged trade secrets in the Denier Economics spreadsheets are public, that they lack value, and that they were not subject to reasonable measures to maintain their security.

In sum, Kolon contends that DuPont's alleged spoliation has denied Kolon access to evidence that Kolon needs to mount a complete defense to DuPont's allegations. DuPont's failure to "cast a much wider net" with its First Hold Order, "shows at

best a reckless disregard for its obligations to preserve evidence, and at worst a deliberate omission." Id. at 12–13. Moreover, DuPont, according to Kolon, has no adequate explanation for failing to issue holds to the four former employees because the Government's purported directive to keep the investigation as confidential as possible is not a proper ground for ignoring the duty to preserve relevant documents.

Finally, Kolon alleges that Clarke and Shomper, though they should have ensured the preservation of relevant documents, allowed the email accounts and documents of the four former employees to be destroyed under unexplained circumstances and in contravention to DuPont internal policies respecting document retention and deletion.

In light of these claims, Kolon has requested the following equitable relief:

(1) a finding that Tad Lee's documents would have shown that he engaged in direct communications with current and former Kolon personnel for the purpose of collecting competitive intelligence;

(2) a finding that Tad Lee sought information regarding Kolon's aramid fiber production, marketing and sales methods and plans;

(3) a finding that Tad Lee communicated DuPont information to Kolon;

(4) a finding that Tad Lee communicated DuPont information to third parties;

(5) a finding that Tad Lee communicated to Kolon at least some of the information alleged by DuPont to be a trade secret in this case;

(6) a finding that Tad Lee communicated to other third parties at least some of the information alleged by DuPont to be a trade secret in this case;

(7) a finding that Otto Fernandez was aware of the competitive intelligence methods used by Tad Lee;

(8) a finding that Otto Fernandez was aware that Tad Lee disclosed DuPont information to Kolon and to other third parties; and

(9) an order requiring DuPont to produce all privileged and work product documents mentioning, received from or sent to Tad Lee, Otto Fernandez, Chico Bogaz, and/or Alan Temple.

Alternatively, Kolon requests that the court instruct the jury that they are permitted to make such adverse inferences.

**F. DuPont's Defense to Kolon's Allegations of Spoliation**

DuPont characterizes Kolon's assertion that DuPont should have sent the First Hold Order to more than eighteen individuals as "pure speculation." Pl.'s Mem. in Opp'n at 6. DuPont takes the view that it sent the First Hold Order to the "key" employees it believed were most likely to have documents relevant to anticipated litigation against Mitchell. Furthermore, "DuPont was careful not to circulate the hold memo broader than necessary, as it did not want to compromise the Government's investigation against Mitchell or in any way risk the chance of obstructing justice by interfering with the investigation." Id. at 5.

20

As to Temple, DuPont claims that it had no indication or reason to believe that the Maydown Denier Economics spreadsheets had been misappropriated by Kolon until August 2009, which was well after DuPont's duty to preserve had been triggered. Furthermore, Bogaz retired from the Spruance Plant almost two months before the issuance of the First Hold Order, and one month before the duty to preserve was triggered. And, though he continued to work at DuPont, it was on an unrelated project; he never worked with Denier Economics at Spruance or elsewhere after his retirement. Thus, DuPont had no reason to believe that he had relevant documents at the time the duty to preserve was triggered, or at any point thereafter.

As to Otto Fernandez, DuPont notes that he left Spruance and transferred to the company's TYVEK® division a little less than seven months before the issuance of the First Hold Order. And, after the transfer, he no longer worked in the gathering and analysis of competitive intelligence. Thus, when DuPont issued the First Hold Order, he was not identified as a potential custodian, though his successor Renaud was so identified. With respect to Tad Lee, DuPont asserts that, contrary to Kolon's characterizations, his primary responsibilities at DKI were not related to competitive intelligence. Rather, like all employees, especially sales representatives, he collected intelligence on competitors.

DuPont asserts that he was one among many employees at DKI who collected competitive intelligence on Kolon or other Korean competitors, and then forwarded that competitive intelligence, first to Otto Fernandez, and then to Renaud, who succeeded to the electronic files of Otto Fernandez. Finally, when Tad Lee left DKI, he allowed K.W. Lee and Jenny Son to copy his files, from which DuPont has produced roughly 380 electronic documents, thereby minimizing, if not eliminating, any prejudice Kolon allegedly has suffered. And, any emails that Tad Lee had that concerned competitive intelligence of Heracron® were forwarded to Renaud during the relevant time period and thus were preserved by Renaud.

