

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

E.I. DUPONT DE NEMOURS
AND COMPANY,

     Plaintiff,

v.                           Civil Action No. 3:09cv058

KOLON INDUSTRIES, INC.,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on the MOTION FOR ATTORNEYS' FEES, SANCTIONS AND COSTS (Docket No. 1593)("MOTION FOR FEES, SANCTIONS AND COSTS") filed by E.I. DuPont de Nemours and Company ("DuPont") against Kolon Industries, Inc. ("Kolon"). For the reasons set forth below, the MOTION FOR FEES, SANCTIONS AND COSTS will be granted in part, denied in part, and taken under advisement in part, pending further briefing.

### BACKGROUND

After two years of discovery, an extensive, indeed, prolific, motions practice, and a seven-week trial, the jury, using a fifty-one page verdict form, specifically found that Kolon had willfully and maliciously misappropriated and used 149 DuPont trade secrets. (Verdict Form, Docket No. 1514.) Subsequently, under Va. Code Ann. § 59.1-338B, the Court

assessed punitive damages in the amount of $350,000. (Docket Nos. 1696 & 1697.) DuPont seeks attorneys' fees from Kolon under the Virginia Uniform Trade Secrets Act, specifically Va. Code Ann. § 59.1-338.1. (MOTION FOR FEES, SANCTIONS AND COSTS at 1.) DuPont also moves for fees, costs, and expenses against Kolon and its attorneys pursuant to 28 U.S.C. § 1927 "and the Court's inherent authority as a result of the litigation tactics of Kolon and its counsel that unnecessarily multiplied these proceedings." (MOTION FOR FEES, SANCTIONS AND COSTS at 1.)

DuPont originally sought "an award of attorneys' fees in the total amount of $22,791,958.67," less whatever fees are awarded with DUPONT'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES RELATED TO KOLON'S SPOLIATION OF EVIDENCE (Docket No. 1512)("APPLICATION FOR FEES AND EXPENSES"). See DuPont's Mem. Supp. at 21. DuPont also originally sought an award of "nontaxable costs in the total amount of $12,987,742.21," less the costs awarded in connection with the APPLICATION FOR FEES AND EXPENSES. (DuPont's Mem. Supp. at 21.) The amounts sought in the initial memorandum were later amended. The most recent amounts, as of the reply memorandum, are $18,900,134.36 for fees and $10,316,534.78 for non-taxable costs.

2

### DISCUSSION

### 1. The Virginia Uniform Trade Secrets Act

Because the claim on which Dupont prevailed was based on the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code Ann. § 59.1-338.1, which authorizes an award of attorneys' fees to the prevailing party, the analysis begins with that aspect of DuPont's motion. Section 59.1-338.1 provides that: "[i]f the court determines that . . . (ii) willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party."

### (a) Willful and Malicious Misappropriation

The jury found and the Court also has held that the misappropriation was "willful and malicious." See Jury Verdict, Sept. 14, 2011 (Docket No. 1514); Mem. Op., Nov. 22, 2011 (Docket No. 1696)("The jury, after being fully and correctly informed, held that the misappropriation of each of 149 trade secrets was malicious and willful. The evidence fully supports that finding."); Order, Jan. 27, 2012 (Docket No. 1872) (stating that "the Court further finds that . . . the misappropriation was willful and malicious"); Mem. Op., Aug. 30, 2012 (Docket No. 2051)("Kolon's conduct in effecting the misappropriation was egregious (the jury found it to be willful and malicious).").

3

Notwithstanding these findings and Kolon's necessitous concession that the jury found that the misappropriation was willful and malicious, Kolon opposes an award of attorneys' fees on the meritless notion that "there was no willful or malicious misappropriation," a position that Kolon grounds on the contention that there was no evidence of malice.

At bottom, the predicate for Kolon's position is that DuPont "essentially conceded that it lacked evidence of malice when it [DuPont] dismissed its claims of statutory conspiracy under [the Virginia Business Conspiracy Act ("VBCA")] Va. Code Ann. § 18.2-499 et seq. during trial." (Kolon's Opp'n at 6.) Kolon bases that assertion on comments made during argument on Kolon's Judgment as a Matter of Law ("JMOL") motion on DuPont's business conspiracy claim. In that argument, DuPont did acknowledge that there was not direct evidence of the kind of malice required by the VBCA. (Id. at 7 n.5 (citing Trial Tr., Aug. 18, 2011, at 3047.)) However, DuPont took the view in the JMOL argument that there was circumstantial evidence of that species of malice, as to which the Court observed, "I can't see that the purpose was to injure [DuPont] in their reputation, trade, business or profession. That wasn't the purpose. The purpose was to get the information and to help [Kolon] sufficiently." (Trial Tr. 3051:1-4.) Thereafter, on August 23,

4

2011, DuPont moved voluntarily to dismiss the statutory conspiracy claim. (Trial Tr., Aug. 23, 2011, at 3199; Order, Aug. 25, 2011 (Docket No. 1393).) In Kolon's view, DuPont's concession, the Court's observation, and DuPont's voluntary dismissal of the VBCA claim add up to an absence of malice that forecloses a finding of malicious misappropriation under the VUTSA.

Kolon's argument is without merit because it relies, not on the standard for willful and malicious misappropriation under the VUTSA, but on an entirely different species of malice that is required to establish a violation of the VBCA. The language of the VBCA clearly requires an intent to injure – that there be "two or more persons who combine . . . *for the purpose of (i) willfully and maliciously injuring another* in his reputation, trade, business or profession . . . ." Va. Code Ann. § 18.2-499 (emphasis added).[1] The discussion held in the JMOL argument with regard to malice related only to the species of malice that is required under the VBCA. When the VUTSA was addressed during

---

[1] The Supreme Court of Virginia recently held that "to sustain a claim for this statutory business conspiracy, the plaintiff must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business." Northern Virginia Real Estate, Inc. v. Martins, 283 Va. 86, 110, 720 S.E.2d 121, 133 (2012).

5

that discussion, neither counsel nor the Court addressed the standard for willful and malicious misappropriation under the VUTSA, but the statute, Va. Code Ann. § 59.1-338.1, shows that the VUTSA contains no requirement of an intent to injure. (Trial Tr., Aug. 18, 2011, at 3044.)[2]

Kolon actually recognized as much in its proposed jury instruction which defined "maliciously" for purposes of the "willful and malicious misappropriation" element in the VUTSA claim without proposing an "intent to injure" requirement. That instruction read: "An act is done 'maliciously' if prompted or accompanied by such gross indifference to the rights of others as will amount to a willful act without just cause or excuse." (Docket No. 1047-2.) Thereafter, the parties agreed to that proposed jury instruction in a joint submission to the Court. (Docket No. 1508 at 43.) The Court then adopted the instruction without change, and Kolon did not object at the charge conference, when the instruction was given to the jury, or at any time before the jury returned its verdict. (Trial Tr. 5242:15-17; 5553:2-5.) Thus, Kolon has waived its right to

---

[2] The VUTSA requires only that there be "willful and malicious misappropriation" in order for the court to award "reasonable attorneys' fees to the prevailing party." Va. Code Ann. § 59.1-338.1. The same requirement exists as a precondition for the award of punitive damages. (Mem. Op., Nov. 22, 2011 (Docket No. 1696).)

6

assert, at this stage, the "intent to injure" standard. Fed. R. Civ. P. 51(a) & (c). In any event, as explained above, that standard does not apply to the VUTSA.