Furthermore, DuPont asserts that it had no reason to include in the First Hold Order "all information related to the actual collection of competitive intelligence [by employees] prior to their departure." Id. at 23. Moreover, the company believed that it was fulfilling its obligations through issuing the First Hold Order to Renaud, a decision which, in DuPont's estimation, balanced both the Government's directive and fulfilled its obligation to preserve the relevant documents of key employees. Because Renaud worked with Otto Fernandez before he departed the Spruance facility, and because such competitive intelligence as Tad Lee had gathered was forwarded to Renaud even before Otto Fernandez's departure, DuPont says that it

reasonably believed that it was complying with its preservation obligation related to competitive intelligence about Kolon.

## DISCUSSION

### A.   Controlling Legal Principles: Spoliation

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (citing West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).   Issues of spoliation and sanctions are resolved under principles of federal law.   Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 449 (4th Cir. 2004).   Furthermore, "spoliation is not a substantive claim or defense but a 'rule of evidence,' and thus is 'administered at the discretion of the trial court.'"   Id. at 450 (quoting Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995)).

The power of the court to sanction a party for spoliation derives not from substantive law, but the inherent power of the court "to control the judicial process and litigation." Silvestri, 271 F.3d at 590; see also Suntrust Mortg., Inc. v. AIG United Guar. Corp., Civ. Action No. 3:09cv529, 2011 WL 1225989, at *14 (E.D. Va. Mar. 29, 2011) (explaining that

"spoliation of evidence is an abuse of the judicial process that is sanctionable under the inherent power" of the court). This power is, however, "limited to that necessary to redress conduct 'which abuses the judicial process.'" Silvestri, 271 F.3d at 590 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)). As the Fourth Circuit explained in Silvestri:

> The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth. "[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions -- all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition." The courts must protect the integrity of the judicial process because, "[a]s soon as the process falters . . . the people are then justified in abandoning support for the system."

Id. (quoting United States v. Shaffer Equip. Co., 11 F.3d 450, 457 (4th Cir. 1993)). While district courts have "broad discretion" to choose an appropriate sanction, "'the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" Id. (quoting West, 167 F.3d at 779). The court's decision to impose sanctions should serve dual purposes: "leveling the evidentiary playing field" and "sanctioning the improper conduct." Vodusek, 71 F.3d at 156.

24

## 1. The Duty to Preserve

Spoliation is both the destruction of evidence and/or the failure to preserve evidence. "As such, litigants have a duty to preserve documents or materials -- including electronic documents and materials -- that may be relevant to ongoing and potential future litigation." Phillips Elecs. N. Am. Corp. v. BC Technical, -- F. Supp. 2d --, 2011 WL 677462, at *40 (D. Utah Feb. 16, 2011). This duty "arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Silvestri, 271 F.3d at 591 (citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)). Spoliation therefore implicates "both the duty to preserve and the breach of that duty through the destruction or alteration of the evidence." Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 521 (D. Md. 2010).

Upon recognizing the threat or anticipation of litigation, litigants are not required to "preserve every shred of paper, every e-mail or electronic document, and every back up tape," for "[s]uch a rule would cripple large corporations." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). A party that anticipates litigation, however, is "under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery

of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." Samsung Elecs. Co. v. Rambus, Inc., 439 F. Supp. 2d 524, 543 (E.D. Va. 2006), vacated on other grounds, 523 F.3d 1374 (Fed. Cir. 2008) (citation and quotation marks omitted). In order to comply with this obligation, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Zubulake, 220 F.R.D. at 218. "Relevant documents" include the following:

> [A]ny documents or tangible things (as defined by [Fed. R. Civ. P. 34(a)]) made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." The duty also includes documents prepared for those individuals, to the extent those documents can be readily identified (e.g., from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of any party, or which is "relevant to the subject matter involved in the action." Thus, the duty to preserve extends to those employees likely to have relevant information -- the "key players" in the case.

Id. at 217-18 (footnotes omitted); see also Goodman v. Praxair Servs., Inc., 632 F. Supp. 2d 494, 511-12 (D. Md. 2009).