For the foregoing reasons, Kolon's contention that DuPont did not prove willful and malicious misappropriation under the VUTSA must be rejected. The record shows clearly that the misappropriation was willful and malicious within the meaning of the VUTSA.[3]

### (b) Prevailing Party

The VUTSA permits a discretionary award of attorneys' fees to the prevailing party in two circumstances: (1) if the court determines that "a claim of misappropriation is made in bad faith;" or (2) if the court determines that "willful and malicious misappropriation exists."[4] According to the comment to the Uniform Trade Secrets Act ("Uniform Act"), the award of reasonable fees to a prevailing party serves "as a deterrent to" bad faith claims of misappropriation and to the willful and

---

[3] Kolon concedes "that the jury found in favor of DuPont on its claims of misappropriation of trade secrets under the VUTSA," but argues that "the Court should exercise its discretion and not award attorneys' fees" because Kolon's "actions were not motivated by malice." (Kolon's Opp'n at 2.) As noted in the text, Kolon's view of malice is erroneous, and thus this argument fails as well.

[4] The Uniform Act contains a third circumstance that is not in the VUTSA.

7

malicious misappropriation of trade secrets. Uniform Act § 4 Attorney's Fees, Comment.

Neither the VUTSA, the Uniform Act, nor the comments to the Uniform Act provides any rule, or, for that matter, any guidance respecting how a court is to exercise the discretion conferred upon it. However, the comment to § 4 of the Uniform Act provides, rather tersely, that "patent law is followed in allowing the judge to determine whether attorney's fees should be awarded, even if there is a jury, compare 35 U.S.C. § 285 (1976)."

It is not clear from the Uniform Act or its comments why the drafters of the Uniform Act considered it appropriate to use principles of patent jurisprudence to provide the framework for determining whether to award attorneys' fees in cases of trade secret misappropriation. However, the limited information that is available shows that the genesis of the Uniform Act was a study by the Patent Section of the American Bar Association that was prompted by the recognition that the patent statute and the common law of trade secrets provided alternative, but complementary, modes of protecting commercially valuable intellectual property. Brian M. Malsberger, Trade Secrets: A State-by-State Survey (Appendix A); Ramon A. Klitzke, The Uniform Trade Secrets Act, 64 Marq. L. Rev. 277 (1980-81). Given

8

the complementary relationship between patent law and trade secret law in protecting intellectual property, and considering that the stated purpose of awarding attorneys' fees in the Uniform Act is to deter misappropriation of trade secrets (a form of intellectual property), it is logical that the comment to § 4 of the Uniform Act teaches reliance on patent law to inform judicial discretion in deciding whether to award attorneys' fees under the VUTSA.

The part of the Patent Act cited in the comment to § 4 of the Uniform Act simply provides that "[t]he court in exceptional cases may award reasonable attorneys fees to the prevailing party." 35 U.S.C. § 285. Both DuPont and Kolon agree that the decision whether to make an award of attorneys' fees under the VUTSA is to be made using the criteria prescribed by the Federal Circuit for applying 35 U.S.C. § 285. In fact, both parties cite the same decision, Delta-X Corp. v. Baker Hughes Production Tools, Inc., 984 F.2d 410, 414 (Fed. Cir. 1993), as support for their respective analyses of the question: whether DuPont is entitled to an award of attorneys' fees.

### (c) Whether to Award Fees Under VUTSA

In Delta-X Corp., the Federal Circuit identified three non-exclusive factors that should be taken into account in making the determination whether an award of fees should be made in a

9

patent case. The court left room for other factors as well. As the Federal Circuit put it:

> For good reasons, this court affords trial judges discretion to award enhanced damages and attorney fees. The trial judge, after presiding over the preparation and trial of the case, can best weigh the relevant considerations, such as the closeness of the case, the tactics of counsel, the flagrant or good faith character of the parties' conduct, and any other factors contributing to imposition of punitive sanctions or to fair allocation of the burdens of litigation.

Delta-X Corp. v. Baker Hughes Production Tools, Inc., 984 F.2d 410, 414 (Fed. Cir. 1993)(emphasis added).[5]

---

[5] Under the Patent Act, "[b]efore awarding attorney fees, the district court must both classify the case as 'exceptional' and exercise its discretion to award fees.  A determination of exceptionality is a question of fact." Delta-X Corp. v. Baker Hughes Production Tools, Inc., 984 F.2d 410, 413 (Fed. Cir. 1993)(internal citations omitted). While this requirement – that the case be classified as "exceptional" – does not apply in the trade secrets act context, the facts of this case clearly satisfy the requirements to be classified as exceptional.  "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions." Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005). Given Kolon's willful and malicious misappropriation and its spoliation of evidence during litigation, this case would qualify as exceptional if such a finding were required. Moreover, as DuPont notes, the exceptionality requirement is a precondition in the context of patent cases just as a finding of "willful and malicious misappropriation" is a precondition in the VUTSA.

More recent decisions set forth additional factors that may be considered in "determining whether enhanced damages are warranted, and if so, in what amount." Odetics, Inc. v. Storage Technology Corp., 14 F. Supp. 2d 800, 803 (E.D. Va. 1998)(listing nine factors from Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992)).  The nine factors listed in Read Corp. are:

- whether the infringer deliberately copied the invention;

- whether the infringer investigated the scope of the patent and formed a good-faith belief that it was invalid or not infringed;

- the infringer's behavior as a party to the litigation;

- the infringer's size and financial condition;

- the closeness of the case;

- the duration of the infringer's conduct;

- remedial action by the infringer;

- the infringer's motivation for harm; and

- whether the infringer attempted to conceal its infringement.

920 F.2d at 826.

11

These additional factors also may be considered to determine whether to award attorneys' fees, after the court determines that the case is "exceptional." See Judkins v. HT Window Fashions Corp., 704 F. Supp. 2d 470, 480, 484 (W.D. Pa. 2010) (noting that the court would "consider[] all the facts and circumstances of this case, as discussed above," in exercising its discretion and not awarding attorneys' fees). See also Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1349 (Fed. Cir. 2011)("Indeed, similar considerations may be relevant to both enhanced damages and attorney fees," but "attorney misconduct or other aggravation of the litigation process may weigh heavily with respect to attorney fees, but not for enhancement of damages."). However, most courts seem to agree on the basic factors to consider in assessing whether to award attorneys' fees. "The subsequent decision to award attorney fees, vel non, is discretionary and 'permits the judge to weigh intangible as well as tangible factors: the degree of culpability of the infringer, the closeness of the question, litigation behavior, and any other factors whereby fee shifting may serve as an instrument of justice.'" Superior Fireplace Co. v. Majestic Products Co., 270 F.3d 1358, 1378 (Fed. Cir. 2001) (citations omitted). Each of these factors is discussed below, and they support an award of attorneys' fees to DuPont.

12

### (1)  The Closeness of the Case

DuPont contends that this was not a close case. First, it points out that this is not a "developing area of law in which the factual predicates required to establish liability remain undetermined." Second, it argues that "the facts adduced at trial all but required a finding of misappropriation," noting that DuPont established by fact and expert witnesses the required elements of the claim. And, third, says DuPont, it is notable that "Kolon failed to produce a single fact witness to testify to its principal defense - independent development." (DuPont's Mem. Supp. at 17.)

Kolon disagrees, pointing out that it prevailed on five of the six claims asserted against it.[6] Kolon also argues that the "overbroad fee requests encompasses [sic] these claims," and that the fact that Kolon prevailed on them must be considered by the Court in weighing DuPont's motion. (Kolon's Opp'n at 19.)