## 2. Culpable Conduct

In the Fourth Circuit, any level of fault, or culpable conduct, suffices for a finding of spoliation, but the appropriate place to assess the spoliator's state of mind is in determining the appropriate sanction. Goodman, 632 F. Supp. 2d at 518, 520; see also Samsung, 439 F. Supp. 2d at 540 ("[T]he appropriate place to assess the effect of the spoliator's state of mind is in ascertaining an appropriate sanction, not in assessing whether spoliation has occurred." (citing Silvestri, 271 F.3d at 593-95)); Victor Stanley, 269 F.R.D. at 529 ("In the Fourth Circuit, for a court to impose some form of sanctions for spoliation, any fault -- be it bad faith, willfulness, gross negligence, or ordinary negligence -- is a sufficiently culpable mindset."); Suntrust Mortg., 2011 WL 1225989, at *14.

"With regard to preservation of evidence, if either the failure to collect or preserve evidence . . . causes the loss or destruction of relevant information, the spoliator's actions may amount to negligence, gross negligence, . . . intentional misconduct," or bad faith. Victor Stanley, 269 F.R.D. at 529. "Negligence, or 'culpable carelessness,' is '[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]'" Id. (alterations in original) (quoting Black's Law Dictionary 846 (Bryan A. Garner ed., abridged 7th ed., West 2000)). Contrasted

27

with negligent conduct is that conduct which "'is intentionally, wantonly, or willfully disregardful of others' rights.'" Id. "While bad faith requires 'destruction for the purpose of depriving the adversary of the evidence,' Powell v. Town of Sharpsburg, 591 F. Supp. 2d 814, 820 (E.D.N.C. 2008), for willfulness, it is sufficient that the actor intended to destroy the evidence." Id. at 530 (citing Goodman, 632 F. Supp. 2d at 520). In other words, "[c]onduct that is in bad faith must be willful, but conduct that is willful need not rise to bad faith actions." Id. Furthermore, the Fourth Circuit has emphasized that spoliation does not have to be conducted in bad faith in order to warrant sanctions; but, the absence of bad faith in the spoliator's actions does not equate to negligent conduct. Buckley v. Mukasey, 538 F.3d 306, 323 (4th Cir. 2008); Vodusek, 71 F.3d at 156-57.

If the Court finds spoliation in this case, Kolon requests, as a sanction, entry of specific findings, or, in the alternative, that the Court instruct the jury that it is permitted to make such adverse inferences against DuPont. "The spoliation of evidence rule allows the drawing of an adverse inference against a party whose intentional conduct causes not just the destruction of evidence, . . . but also against one who fails to preserve or produce evidence . . . ." Hodge, 360 F.3d at 450. A finding of bad faith is not necessary to permit an

adverse inference, though it will suffice. <u>Vodusek</u>, 71 F.3d at

156. However, an adverse inference usually "cannot be drawn

merely from [the spoliator's] negligent loss or destruction of

evidence; the inference requires a showing that the <u>party knew</u>

<u>the evidence was relevant</u> to some issue at trial and that <u>his</u>

<u>willful conduct</u> resulted in its loss or destruction." <u>Id.</u>

(emphasis added). Thus, in order to grant Kolon's request for

adverse inferences, Kolon has to show that DuPont engaged in

spoliation of the email accounts and documents of the four

former employees either in bad faith, or by intentionally or

deliberately destroying evidence that DuPont knew was relevant

to an issue at trial, or by negligently spoliating evidence that

DuPont knew to be relevant and in so doing acted in a willful

manner and with severe prejudice to Kolon.[7]

### 3. Relevance

As part of the requirement for an adverse inference

instruction, Kolon must show that DuPont destroyed evidence that

it knew likely would be <u>relevant</u> in pending litigation or in

litigation it reasonably anticipated, or reasonably should have

anticipated. Relevance in the context of spoliation is

"somewhat more stringent" than the standard provided by Federal

---

[7] <u>Silvestri</u> also permits dismissal as a sanction for this
species of negligent spoliation.

Rule of Evidence 401.[8]   Sampson, 251 F.R.D. at 79-80.   In

Vodusek, the Fourth Circuit explained that relevant evidence is

that evidence which would "naturally have been introduced into

evidence."   Vodusek, 71 F.3d at 156.   Another court has

explained that lost or destroyed evidence is relevant if "a

reasonable factfinder could conclude that the lost evidence

would have supported the claims or defenses of the party that

sought it."   Thompson v. U.S. Dep't Hous. & Urban Dev., 219

F.R.D. 93, 101 (D. Md. 2003); see also Goodman, 632 F. Supp. 2d

at 522 (same).   Yet another court found the following definition

of relevant evidence instructive:   "'The burden is on the

aggrieved party to establish a reasonable possibility, based on

concrete evidence rather than a fertile imagination, that access

to the lost material would have produced evidence favorable to

his cause.'"   Sampson, 251 F.R.D. at 180 (quoting Gates Rubber

Co. v. Bando Chem. Indus., Ltd., 167 F.R.D. 90, 104 (D. Colo.