This was not a close case. It is correct that DuPont voluntarily dismissed three of the six claims that it originally filed against Kolon and that the Court dismissed two more claims. See Mem. Op. & Order, Oct. 2, 2011 (Docket Nos. 1601 &

---

[6] Kolon also points out that it succeeded in obtaining a reversal of the Court's dismissal of its antitrust counterclaim. That is not pertinent here. In any event, DuPont later was awarded summary judgment on the antitrust counterclaim.

1602). However, DuPont presented overwhelming evidence of willful and malicious misappropriation of its trade secrets by Kolon, the claim on which the motion for attorneys' fees is based. The jury found that Kolon misappropriated and used each of the 149 trade secret claims submitted to the jury; it awarded DuPont 100% of the damages it sought; and DuPont secured extensive injunctive relief as well. As discussed in several memorandum opinions and orders, see Mem. Op. & Order, Nov. 22, 2011 (Docket Nos. 1696 & 1697); Orders, Jan. 27, 2012 (Docket Nos. 1871 & 1872); Mem. Op. & Order, August 30, 2012 (Docket Nos. 2051, 2052, 2053), the evidence convincingly and clearly demonstrated willful and malicious misappropriation of DuPont's trade secrets by Kolon.[7]

### (2) Litigation Tactics

DuPont contends that the tactics factor also supports an award of attorneys' fees to DuPont because Kolon and its counsel have engaged in "obstreperous litigation tactics that unnecessarily multiplied the proceedings" and that their tactics "exceeded mere zealous advocacy and amounted to vexatious

---

[7] Of course, as Kolon contends, DuPont cannot be awarded fees associated with its unsuccessful claims. However, where, as here, all of DuPont's claims were based on a common core of facts, that is a matter to be sorted out in calculating the fees, not in assessing the closeness of the VUTSA claim on which DuPont prevailed and which provides the predicate of fee entitlement.

14

litigation." (DuPont's Mem. Supp. at 3-4.) As examples of the "more egregious" litigation misconduct, DuPont cites:

- Kolon's multiple motions regarding trade secret specificity;

- Kolon's refusal to provide discovery regarding the full extent of its trade secret theft (requiring the Court to order Kolon to produce "every scrap" of information that Kolon got from Mitchell or any other former DuPont employee related to Kevlar®);

- Kolon's "document dump" of over "one million pages of irrelevant documents;"

- Kolon's refusal to allow DuPont to inspect its aramid production facility (requiring the Court to order compliance and DuPont to make a second trip to South Korea);

- Kolon's "manipulation of the managing agents" by which it attempted to hide its managing agents and prevent their depositions;

- Kolon's withholding of information about the Mitchell CD, resulting in more than an 18-month delay;

- Kolon's demand that DuPont conduct a second review of privileged documents from the Akzo litigation, requiring a review of more than 588 boxes of archived documents and resulting in no additional documents containing the name or initials of the trial judge; and

- Kolon's pretrial activities, including its identifying over 6000 exhibits and

> 134 trial witnesses but using less than
> 400 exhibits and presenting no Kolon
> witnesses.

(DuPont's Mem. Supp. at 3-18.)

Kolon's view is that this case involved the usual motions practice in intellectual property cases plus additional complex discovery issues that were complicated by contemplated criminal charges against Kolon and its employees. (Kolon's Opp'n at 8.)[8] Kolon takes the view that it had to file multiple motions "to learn the contours of DuPont's claims" and that its tactics were necessitated by the way DuPont pursued its claims. Kolon argues that it fully responded to DuPont's discovery requests, and that DuPont was also ordered by the Court to provide discovery sought by the opposition. Kolon contends that the so-called "document dump" took place pursuant to the parties' agreement and that Kolon provided certain Bates prefix identification. As to DuPont's arguments about the managing agents, Kolon argues that it acted properly, that DuPont refused to conduct the depositions in Korea at Kolon's expense, and that, during the depositions, DuPont never had to seek the intervention of the

---

[8] Throughout the time that this case was pending, federal authorities were investigating Kolon's conduct. On August 21, 2012, a grand jury returned an indictment charging Kolon and several employees with conspiracy to convert trade secrets, theft of trade secrets, and obstruction of justice. See United States v. Kolon Industries, Inc., et al., No. 3:12CR137 (E.D. Va. Aug. 21, 2012).

16

Court. Kolon says that the belated disclosures regarding the Mitchell CD were caused by DuPont's inaccurate requests for admission and its "pos[ing] unclear questions to a Kolon witness who was not designated to testify on the topic." (Kolon's Opp'n at 12-13.)

With regard to the inquiries related to the so-called "Akzo litigation," Kolon's position is that the Court held that these inquiries were appropriate, even though they came late. Finally, Kolon contends that the size of its initial exhibit and witness lists was dictated by the number and breadth of the trade secrets being asserted by DuPont and the fact that the parties' motions *in limine* were pending when the initial lists were filed. It contends that, by the time of the Final Pretrial Conference, it was able to cut its exhibit list in half and had removed many witnesses.

Having presided over this matter since 2009, the Court is familiar with the litigation tactics in this case. While some of the tactics can be attributed to zealous advocacy in an intellectual property case with great significance to both parties, the tactics used by Kolon must be described as

17

"Shermanesque."[9] For example, as previously determined, Kolon "persisted in filing repetitive motions, sometimes after the Court has decided a like motion, in filing motions with different captions addressing issues that have previously been presented and/or decided, in filing over 6,000 trial exhibits, and refusing to materially reduce the number of trial exhibits even after decisions on motions *in limine* should have produced that result, and [it] has filed several motions *in limine* that have been rejected in previously denied motions for summary judgment." (Notice, June 15, 2011 (Docket No. 1177).) That conduct substantially increased the burden of litigation for DuPont.

So too did Kolon's approach to discovery. Kolon resisted producing important documents and, even after being ordered to do so, the production often was made slowly, thereby making it necessary to delay or reschedule depositions. The dilatory approach was particularly prevalent in Kolon's largely unfounded opposition to providing information about the extent of the efforts it made to secure DuPont's trade secrets and in opposing the depositions of Kolon's managing agents, moving "its

---

[9] "Shermanesque" refers to Major General William Tecumseh Sherman's scorched earth policy as he destroyed much of the South on his March to the Sea in November and December, 1864.

[Kolon's] employees around like chessmen" in efforts to shield them from depositions. (Mem. Op., May 25, 2010, at 12 (Docket No. 213).) Kolon took "personnel actions (terminations and reassignments) that [it] then [] used as a ground to oppose the taking of the [managing agents'] depositions." (Id. at 28.) This all greatly increased the legal fees for Dupont.

Kolon also strung out discovery about how much information it had obtained from Michael Mitchell (the employee who pled guilty to theft of trade secrets and obstruction of justice) and how it had obtained that information. DuPont, therefore, was forced to incur significant expense to obtain this information which, of course, was of great importance and which should have been disclosed in response to DuPont's discovery requests.

The simple fact is that Kolon chose to conduct this case by fighting virtually every issue, by engaging in perhaps the most extensive motions practice possible, and with no view to settlement. Here, as in Saleh v. Moore, 95 F. Supp. 2d 555 (E.D. Va. 2000), aff'd sub nom. Saleh v. Upadhyay, 11 Fed. App'x 241 (4th Cir. 2001):

> [T]he prosecution of the case was made more difficult, and for the Plaintiffs more costly, by the presentation of a highly aggressive and comprehensive defense. The Defendants, of course, were entitled to mount a full scale defense if they were so advised, but, where, as here, a defense of

19

> that ilk is unsuccessful, the Defendants
> must pay for the fees reasonably incurred by
> their adversaries in meeting the defense.