1996)).   Once the aggrieved party has made a prima facie showing

of relevance, the burden then shifts to the spoliator to show

that the destroyed evidence was in fact inconsequential.   See

Samsung, 439 F. Supp. 2d at 561-62 (discussing burden-shifting

in the relevance context).

---

[8]   Federal Rule of Evidence 401 states that relevant evidence
is that "evidence having any tendency to make the existence of
any fact that is of consequence to the determination of the
action more probable or less probable than it would be without
the evidence."   Fed. R. Evid. 401.

**B. Application to the Facts**

    **1. Trigger Date of Duty to Preserve**

        Kolon argues, based on privilege log entries and DuPont's alleged admission, that DuPont reasonably anticipated litigation with Kolon in May 2006. However, the Court previously has held that, by May 21, 2007, DuPont reasonably anticipated litigation with Mitchell and/or Kolon over the trade secrets and confidential information supplied by Mitchell to Kolon. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., Civ. Action No. 3:09cv58, 2010 WL 1489966, at *6 (E.D. Va. Apr. 13, 2010). Thereafter, DuPont was under a duty to "preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." Samsung, 439 F. Supp. 2d at 543 (citation and quotation marks omitted). What DuPont knew, or what it reasonably should have known, on May 21, 2007, almost a year and a half prior to filing this action, thus is key to determining whether DuPont engaged in spoliation with respect to the electronic documents and email accounts of Tad Lee, Otto Fernandez, Temple, and Chico Bogaz. After reviewing the specific facts surrounding this litigation and the departure of the four former employees, the Court concludes that, on May 21, 2007, DuPont had no reason to believe

that either the Denier Economics spreadsheets or the methods used by DuPont to collect competitive intelligence would be relevant, or potentially relevant, to the litigation against Mitchell and/or Kolon. Accordingly, DuPont did not breach its duty to preserve, and thereby did not engage in spoliation of the email accounts and documents about that topic until these matters reasonably could be thought relevant or discoverable.

### 1. Scope of DuPont's Duty to Preserve

In order to comply with its duty to preserve, DuPont was obligated to implement a litigation hold with respect to relevant documents, including electronically stored information, for the "key players" involved with the anticipated litigation against Mitchell and/or Kolon. Identification of a "key player" is not always an easy assessment to make. It is "not dependent on the volume of interaction between an individual and a litigant, but rather is determined by whether an individual is likely to have information relevant to the events that underlie the litigation." Goodman, 632 F. Supp. 2d at 512; see also Ashton v. Knight Transp., Inc., -- F. Supp. 2d --, 2011 WL 734282, at *26 (N.D. Tex. Feb. 22, 2011) ("The duty to preserve extends to the party's or potential party's employees likely to have relevant information -- the 'key players'." (quotation marks omitted)). Kolon contends that Otto Fernandez, Tad Lee,

Temple, and Bogaz were "key players" who should have been issued the First Hold Order.

The Court finds, however, that DuPont's duty to preserve relevant information did not extend to the four former DuPont employees because they could not reasonably have been seen to be "key players" on June 25, 2007, when DuPont issued the First Hold Order. By that date, DuPont had been investigating Mitchell's employment relationship with Kolon for approximately two to three months. But, the record does not show that, by then, DuPont knew the scope of Mitchell's "duties" as a consultant for Kolon, nor that Mitchell had misappropriated documents and sent them to Kolon, nor the subjects addressed in those documents. Moreover, DuPont could not have reasonably known that, as a defense to possible trade secret allegations, Kolon would claim that DuPont sanctioned the use of improper means by its employees to gather competitive intelligence or that its employees were not protecting its proprietary information. In fact, the universe of DuPont's knowledge was quite limited at that point. However, as its investigation continued, DuPont's universe of knowledge about Mitchell and Kolon and their relationship increased, along with the universe of relevant documents that needed to be preserved. But, on June 25, 2007, DuPont's knowledge was relatively limited, and its preservation obligation and the task of identifying "key

33

players" was further complicated by the Government's directive to keep the investigation as confidential as possible.