95 F. Supp. 2d at 574. See also McAfee v. Boczar, No. 3:11CV646,
Nov. 2, 2012 Memorandum Opinion (Docket No. 130) ("Nov. 2, 2012
Mem. Op.").

DuPont is correct that it was required to incur significant
expense in responding to Kolon's efforts to inject into this
case DuPont's alleged waiver of trade secrets in a case tried in
this Court in 1986, Akzo, N.V. v. E. I. du Pont de Nemours and
Co., 635 F. Supp. 1336 (E.D. Va. 1986)(the "Akzo case"). In sum,
what happened was simply that Kolon tried to show that DuPont
had waived the trade secrets at issue in this case by presenting
evidence about them in the Akzo case without sealing the record
and by certain acts of DuPont's counsel in the Akzo case. Based
on the record before the Court when, in May 2011, it decided the
motions related to the waiver issue, the Court ruled as follows:

> [F]inding that Kolon has produced no
> evidence that any particular trade secret,
> much less a trade secret that is at issue in
> this litigation, was disclosed in the
> litigation between the plaintiff and Akzo,
> N.V. previously conducted in this Court, and
> further finding that the communications
> between counsel for the plaintiff and Akzo
> in that litigation on which the defendant
> relies to assert the existence of a waiver
> of confidentiality is inconclusive and does
> not prove the waiver of any trade secret at
> issue in this case and, therefore, further

20

finding that the proofs offered by the defendant as to the waiver that allegedly occurred in the Akzo litigation in this Court are speculative, and further finding that the two documents cited by the defendants as acts of disclosure of trade secrets in the Joint Appendix filed in the United States Court of Appeals for the Federal Circuit (which appendix is no longer in the public record, and as to which appendix there is no information respecting how long, if ever, the documents were in the public record, which appendix was obtained in this litigation only from the records of the plaintiff's counsel in the Akzo litigation in this Court) do not contain any trade secrets at issue in this litigation, and further finding that the defendant has not established even that those two documents contained any trade secrets given the detailed and limited nature of the information reflected in those documents, and further finding, for the foregoing reasons, that any evidence which the defendant purports to offer about the Akzo litigation is not relevant to this case, and further finding that any marginal relevance that could be found in such evidence is outweighed substantially by the prejudicial effect of the jury confusion, delay, and in the satellite litigation which admission of those documents would generate, it is hereby ORDERED that PLAINTIFF E.I. du PONT de NEMOURS AND COMPANY'S MOTION *IN LIMINE* TO PRECLUDE KOLON FROM PRESENTING EVIDENCE OR ARGUMENT AT TRIAL CONCERNING THE AKZO LITIGATIONS (Docket No. 431) is granted.

(Order, May 16, 2011 (Docket No. 1146), as amended to correct

typographical error by Order, Aug. 29, 2011 (Docket No. 1410).)

The Court also denied as moot Kolon's reciprocal MOTION *IN*

*LIMINE* TO EXCLUDE EVIDENCE OF THE CONFIDENTIALITY OF CERTAIN

AKZO DOCUMENTS (Docket No. 947) in view of the decision that granted DuPont's motion (Docket No. 431).

Later, after the close of discovery and in the final pretrial filings, Kolon filed a great many proposed exhibits that, according to Kolon, pertained to the alleged waiver issue. This, in turn, raised disputes about the use of those documents at trial, a dispute as to which DuPont prevailed because those documents were first presented after the close of discovery and in the final pretrial process.

In essence, by its belated presentation of these proposed exhibits, Kolon was making an effort to cure the legal insufficiency of the proofs that had led earlier to the rulings on the motions *in limine* on the waiver issue. DuPont needlessly incurred legal fees to oppose the use of these many documents that were not made available in discovery. This is yet another example of why Kolon's litigation tactics warrant an award of attorneys' fees.

The final pretrial litigation phase also was marked by tactics that greatly increased the litigation burden for DuPont. For example, Kolon listed some 6,000 trial exhibits, conduct that made it necessary for DuPont to review those putative exhibits, to prepare objections respecting many of them, and to be prepared to meet them. Kolon used only about 400 of those

22

exhibits. And, many of those exhibits, such as those related to the alleged Akzo case, were either never produced in discovery or produced only after the close of discovery.

Kolon listed 134 trial witnesses, making it necessary for DuPont to begin preparation for their appearances.[10] Kolon called only a few witnesses, none of whom were its officers or employees. Kolon's deposition designations followed the same course: many designations, minimal use at trial. The obvious consequence of Kolon's conduct in the final pretrial stage was to put significant burden on its adversary.

DuPont also incurred significant fees in defending against an untimely and unsuccessful recusal motion. There is no need to recount the facts and circumstances leading to that motion. The opinion resolving the motion speaks for itself. (Feb. 21, 2012 Memorandum Opinion (Docket No. 1949).)

The record leaves no doubt that Kolon's tactics in motions practice, in discovery, and in the final pretrial process were of the sort, and to the extent, that warrant a decision to allocate to it the burden that those tactics imposed on DuPont.

---

[10] Some, but not much, of this expense was mitigated by Court directives requiring the parties to identify witnesses a day or two before they were to appear.

### (3) The Flagrant or Good Faith Character of the Conduct In The Misappropriation

The factor looks principally at the nature of the misappropriator's conduct in respect of the acts of misappropriation. In patent law, therefore, willful infringement or inequitable or fraudulent conduct in procuring the patent brings this factor into play. Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005)(citations omitted). The record here establishes quite clearly that Kolon had tried, but, after years of effort, had failed to produce a product that would compete with DuPont's pararamid product, Kevlar®. Kolon, at the instruction of its chief executive and board chairman, set out to obtain DuPont's trade secrets. It pursued this objective diligently and in ways that it knew were not lawful. (Mem. Op., Aug. 30, 2012 (Docket No. 2051).) Kolon's conduct in effectuating the misappropriation was the epitome of flagrant bad faith. Hence, this factor counsels in favor of an attorneys' fee award to DuPont.

### (4) Other Factors Relative to the Allocation of the Burdens of Litigation

Kolon contends that the Court should consider the cumulative effect of the relief that DuPont already has achieved. It notes that DuPont sought and obtained adverse jury

24

instructions, sought a punitive damages award, and sought a permanent injunction.[11]

DuPont focuses on the issue of deterrence. As noted previously, the comment to the Uniform Trade Secrets Act § 4 makes the point that a court may award reasonable attorneys' fees "as a deterrent . . . to willful and malicious misappropriation," but cautions that "the court should take into consideration the extent to which a complainant will recover exemplary damages in determining whether additional attorney's fees should be awarded." See In re Wilson, 165 F.3d 913, 1998 WL 671658, *5 (4th Cir. 1998)(unpublished)(affirming the bankruptcy court's refusal to award attorney's fees because, among other reasons, "substantial exemplary damages were awarded" in the case and the plaintiff prevailed on only nine of twenty-seven trade secret claims); O2 Micro Intern. Ltd. v. Monolithic Power Systems, Inc., 399 F. Supp. 2d 1064, 1080 (N.D. Cal. 2005)(declining to award attorneys' fees under the California UTSA in part because of the exemplary damages awarded); Chetu, Inc. v. Salihu, 2010 WL 2680088 (S.D. Fl. 2010)(unpublished)(declining to award attorneys' fees under

---

[11] The Court granted DuPont's motion for punitive damages, but limited the award to $350,000, the maximum permissible punitive award under Virginia law, and the Court granted DuPont's motion for permanent injunction. (Docket Nos. 1696, 1697, 2051-2054.)