### a. Alan Temple and Chico Bogaz

On June 25, 2007, DuPont was unaware that Mitchell had misappropriated and sent Denier Economics information and spreadsheets to Kolon. Accordingly, DuPont would have been unaware that Bogaz and Temple, custodians at one point of the Denier Economics spreadsheets at Spruance and Maydown, respectively, would have had relevant information. In fact, the earliest DuPont learned that Mitchell had retained the spreadsheets, and thus that custodians of Denier Economics spreadsheets may have relevant information requiring preservation, was in April 2008. By that time, Temple had retired and his email account and documents deleted pursuant to DuPont's document deletion policies.[9]

As to Bogaz, by the time DuPont had an indication that Mitchell had retained Denier Economics spreadsheets in April

---

[9] The Court notes that Temple retired from DuPont on December 22, 2007 and his email account deleted on February 19, 2008. Under DuPont's document deletion policies, it appears that Temple's email account was deleted roughly sixty days after he retired, corresponding to the information provided by DuPont's counsel in the July 2, 2010 letter that set forth DuPont's policies. With no duty to preserve triggered though, the routine deletion of his documents and email account does not amount to spoliation. Furthermore, assuming, arguendo, that spoliation had occurred, the prejudice to Kolon -- a factor the Court can take into account when fashioning a sanction -- was minimized, if not eliminated, by the archived email account given by Temple to his successor, Cristina Fernandez.

34

2008, Bogaz had retired from his position at Spruance -- he retired almost a year earlier, on April 30, 2007 -- and was working on an unrelated project as a limited service employee. Shomper did reach out to Bogaz to ask "basic questions" about the spreadsheets in April 2008, but Bogaz informed Shomper of his retirement and limited work status on the unrelated project. Pl.'s Mem. in Opp'n at 9. He directed Shomper to his successor at Spruance, Chad Hurley, who also had his electronic files.

DuPont argues that it was not under a duty to preserve Bogaz's email account and electronic documents because, even though it was aware that Mitchell had retained some Denier Economics information in April 2008, it was not aware what portions of the spreadsheets had been misappropriated or the extent of the misappropriation until December 17, 2008.[10] And, by that time, Bogaz's email account and documents had been deleted from DuPont's servers.

The Court must agree with DuPont. Even though, before the deletion of Bogaz's email account and electronic documents, DuPont learned that Mitchell had retained some of the Denier Economic spreadsheets and had sent them to Kolon, DuPont was

---

[10]    Even receiving this information from the Government in December 2008 did not reveal the true extent of Mitchell's and Kolon's misappropriation of the Denier Economics information, as DuPont did not learn until Kolon's 4500-page production in August 2009 that the Maydown Denier Economics spreadsheets also had been sent to Kolon by Mitchell.

unaware what spreadsheets had been misappropriated or the scope of the misappropriation. For example, from the record before the Court, DuPont has at least two plants, Spruance and Maydown, which produce such spreadsheets. There may possibly be other sites as well. Furthermore, there may be many different versions of the spreadsheets, ranging over the many number of years DuPont has been developing Kevlar®. Thus, there could be a rather large universe of documents related to the general subject of "Denier Economics." In addition, Bogaz retired from Spruance on April 30, 2007, around the time that Kolon and Mitchell formalized their employment relationship. Even if DuPont should have preserved the email account and electronic documents of employees who dealt with Denier Economics spreadsheets in April 2008, when it learned Mitchell had retained some of the spreadsheets, it was not in possession of sufficient information to alert it to preserve the electronic documents and email account of former employees who at some point in the past, had performed duties related to the spreadsheets. The limited knowledge that DuPont had about Mitchell's possession of Denier Economics spreadsheets in April and June 2008 informed the scope of its preservation obligations, which the Court concludes did not reach to the email account and electronic documents of Bogaz. Therefore the Court finds that, because the email account and electronic

documents of Bogaz were deleted without being subject to a duty to preserve, no spoliation of that information has occurred.