Florida UTSA since jury awarded $100,000 in punitive damages and same conduct serves as the basis for both punitive damages and attorneys' fees, thus an award of attorneys' fees would overcompensate the plaintiff).

The compensatory and punitive damages awarded and the permanent injunction granted do not detract from the propriety of an award of attorneys' fees in this case. The compensatory damages were awarded to compensate DuPont, and the punitive damage award was quite small, especially in perspective of Kolon's conduct in effecting the misappropriation and its "Shermanesque" litigation tactics. The injunction was granted to prevent Kolon from benefiting further from its unlawful conduct. But, these remedies do not compensate DuPont for the attorneys' fees it necessarily expended to protect its trade secrets.

DuPont incurred many millions of dollars in attorneys' fees to attempt to redress the wrongful acts committed willfully and maliciously by Kolon. Kolon met DuPont's efforts to redress those wrongs with all-out warfare. The award of attorneys' fees should serve to deter both Kolon, and others, from trade secret misappropriation. And, an award of fees will help relieve the burden that DuPont incurred in the efforts to protect its intellectual property.

26

Kolon's arguments to the contrary focus on the nature of the relief that DuPont has received so far. Those arguments are particularly hollow considering that Kolon has asserted that it cannot even afford to post an appeal bond and that the injunction has been stayed. But, even if the injunction were in effect and the judgment had been paid, a fee award would be appropriate because the record clearly and convincingly satisfies the principal factors in favor of an award (closeness of the case, Kolon's litigation tactics, and Kolon's bad faith misappropriation).

The factors identified in Read Corp. and Odetics, if applied here, also would support that conclusion. The record shows that: (1) Kolon deliberately copied the trade secrets, putting them to use in the manufacture of its pararamid product; (2) Kolon knew that the information it sought from DuPont's former employees was trade secret information but that made no difference to Kolon; (3) Kolon is part of a large, apparently well-heeled conglomerate; (4) Kolon's litigation tactics caused great burden to DuPont; (5) Kolon has taken no remedial action and is vigorously opposing any efforts to enforce the judgment for which it has not posted an appeal bond; and (6) Kolon tried to conceal its conduct both when it was underway and during the litigation.

27

For all the foregoing reasons, shifting the fee burden here serves in a real way as an instrument of justice. Superior Fireplace Co. v. Majestic Products Co., 270 F.3d 1358, 1378 (Fed. Cir. 2001). And, shifting the fee burden serves the deterrent purpose that a fee award under the VUTSA is intended to serve.

## 2. Title 28, United States Code, Section 1927, and the Court's Inherent Authority

DuPont seeks fees and costs pursuant to 28 U.S.C. § 1927 and the Court's inherent authority. Title 28, U.S.C. § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

To support an award under the Court's inherent authority, DuPont relies on Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991)(cited in United States v. Moussaoui, 483 F.3d 220 (4th Cir. 2007) for the proposition that "federal courts possess the inherent authority to sanction a party and lawyer appearing before the court"). DuPont contends that Chambers supports its position that the Court "has the inherent authority to award

28

sanctions" against a party, including attorneys' fees and nontaxable costs. (DuPont's Mem. Supp. at 18.) In Sanford v. Virginia, 689 F. Supp. 2d 802 (E.D. Va. 2010), the Court examined the standards for awarding fees under § 1927 and under the Court's inherent power to self-regulate.

### (a)  Section 1927

To secure an award under § 1927, the moving party is required to make three showings:

> First, the attorney [against whom sanctions are sought] must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiples the proceedings." Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Sanford v. Virginia, 689 F. Supp. 2d at 806 (quoting Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997)). "[F]or conduct to be vexatious, more than mere negligence is required." Id. at 809.[12] The explanation found in Sanford explains why this is so.

---

[12]  "[T]he other word used in the statute to describe an attorney's conduct, 'unreasonabl[e],' by contrast, does not connote anything more than mere negligence." Id. n.6.

29

First, in Christiansburg [Garment Co. v. EEOC, 434 U.S. 412, 421 (1978)], the Supreme Court of the United States explicitly adopted a definition of "vexatious," in a comparable context, that did not require subjective intent by the party against whom sanctions are sought. Second, as the Sixth Circuit explained in Jones [v. Continental Corp., 789 F.2d 1225, 1230 (6th Cir. 1986)], if subjective bad faith is required for § 1927 sanctions, then § 1927 adds nothing to the Court's inherent powers but a legislative imprimatur, and the Court agrees with Jones that Congress intended the words of § 1927 to have effect. Third, adopting a definition of "vexatious" that does not have a strict subjective bad faith predicate allows the court more flexibility in sanctioning conduct when proceedings are multiplied. When proceedings are multiplied due to an abdication of professional duty, even when that duty is not explicitly recognized and rejected by the offending party, sanctions are warranted. There must be a mechanism for holding accountable lawyers, as officers of the court, who act "with an empty head and a pure heart, Braley [v. Campbell, 832 F.2d 1504, 1512 (10th Cir. 1987)], to the detriment of the Court and the opposing party, by multiplying the proceedings in a manner that harasses opposing litigants and burdens the Court.

Often, as in many of the decisions discussed above, the difference among the various standards will be academic. But the difference matters when an attorney engages in "reckless" behavior that demonstrates a conscious disregard for a foreseeable risk that proceedings will be unreasonably and vexatiously multiplied. In such instances, such as that in [Mitchell v.] Sonies, [1995 WL 330870 (4th Cir. June 5, 1995)], sanctions may well be warranted notwithstanding the absence of any other evidence of bad faith intent, or even of

> conduct that any reasonable, objective
> person would necessarily conclude was
> conducted in bad faith.

Id. at 810-11.

Section 1927 "must be strictly construed and utilized only in instances evidencing a serious and standard disregard for the orderly process of justice." Lewis v. Circuit City Stores, Inc., 500 F.3d 1140, 1153 (10th Cir. 2007); see also LaSalle Nat'l Bank v. First Conn. Holding Grp., 287 F.3d 279, 288-89 (3d Cir. 2002)("The 'courts should exercise this sanctioning power only in instances of a serious and studied disregard for the orderly process of justice,'" and "the statute should be construed narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law."); Mone v. Comm'r, 774 F.2d 570, 574 (2d Cir. 1985)(same).

Moreover, an award of sanctions under § 1927 may not be appropriate when both parties have aggressively litigated the case, as was the case here. See Hillman Lumber Prods., Inc. v. Webster Mfg., Inc., 727 F. Supp. 2d 503, 508 (W.D. La. 2010)(sanctions under § 1927 were inappropriate where the "delays were the result of the zealous, often contentious and generally less than genteel conduct of counsel for *both* parties")(emphasis in original); Corley v. Rosewood Care Center,

31

Inc., 388 F.3d 990, 1014 (7th Cir. 2004)(affirming the district court's "sound decision" not to sanction under § 1927, which "is permissive, not mandatory," where each side contributed to the "outrageous delays and expenses with its own unreasonable litigation tactics").

In this case, as in Sanford, it cannot be said that the defense attorneys "displayed [] a reckless disregard of their ethical duties." Notwithstanding the nature of Kolon's litigation tactics, as discussed previously, the actions do not satisfy the standard for the imposition of sanctions under section 1927.

### (b)   The Court's Inherent Power

The Court's inherent power is described in detail in Sanford, which relies on Royal Insurance v. Lynnhaven Marine Boatel, Inc., 216 F. Supp. 2d 562 (E.D. Va. 2002).