### a. Otto Fernandez and Tad Lee

Kolon argues that DuPont should have issued the First Hold Order to Otto Fernandez and Tad Lee because they were involved in collecting competitive intelligence, the methods of which are key to Kolon's defenses, including its unclean hands defense. However, just as DuPont could not have anticipated that Kolon would file a counterclaim alleging violations of the antitrust laws, the Court finds that DuPont had no reason to know that Kolon would raise defenses related to DuPont's own methods of collecting competitive intelligence. Accordingly, at the time of the First Hold Order, DuPont had no duty to preserve the electronic documents and email accounts of Tad Lee and Otto Fernandez which form that aspect of Kolon's spoliation claim.

In Victor Stanley, the court discussed the duty to preserve, and specifically, the fact that it should not be analyzed in "absolute terms; it requires nuance, because the duty cannot be defined with precision." Victor Stanley, 269 F.R.D. at 522 (citations and quotation marks omitted). The court further explained:

> Proper analysis requires the Court to determine reasonableness under the circumstances -- reasonable and good faith efforts to retain information that may be relevant to pending or threatened

> litigation. It is neither absolute, nor
> intended to cripple organizations. Thus,
> whether preservation or discovery conduct is
> acceptable in a case depends on what is
> reasonable, and that in turn depends on
> whether what was done -- or not done -- was
> proportional to that case and consistent
> with clearly established applicable
> standards. . . . [A]ssessment of
> reasonableness and proportionality should be
> at the forefront of all inquiries into
> whether a party has fulfilled its duty to
> preserve relevant evidence.

Id. at 522, 523 (emphasis in original) (citations and quotation
marks omitted). Accordingly, a party breaches the duty to
preserve when it fails to act reasonably in taking positive
action to preserve material evidence. Jones v. Bremen High Sch.
228, No. 08-c-3548, 2010 WL 2106640, at *6 (N.D. Ill. May 25,
2010). More than "good intentions" are required; "'those
intentions [must] be followed up with concrete actions
reasonably calculated to ensure that relevant materials will be
preserved,' such as giving out specific criteria on what should
or should not be saved for litigation." Id. (quoting Danis v.
USN Commc'ns, Inc., No. 98-c-7482, 2000 WL 1694325, at *36, *38
(N.D. Ill. Oct. 20, 2000)).

The discussion of reasonableness as an underlying
consideration when analyzing a litigant's compliance with its
duty to preserve is particularly appropriate in these
circumstances. Based on the record, the Court finds that DuPont
acted reasonably and in good faith when it preserved documents

38

concerning competitive intelligence it believed were relevant to potential litigation with Kolon. Shortly after its duty to preserve was triggered, DuPont issued the First Hold Order, in which it directed the recipients to hold "any competitive intelligence related to Kolon Industries, Inc." Renaud, Otto Fernandez's successor with respect to competitive intelligence, and the person at DuPont who was forwarded all competitive intelligence by the roughly 2500 people in the AFS business unit, received the First Hold Order and complied with it. Hence, from that point forward, all competitive intelligence gathered about Kolon was preserved through Renaud. Moreover, while DuPont's First Hold Order did include directions to preserve "any competitive intelligence related to Kolon Industries, Inc," DuPont had no reason to believe that the scope of the hold order should include all information related to how its employees went about their actual collection of competitive intelligence. DuPont included the category because it wanted to monitor Mitchell's activities as a sales representative of Kolon, a claim that Kolon has offered no evidence to refute. The Court refuses to second-guess DuPont's efforts in this regard based on the record, and finds that DuPont, in good faith, took positive steps reasonably calculated to ensure that information it reasonably believed was relevant at that time was preserved for litigation.

DuPont did not identify Otto Fernandez as a potential custodian initially, or at any time thereafter, because he had transferred to the company's TYVEK® unit on November 1, 2006, almost eight months before June 25, 2007. Mitchell and Kolon did not formalize their employment relationship until early spring 2007, a date which post-dated Otto Fernandez's involvement with Kevlar® and the gathering of competitive intelligence on Kolon. Accordingly, until Kolon issued its Second Set of Interrogatories on October 21, 2009, seeking information on the methods of DuPont's collection of competitive intelligence, DuPont had no reason to believe that Otto Fernandez's email account and documents contained relevant information to an issue in the case.[11] On DuPont's collection methods until October, 21, 2009, with no duty to preserve triggered, DuPont cannot have engaged in spoliation by failing to subject Otto Fernandez's email account and electronic documents to a litigation hold and allowing their deletion to occur on August 4, 2009.