> The power, "incidental to all courts," allows district courts to sanction attorneys who inhibit courts' ability "to manage their own affairs." The power allows a court to sanction an attorney's actions taken in bad faith, wantonly, oppressively, or vexatiously. The power "ought to be exercised with great caution," in circumstances such as those involving "the very temple of justice [being] defiled."

Sanford, 689 F. Supp. 2d at 813 (emphasis added). Moreover, "[t]he Court's inherent power to impose sanctions is in some

32

respects broader, and in other respects narrower, than its
authority to impose sanctions pursuant to § 1927." Id.

> It is broader, in that it covers every type
> of litigation misconduct, unlike rule-based
> and statutory authorities such as Rule 11,
> Rule 37, and § 1927, which concern
> themselves with specific types of
> misconduct. But, the Court's inherent power
> is narrower in that the misconduct required
> is almost always something more egregious
> than that required for other types of
> sanctions.

Id. Given the determination that the misconduct in this case
does not rise to the level of that required under § 1927, the
Court cannot find that the misconduct satisfies the higher
standard required to impose sanctions pursuant to the Court's
inherent power.

For these reasons, the MOTION FOR FEES, SANCTIONS AND COSTS
pursuant to section 1927 and the Court's inherent authority will
be denied.

## 3.   The   Standard   for   Determining   Reasonableness   of Attorneys' Fees

The VUTSA does not instruct the judiciary what is to be
taken into account in determining whether a requested fee award
made under section 59.1-338.1 is reasonable in amount. Nor is
such guidance supplied by the Uniform Act or its comments.

Citing an unpublished opinion from the United States Court
of Appeals for the Fourth Circuit, Kolon contends that, when

awarding fees under the VUTSA, the Court should look to Virginia's standards for determining whether the fee is reasonable. In Peter Farrell Supercars, Inc. v. Monsen, 82 F. App'x 293, 300, 2003 WL 22852654 (Dec. 3, 2003)(unpublished), the Fourth Circuit, in reviewing a fee award under the Virginia Consumer Protection Act, held that "[b]ecause the district court granted fees pursuant to a Virginia statute, we look to Virginia's standards for determining if the fee award is reasonable."

DuPont does not address the Virginia standard for determining whether a fee request is reasonable. Instead, it frames the request under decisions of the Fourth Circuit which review fee awards under the lodestar method as informed by the so-called twelve Johnson factors. See, e.g., Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243 (4th Cir. 2009)(holding in Fair Credit Reporting Act case that "[i]n calculating an award of attorney's fees, a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate" and should be guided by the twelve factors from Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994); Barber v. Kimbrell's, Inc., 579 F.2d 216, 226 n.28 (4th Cir. 1974); Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)). DuPont also cites decisions

of the Supreme Court to the same end. See e.g., Perdue v. Kenny A., 130 S. Ct. 1662, 1673 (2010)(holding that "there is a 'strong presumption' that the lodestar figure is reasonable"); Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984); Hensley v. Eckerhart, 461 U.S. 424, 436 (1983).

In Perdue, the Supreme Court "relegated the Johnson approach to the sidelines in fee analysis." McAfee v. Boczar, Nov. 2, 2012 Mem. Op., at 12. That was because the Johnson approach gave very little guidance about how to set fees, "placed unlimited discretion in trial judges and produced disparate results." Perdue v. Kenny A., 130 S. Ct. at 1672 (internal quotation and citation omitted). More importantly, in Perdue, the Supreme Court endorsed the lodestar method of fee setting (reasonable hourly rates multiplied by the number of hours reasonably expended) as the preferred mode of fee analysis under federal law. Id. In so doing, the Court made clear that the lodestar fee, if properly calculated, enjoys a strong presumption of reasonableness from which departures will be permitted rarely and then only in extraordinary circumstances. Perdue v. Kenny A., 130 S. Ct. at 1677, 1678; McAfee v. Boczar, Nov. 2, 2012 Mem. Op., at 12.

In Perdue, the Supreme Court also gave guidance about how to apply the lodestar method. McAfee v. Boczar, Nov. 2, 2012

35

Mem. Op., at 12-13. Hence, if the lodestar method, rather than state law, provides the mode of analysis, it will be that which is prescribed by Perdue.

Neither in Perdue, which involved a fee request made under federal law, nor elsewhere has the Supreme Court decided how federal courts are to determine fee requests under any version of the Uniform Act. And, the only Fourth Circuit decision on the point is unpublished and thus is not of precedential force.

Given the positions taken by the parties, it is necessary to decide which standard applies to making the reasonableness determination in this case – the Virginia approach or the federal lodestar method. A review of federal decisions under various states' versions of the Uniform Act discloses that many courts do not actually address this issue. And, a number of courts simply apply the federal lodestar method even though the fees are being awarded based on a state statute, without addressing which standard applies and why. See, e.g., Sun Media Systems, Inc. v. KDSM, LLC, 587 F. Supp. 2d 1059, 1075 & n.12 (S.D. Iowa 2008)(finding, without explanation, the lodestar calculation to be "appropriate in this case" to the determination of fees pursuant to the Iowa Uniform Act in a case that also involved the Copyright Act, which "has been interpreted as requiring the . . . lodestar method"); Contract

Materials Processing, Inc. v. Kataleuna GMBH Catalysts, 222 F.
Supp. 2d 733, 750-51 (D. Md. 2002)(applying the lodestar method
and federal decisional law without explanation in a Maryland
Uniform Trade Secrets Act case); Mattern & Assocs., LLC v.
Seidel, 678 F. Supp. 2d 256, 272 (D. Del. 2010)(applying the
lodestar approach and federal decisional law without explanation
in a Delaware Uniform Trade Secrets Act case); Stilwell
Development, Inc. v. Chen, 1989 WL 418783, at *5, No. CV-86-4487
(C.D. Cal. 1989)(applying the lodestar calculation and federal
decisional law with no discussion of state decisions in a
California Uniform Trade Secrets Act case). A recent decision
from the Middle District of Florida noted that "Florida follows
the federal 'lodestar' approach, which requires multiplying the
number of hours reasonably expended by a reasonable hourly
rate," thus eliminating any issue with regard to which standard
to apply. Knights Armament Co. v. Optical Systems Technology,
Inc., 2012 WL 3932863, at *10 (M.D. Fla. Aug. 20, 2012).

However, application of the federal lodestar method, to
some extent, is at odds with the general principle that: "'[i]n
an ordinary diversity case where the state law does not run
counter to a valid federal statute or rule of court, and usually
it will not, state law denying the right to attorneys' fees or
giving a right thereto, which reflects a substantial policy of

the state, should be followed.'" <u>Aleyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 259 n.31 (1975)(internal citation omitted). "Federal courts sitting in diversity cases thus customarily will apply state "fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees.'" <u>Degussa Admixtures, Inc. v. Burnett</u>, 277 Fed. App'x 530, 532, 2008 WL 1960861, at *2 (6th Cir. 2008)(quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 52 (1991)).

In <u>Hitachi Credit America Corp. v. Signet Bank</u>, 166 F.3d 614, 631 (4th Cir. 1999), the Fourth Circuit stated: "We apply Virginia law to determine whether an award of attorneys' fees and costs to Hitachi is warranted." To support that statement, the Fourth Circuit relied on <u>Culbertson v. Jno. McCall Coal Co.</u>, 495 F.2d 1403, 1405-06 (4th Cir. 1974), which, citing <u>Sperry Rand Corp. v. A-T-O, Inc.</u>, 447 F.2d 1387 (4th Cir. 1971), held that state law with respect to attorneys' fees and costs should ordinarily be followed in diversity cases. But those decisions do not explicitly address whether Virginia law applies to determine the calculation and reasonableness of the fee award, as opposed to whether an award is warranted at all.