---

[11] Indeed, it is not clear even now that how DuPont collected information is an appropriate measure for use in Kolon's defense of the claims in this case. For example, the fact that DuPont did something wrong (if it did) would not vindicate Kolon's conduct of the same ilk (if it was wrong). Nor would Dupont's misconduct, if any, convert Kolon's improper conduct, if any, into proper conduct. That Kolon's counsel has fashioned such a theory does not mean that Dupont's counsel reasonably should have anticipated it in describing the scope of a litigation hold.

The same reasoning holds true with respect to Tad Lee. At no point before Kolon's Second Set of Interrogatories did DuPont have reason to believe that its methods, or those of Tad Lee, respecting the collection of competitive intelligence on Kolon were relevant to reasonably anticipated litigation which was to involve the misappropriation of DuPont's own trade secrets by a former employee and acting for a competitor. Therefore, the Court finds that DuPont did not breach its duty to preserve evidence by failing to issue the First Hold Order to Tad Lee, or to preserve his documents at any time until Kolon injected the methods used by DuPont into the case when, on October 21, 2009, Kolon filed its Second Set of Interrogatories. Additionally, because DuPont did not breach any duty to preserve when Tad Lee's email account and electronic documents were deleted on January 27, 2009, there is no basis for a finding of spoliation.

Apart from its arguments respecting DuPont's failure to issue the First Hold Order to Tad Lee, Kolon also claims that DuPont deliberately destroyed Tad Lee's email account on January 27, 2009, twelve days after his formal departure from DKI and in contravention to DuPont's document deletion practices. Particularly troubling, according to Kolon, is that the deletion of the email account occurred a week after K.W. Lee gave the PowerPoint presentation to DKI employees about the forthcoming litigation hold and its implications. Had the unknown Human

Resources, Legal, or upper-management employee who deleted Tad Lee's email account not done so, then Tad Lee's email account would have gone through the usual sixty day waiting period for inactive accounts, and then would have become subject to the Second Hold Order on February 4, 2009 and thereby would have been preserved. Kolon thus argues that: "[t]he timeline of events, taken together with DuPont's affirmative, deliberate actions to delete information it knew was highly likely to be relevant to this litigation, raises serious questions about DuPont's state of mind." Def.'s Mem. in Supp. at 22. In other words, Kolon implies that DuPont deleted Tad Lee's email account in bad faith -- sufficient to support an adverse inference jury instruction -- "the circumstances strongly suggest[ing] that DuPont affirmatively deleted relevant information for the very purpose of avoiding a forthcoming litigation hold." Id.

DuPont contends that there is no evidence that it willfully destroyed documents that it knew, or reasonably should have known, were relevant or discoverable. DuPont argues that the deletion of Tad Lee's email account occurred in accord with DuPont's standard policies. Furthermore, according to DuPont, Kolon has not established that the lost emails were relevant to its case, nor that it suffered any prejudice from the deletion of Tad Lee's email account, especially considering that any

competitive intelligence that he had collected was forwarded to Renaud and Otto Fernandez during the relevant time period.

Assuming, arguendo, that DuPont had a duty to preserve the electronic documents and email account of Tad Lee before his departure from DKI (which, as explained above it did not), the Court finds that Kolon has nonetheless failed to meet the standard required for an adverse inference instruction as a sanction for spoliation. Kolon must show that DuPont (1) knew, or reasonably should have known, that the evidence was relevant to some issue in the reasonably anticipated litigation, and (2) that DuPont's willful conduct resulted in its loss or destruction. Vodusek, 71 F.3d at 156. There is no doubt that some unknown employee at DuPont or DKI deleted Tad Lee's email account on January 27, 2009, resulting in the loss of his emails. See Pl.'s Mem. in Opp'n, Ex. 14, Letter from R. Gray to S. Flicker (July 2, 2010). What Kolon has not shown, however, is that the employee intentionally or willfully deleted the account, rather than negligently, or that the employee or DuPont knew, or reasonably should have known, that the emails were relevant to some issue at trial, let alone relevant at all. Rather, Kolon makes unsupported assertions to that effect, claiming that the emails were highly probative to many of its defenses against the trade secret allegations. Kolon offers certain produced emails from other custodians that it claims

demonstrate that Tad Lee's emails would have provided highly probative evidence of some sort to support its defenses.