The Ninth Circuit and the Sixth Circuit have held that a federal court sitting in diversity is governed by state

standards in deciding whether to award attorneys' fees under state versions of the Uniform Act. In CRST Van Expedited, Inc. v. Werner Enterprises, Inc., 479 F.3d 1099 (9th Cir. 2007), the Ninth Circuit affirmed an award of attorneys' fees to the defendant in a trade secret misappropriation claim made under the California Uniform Trade Secret Act.   Cal. Civ. Code § 3426.4 (2004) provides in part: "If a claim of misappropriation is made in bad faith . . . or willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."[13] The Ninth Circuit noted, as a preliminary matter, that the state statute "properly was applied by the district court under the rule of Erie v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), which requires federal courts sitting in diversity to apply state substantive law and federal procedural law." 479 F.3d at 1111. The Ninth Circuit explained, "We have held that when state statutes authorize fee awards to litigants in a particular class of cases, the statutes are substantive for Erie purposes if there is no direct collision with the Federal Rules." Id. (citations omitted).

---

[13] The Ninth Circuit also noted that the California statute was amended in 2006, after the district court proceedings, to permit the award of "costs" as well as attorneys' fees.

In Degussa Admixtures, Inc. v. Burnett, 277 Fed. App'x 530, 532, 2008 WL 1960861 (6th Cir. 2008), the Sixth Circuit considered the fee award provision in the Michigan Uniform Trade Secrets Act and concluded that "[f]ederal courts sitting in diversity thus customarily will apply state 'fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees.'" Id. at *2 (citation omitted). The Sixth Circuit ruled that the Michigan Uniform Trade Secrets Act "amounts to a substantive rule under Erie, requiring federal courts to apply it in a diversity case." Id.

The fee-shifting provision of the VUTSA meets the tests of Aleyeska and Chambers. However, neither Aleyeska, Chambers, Degussa, nor Hitachi address what is to be taken into account to determine the reasonableness of a fee in cases wherein a federal court is sitting in diversity but applying a state fee-shifting statute reflecting state policy.

In Mathis v. Exxon Corp., 302 F.3d 448, 461 (5th Cir. 2002), the Fifth Circuit held, in a non-trade secrets case, that: "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." More recently, in Chevron USA, Inc. v. Aker Maritime Inc., 689 F.3d 497, 505 (5th Cir. 2012), the Fifth

Circuit considered a challenge to the reasonableness of a fee award in a breach of contract case. Noting first that "[a] fee award is governed by the same law that serves as the rule of decision for substantive issues in the case," the Fifth Circuit affirmed the award as reasonable because, in Louisiana, "the amount of an attorneys'-fee award is governed by Rule 1.5 of the Rules of Professional Conduct," and the state factors "are very similar to those used in the federal 'lodestar' method. Id.[14]

The commentators provide more guidance. For example, according to Moore's Federal Practice, "[s]tate law generally governs a litigant's entitlement to an award of attorney's fees because attorney fee statutes are substantive state law." Moore's Federal Practice § 124.07[3][b] (2008). "Stated differently, a federal court sitting in diversity applies state law in determining whether to allow attorney's fees when those fees are connected to the substance of the case." Id. And, according to Moore's, state law respecting the method of

---

[14] A review of the underlying district court opinion indicates, interestingly, that the district court mistakenly applied the lodestar calculation with the Johnson factors as adjustments and cited federal decisions, including Hensley and decisions from the Fifth Circuit. The Fifth Circuit decision essentially glosses over this error, ruling that "[b]ecause the court applied factors essentially identical to those required by Louisiana law, it did not abuse its discretion." 689 F.3d at 506.

41

calculating and determining the reasonableness of the fees is a matter of substantive law.

> When state law controls, state law governs not only the right to fees, but also the method of calculating the fees. The method of calculating a fee is an inherent part of the substantive right to the fee itself and reflects substantive state policy.

Moore's Federal Practice § 124.07[3][b] (2008)(citing Mangold v. California PUC, 67 F.3d 1470, 1478-79 (9th Cir. 1995)(state law formula used to calculate fees because otherwise it would result in forum shopping)); Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 475 (1st Cir. 1988)(federal lodestar method rejected in favor of Massachusetts law that looked to party's agreement with lawyers); Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992)(state law determined what records had to be submitted to substantiate fees); Davis v. Mutual Life Ins. Co., 6 F.3d 367, 382-83 (6th Cir. 1993), cert. denied, 510 U.S. 1193 (1994)(state law multiplier used to calculate attorney's fee)). See also Rodriguez v. Disner, 688 F.3d 645, 653 n.6 (9th Cir. 2012)(confirming that, if the court was exercising diversity jurisdiction, "state law would control whether an attorney is entitled to fees and the method of calculating such fees")(citing Mangold, 67 F.3d at 1478-79); In re Volkswagen & Audi Warranty Extension Litigation, 692 F.3d 4,

15, 21-22 (1st Cir. 2012)(holding that, if jurisdiction is based on diversity, then the award and calculation of attorneys' fees is governed by state law); Northon v. Rule, 637 F.3d 937 (9th Cir. 2011)(holding that state laws awarding attorneys' fees are generally substantive under the Erie doctrine when the fee award is connected to the substance of the case); Scottsdale Ins. Co. v. Tolliver, 636 F.3d 1273, 1279 (10th Cir. 2011)(restating its previous holding that, in diversity cases, attorneys' fees are a substantive matter controlled by state law and distinguishing between substantive fees that are tied to the outcome of the litigation and procedural fees that are based on a litigant's bad faith conduct during the litigation); Chin v. Chrysler LLC, 538 F.3d 272, 278-79 (3rd Cir. 2008)(same).

In Federal Practice & Procedure, the commentators admit that the issue has received different treatment in different decisions.

> Some cases have treated the state policy permitting or forbidding an allowance of fees as 'substantive' and have held it applicable in a federal court; other cases have held that a federal judge has discretion to allow or disallow the fees, and have concluded that the judge's exercise of this discretion is not to be fettered by state doctrines relating to attorney's fees.

10 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedures § 2669 (3d

ed. 2012). See, e.g., MRO Communications, Inc. v. American Telephone & Telegraph Company, 197 F.3d 1276, 1281 (9th Cir. 1999)("In an action where a district court is exercising its subject matter jurisdiction over a state law claim, so long as 'state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed."). However, Wright, Miller, Kane & Marcus conclude that the decisions which hold that state law controls "appear analytically sounder," both when the state law forbids an award of attorney's fees and "in the converse situation – when state law provides for the recovery of an attorney's fee as part of the claim being asserted." Id.

The foregoing convinces that the sounder view is that, where state law supplies the rule of decision in a case, state law governs both whether to award fees and the determination whether the requested fee is reasonable. That certainly is the holding in Peter Farrell which, albeit an unpublished decision, expresses the sound view reflected by the commentators and the Fifth, Sixth, and Ninth Circuits.