However, the record before the Court supports a different conclusion. The cited emails indicate that what DKI employees gathered by way of competitive intelligence was procured from Kolon's customers or potential customers, which is not an improper method of gathering competitive intelligence. See Def.'s Mem. in Supp., Ex. 21, Email from Z. YS Yu to P. Renaud (July 11, 2007) ("Regarding on the weight of bobbin, I will check it with my customer and will inform it to you soon."); Ex. 10, Email from P. Renaud to V. Gabara, T. Lee, M. Van De Kamp, D. Vaughn, M. Reinhardt, F. Fallaha (June 14, 2007) ("Separately a significant German PM customer reported to us this week that Heracron had told him this Monday that they were struggling in terms of manufacturing process . . . ."); id. ("[A] Spanish LP customer reported to us last week that Heracron told him, they had some manufacturing problems . . . ."); id. ("Tad: are your [sic] in a position, thanks to your South Korean customers, to ethically find out more about those potential product and manufacturing problems at Heracron?"); Ex. 15, Email from O. Fernandez to V. Gabara, P. Renaud, K. Rogers, T. Lee (Apr. 18, 2006) ("I have a Heracron yarn sample in my hands that was provided by Bruce Pearce through Beaver manufacturing.").

Additionally, DuPont's own employees, including Renaud, testified during depositions that all employees who gather competitive intelligence are to do so in a legal and ethical manner, testimony verified by emails reminding employees to abide by the company's legal and ethical standards. Thus, the emails Kolon provided as support for its argument do not, in the Court's view, demonstrate that Tad Lee's emails would have been relevant to Kolon's defenses or that DuPont knew, or reasonably should have known, that they were relevant to issues in the case when the account was deleted on January 27, 2009. Though an aggrieved party "cannot be expected to[] demonstrate with certainty the content of destroyed documents," Samsung, 439 F. Supp. 2d at 561, the party still must show to "a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost [evidence] would have produced evidence favorable to [its] cause," Sampson, 251 F.R.D. at 183 (citation and quotation marks omitted). The Court finds that Kolon has not met that burden.

Kolon also implies that DuPont deleted the account in bad faith, which would be sufficient for an adverse jury instruction, but offers no more than a recounting of the timeline of events to imply that the employee who deleted Tad Lee's account did so for the specific purpose of depriving Kolon of the emails.

Furthermore, even if the Court found spoliation of Tad Lee's email account and electronic documents, prejudice to the aggrieved party is a factor the Court may take into account when determining what sanction to impose. "Unlike the equitable defense of unclean hands, prejudice to the adverse party is not an element that must be proven in order for a court to find that a party's destruction of evidence amounts to spoliation. Rather, Silvestri instructs that prejudice, like willfulness, is a factor to be considered in deciding on an appropriate sanction." Samsung, 439 F. Supp. 3d at 541 (citing Silvestri, 271 F.3d at 593). In this instance, the logical inference to be drawn from K.W. Lee downloading Tad Lee's documents before Tad Lee's departure from DKI and K.W. Lee's subsequent PowerPoint presentation about document preservation is that, when K.W. Lee downloaded the documents, he knew what documents should be kept in order to comply with the company's forthcoming litigation hold. In fact, K.W. Lee's computer file, TAD, contained 14,029,361,701 bytes, 18,290 files, and 1,622 sub-folders, from which DuPont produced responsive documents. And, with respect to the lost emails, any competitive intelligence that Tad Lee collected during his tenure at DKI was forwarded on to his superiors, whether it was Otto Fernandez or Renaud. Renaud was subject to the First Hold Order, and Otto Fernandez left Renaud with two CDs of documents and emails related to competitive

intelligence. Thus, any prejudice that may have resulted to Kolon from the deletion of Tad Lee's email account and documents was minimized, if not eliminated by these actions. An adverse inference instruction, or any other sanction, would not appear warranted for any spoliation that may have occurred had Tad Lee's email and electronic documents been subject to a duty to preserve.[12]

## CONCLUSION

For the foregoing reasons, Defendant Kolon Industries, Inc.'s (Kolon) MOTION FOR SANCTIONS (Docket No. 453) will be denied.

It is so ORDERED.

_____ /s/        _ℓℇℙ_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 27 , 2011

---

[12] Kolon also contends that DuPont resisted Kolon's requests for discovery from DuPont's Tokai, Japan, Maydown, U.K., and Geneva, Switzerland facilities, in violation of the Federal Rules of Civil Procedure and this Court's previous order. After reviewing the record, the Court finds no merit to Kolon's contention with respect to DuPont's alleged discovery abuses. Thus, Kolon's motion for sanctions under Rule 37(b)(2) also will be denied.

47