44

## 4.   The Virginia Standard

As noted previously, under Virginia law, when "deciding whether a party has shown the reasonableness of the fees, the fact finder may consider, *inter alia*, the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate." Schlegel v. Bank of Am., N.A., 628 S.E.2d 362, 369 (Va. 2006); West Square, LLC v. Communication Technologies, Inc., 649 S.E.2d 698, 702 (Va. 2007).[15]  Those decisions make it clear that these are factors that a fact-finder "'may consider' in determining the amount of reasonable attorneys' fees to be awarded to a prevailing party," but that the Supreme Court of Virginia has not stated "that a fact-finder must consider all these factors in every situation." Instead, the Supreme Court held that "[i]n the determination of reasonable attorneys' fees, particular

---

[15]  A recent opinion from the Circuit Court for the City of Norfolk held that it also was appropriate to consider "the lawyer's experience, ability and reputation." Nedelka v. Kia Motors of America, Inc., 77 Va. Cir. 379, 2009 WL 7310705 (Va. Cir. Ct. 2009). However, the Supreme Court of Virginia has not yet taken that view. Moreover, that factor would seem to be considered in assessing whether the fee requested is similar to fees generally charged for similar services, which is one facet of the Virginia standard.

45

factors may have added or lessened significance depending on the circumstances of each case." 649 S.E.2d at 703.

Neither party has briefed the reasonableness of the fee request with reference to the Virginia standard. However, "federal law - which requires consideration of similar factors - also may be consulted to the extent it is a 'persuasive, nonconflicting guide in interpreting reasonable fees under Virginia law.'" Airlines Reporting Corp. v. Sarrion Travel, Inc., 846 F. Supp. 2d 533, 537 (E.D. Va. 2012)(citing GE Supply, a Div. of General Elec. Co. v. Thomas, 62 F.3d 1414, at *7 (4th Cir. 1995)(unpublished)). In GE Supply, the Fourth Circuit notes that the district court's "memorandum order does an admirable job of making this point clear: 'Federal cases stating general principles regarding how to decide on the amount of an attorney fee award can be applied to this case, as they flesh out the meaning of "reasonable," and are not in conflict with the Virginia cases.'" 62 F.3d. at *7 (quoting Joint Appendix 641, n.1)(emphasis added by Fourth Circuit). In Airlines Reporting Corp., the district court noted that federal law may be consulted "because Virginia law and federal law are essentially congruent on the factors to consider in assessing the reasonableness of a fee request." 846 F. Supp. 2d at 537 n.4

46

(citing Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership, 730 F. Supp. 2d 513, 519 n.3 (E.D. Va. 2010)).[16]

Notwithstanding the similarity between the Virginia approach and the federal approach, a proper respect for state law and, indeed, federalism itself necessitates that where, as here, state law controls an issue, the parties and the Court must analyze it using state law as the touchstone. That is of considerable significance in the analysis of this fee request because, as a consequence of Perdue v. Kenny A.,[17] federal law affords strong presumptive force to the lodestar figure while Virginia law does not, taking instead a more nuanced approach.

The parties have not discharged these obligations because their analyses of the fee request focused largely on the federal approach. Indeed, DuPont's analysis was conducted solely under the federal approach. And, although Kolon identified the Virginia standard, its papers, for the most part, responded in DuPont's analytical structure. That will not do, especially

---

[16] In McAfee v. Boczar, the Court examined what is left of Johnson after Perdue and determined that Johnson factors 3, 4, 5, 6, & 9 are implicated in the reasonableness of the rate, and that factors 1, 2 & 7 are implicated in the assessment of the number of hours reasonably expended, and thus these eight factors are "subsumed in the lodestar calculus." McAfee, Nov. 2, 2012 Mem. Op. at 13-14.

[17] Perdue v. Kenny A., 130 S. Ct. at 1673, 1677, 1678; McAfee v. Boczar, Nov. 2, 2012 Mem. Op., at 7.

considering the size of the fee request and the volume of information offered to support it. Therefore, the parties will be required to further brief the issues in perspective of the Virginia approach to analyzing the reasonableness of a fee award.

Further briefing is also appropriate because DuPont's request for fees and costs under 28 U.S.C. § 1927 and the inherent judicial power has been denied. And, Va. Code § 59.1-338.1 does not authorize an award of expenses, permitting only an award of fees.

A review of DuPont's fee request discloses that the fee component actually seeks recompense for items that are expenses. For example, the fee request includes items such as copying and printing costs, telephone charges, travel expenses, postage, meal expenses, delivery services, and other non-fee items. DuPont must excise from its request these and all other like items.[18]

Nor has DuPont presented its request in a way that permits the Court adequately to assess the reasonableness of an important component of any reasonableness determination: the hours expended factor. A general review of the time records

---

[18] Computerized legal research is considered as fees in some jurisdictions. Whether Virginia would allow such treatment must be briefed.

suggests that the hours expended in the case were reasonably and necessarily expended. But, there are hundreds of pages of time entries and thousands of individual entries.

It is unreasonable to expect the Court to be able to make a meaningful judgment based only on raw data. Rather, it is the applicant's responsibility to categorize the time spent in some logical way, such as time devoted to paper discovery, motions, document review, depositions, work with experts, trial preparation, trial, instruction preparation, to name a few examples, and then to set out the total hours (and the related amount of fees) by those categories. Of course, time spent solely on unsuccessful claims must be excluded. Further, the applicant must set out the total number of hours for which recompense is sought. Only then can the Court make a meaningful assessment of the reasonableness of the time expended component of the fee calculus.

Because Kolon has not contested the hourly rates in the fee request, there is no need to further address that issue.[19] And,

---

[19] In a footnote, Kolon states that it "incorporates by reference" arguments made attacking the reasonableness of fees in opposition to DuPont's APPLICATION FOR ATTORNEY'S FEES AND EXPENSES RELATED TO KOLON'S SPOLIATION OF EVIDENCE ("Application"). (Kolon's Opp'n at 28 n.24.) But in Kolon's response to the Application, Kolon states, "Kolon does not dispute the reasonableness of the hourly rates." (Kolon's Opp'n (Docket No. 1650) to Application (Docket No. 1637), at 14 n.8.)

during the litigation, Crowell & Moring changed its billing arrangement from an hourly structure to a flat monthly fee arrangement with a success factor add-on. Kolon has not objected to that compensation mode either but that does not excuse the need for DuPont to demonstrate the reasonableness of the time expended under that arrangement.

Beyond that, the fee request dates back to 2007 while the case was not filed until February 2009. Although it is conceivable that a reasonable fee can include work that predated the filing of the case, it is questionable whether time spent for two years before filing may be awarded. But, in any event, DuPont has not explained why a request that reaches back two years is reasonable.

For the foregoing reasons, further briefing will be required so that the application can be assessed under Virginia law and in a meaningful way. To that end, DuPont and Kolon will be permitted to file briefs addressing the reasonableness of the fee request under Virginia law.

## 5.  Costs

DuPont also seeks reimbursement of non-taxable costs in the amount of $10,316,534.78.[20] DuPont's briefs do not discuss those

---

[20]  Taxable costs were taxed by the Clerk in the amount of $87,270.85 on December 3, 2012. (Docket No. 2200.)

costs, although they are addressed to some extent in the affidavits and supporting exhibits. Nor does Kolon address the claimed non-taxable costs. Moreover, given the decision that DuPont is not entitled to a recovery under either section 1927 or the Court's inherent authority, and given that Va. Code Ann. § 59.1-338.1 provides only for an award of fees,[21] there is no valid basis for the award of non-taxable costs to DuPont. Accordingly, the MOTION FOR FEES, SANCTIONS, AND COSTS will be denied as to non-taxable costs.

## CONCLUSION

For the reasons stated herein, the MOTION FOR FEES, SANCTIONS AND COSTS will be granted in part, denied in part, and taken under advisement in part, pending further briefing.

It is so ORDERED.

/s/   _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 13, 2012

---

[21] The statute provides that: "[i]f the court determines that . . . (ii) willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party" (emphasis added).

51